BAKER LAW, PC
George Richard Baker, Cal. Bar No. 224003
436 N. Stanley Avenue
Los Angeles, California 90036
Telephone:  323.452.9685
richard@bakerlawpc.com

ROSE LAW GROUP, PC
Kathryn Honecker (admitted *pro hac vice*)
Audra Petrolle (admitted *pro hac vice*)
7144 E Stetson Drive, Suite 300
Scottsdale, Arizona  85251
Telephone:  480.505.3936
khonecker@roselawgroup.com
apetrolle@roselawgroup.com
docket@roselawgroup.com

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM RUSHING, Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> WILLIAMS-SONOMA, INC., a Delaware corporation, also d/b/a Williams-Sonoma, and Williams-Sonoma Home, Pottery Barn, PB Teen, and PB Dorm, Pottery Barn Kids, Pottery Barn Baby, and West Elm; WILLIAMS-SONOMA DTC, INC., a California corporation; WILLIAMS-SONOMA ADVERTISING, INC., a California corporation; and DOES 1-30, <br><br> Defendants. | Case No. 3:16-cv-01421-WHO <br><br> *Assigned to the Hon. William H. Orrick* <br><br><br> **FIFTH AMENDED CLASS ACTION COMPLAINT** <br><br><br> <u>CLASS ACTION</u> <br><br> DEMAND FOR JURY TRIAL |

Plaintiff William Rushing, on behalf of himself and all others similarly situated, brings this

Complaint against Defendants Williams-Sonoma, Inc., also d/b/a Williams-Sonoma, Williams-

Sonoma Home, Pottery Barn, PB Teen, PB Dorm, Pottery Barn Kids, Pottery Barn Baby, and West Elm; Williams-Sonoma DTC, Inc.; Williams-Sonoma Advertising, Inc.; and Does 1-30 (collectively, "Defendants"), and based on personal knowledge with respect to himself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters alleges as follows:

## NATURE OF THE CASE

1.      This case is about truth in advertising.  The manufacturer, merchant, and marketer in this case are all the same—Williams-Sonoma, Inc.  Williams-Sonoma, Inc. ("WSI") is one of the country's largest retailers of home goods through a variety of brands, including Williams-Sonoma, Williams-Sonoma Home, Pottery Barn, Pottery Barn Kids, Pottery Barn Baby, Pottery Barn Teen, PB Teen, PB Dorm, and West Elm (WSI's "Brands").  WSI has established a reputation as a purveyor of quality home products.  Nobody would expect that WSI would advertise 600 thread count cotton bedding that does not, in fact, contain 600 threads per square inch as indicated on the label.  But that is exactly what WSI is doing.  WSI is relying upon its Brands' established reputations as high-end retailers to pass off inferior products to consumers.  They market to affluent and aspiring consumers who are willing to pay a premium price for a premium product.  But what WSI advertises is not necessarily what it delivers, particularly when it comes to its bedding products.

2.      Twenty years ago, most consumers did not judge their bedding selection by the same criteria as they do today.  Over the last two decades, manufacturers, merchants, and marketers have stepped in to educate consumers about factors that lead to better quality bedding.  Included as one of these factors is the fabric's thread count, with the message being "the higher, the better."  Bedding with higher thread counts are more durable, and will feel denser and smoother than those with lower thread counts.

3.      Unfortunately, to gain a competitive edge, some manufacturers, merchants, and marketers have strayed from the industry standard for calculating thread count and have

1   intentionally misled consumers into believing they are purchasing higher thread count bedding—

2   and attach higher price tags matching that false quality.

3        4.      The term "bedding" as used herein shall mean and refer to bed sheets, pillowcases,

4   shams, and duvets.

5        5.      Within the textile industry, an advertised thread count must fall within 5% of the

6   fabric's actual thread count to be considered accurate (the "allowed deviation").  And, according

7   to the Industry Standard, which is reflected in the American Society for Testing and Materials

8   International (ASTM) Standard ASTM D3775, in calculating that thread count, whether bedding

9   is constructed from 1-ply or 2-ply thread does not alter the calculation because a thread's plies are

10  not included in the calculation.

11       6.      However, despite industry practice, international standards, and instruction from

12  the Federal Trade Commission (FTC) as to the proper method for calculating and presenting thread

13  counts, some merchants—including Defendants—grossly inflate their bedding's thread count

14  numbers.

15       7.      Investigation has revealed that WSI is engaged in a pattern and practice of not

16  following the textile industry's generally accepted method for calculating thread count and instead

17  improperly inflates the advertised thread counts for many of its most expensive bedding products,

18  specifically its bedding labeled as having a thread count of 350 or greater (hereafter referred to as

19  "higher thread count").

20       8.      A single Industry Standard applies to bedding constructed of one- or multi-ply

21  thread—ASTM D3775.  This Standard specifically provides that multi-ply thread is to be counted

22  as a single thread for calculating thread count.

23       9.      Nevertheless, in Defendants' motion to dismiss Mr. Rushing's Third Amended

24  Complaint (Doc. No. 26, "motion to dismiss"), Defendants admitted that they count each ply in

25  WSI's bedding made of two-ply thread, thereby calculating, labeling, marketing, and advertising

26  thread counts for its bedding that doubles the thread count that would have been calculated using

27  the Industry Standard.

28

10.     In adopting ASTM D3775, the ASTM specifically rejected Defendants' method of calculating thread counts.

11.     Many of the bedding WSI advertises are an average thread count of 200 threads per inch and bear non-thread count identifying names, such as "Leaf Embroidered Linen Bedding," "Peyton Sheet Set," "Dottie Sheet Set," "Organic Harmony Sheet Set" or "Polka Dot Sheet Set." The allegations in this case are not directed at that type of bedding.  Nor is this case directed at WSI's bedding that does not disclose its thread count on its label or in Defendants' marketing or advertising materials.

12.     However, each of WSI's brands also sells some higher thread count bedding.  For those bedding items, WSI strays from its practice of marketing its bedding with vague statements about luxury, comfort, or design to marketing with specific statements about its beddings' thread counts.  The stated thread count is not buried in the products' descriptions, but stated in the first sentence of each of those product's narrative descriptions.   WSI has even named some of its bedding after their purported thread count numbers.

13.     For example, the bedding Mr. Rushing purchased from WSI's website was named "Signature 600-Thread-Count Sateen Bedding." WSI then repeated the thread count again in the first line of the product's description: "Sewn from lustrous 600-thread-count two ply Egyptian-cotton sateen, our Italian bedding becomes even richer in texture with use and laundering."[1]

14.     Unfortunately for Mr. Rushing and anyone else who purchased the "Signature 600-Thread-Count Sateen Bedding," its thread count was not 600, but merely 291.  Nevertheless, WSI charges consumers $499 for one king size set of its 291 thread count bedding.

15.     Defendants know that consumers value higher thread count bedding and are willing to pay a premium for bedding marketed with higher thread counts. Defendants' knowledge of the

---

[1] Available at http://www.williams-sonoma.com/products/signature-600-thread-count-sateen-sheeting/?pkey=chome-sheet-sets&&chome-sheet-sets.

materialness of thread count is evidenced by its inclusion of that information in the names and/or descriptions of WSI's most expensive bedding.

16. Defendants intended to mislead customers into believing they were purchasing higher thread count bedding than they were actually getting. Defendants' scheme and pattern of cheating consumers is facilitated by the inability of consumers to readily discern the actual thread count of the bedding with the untrained and naked eye—a fact that furthers Defendants' scheme of cheating its customers and unjustly profiting from its illegal and fraudulent business practices.

17. Plaintiff brings this action as a class action on behalf of himself and all persons in the United States who during the limitations period purchased bedding, including sheets, pillowcases, duvet covers, and shams, from Williams-Sonoma, Inc. that was (1) advertised as having a thread count of 350 or greater and (2) made of two-ply construction as identified in the list of Bedding Products.

18. As Defendants' conduct is unlawful, Plaintiff, on behalf of himself and the proposed Class, now seeks damages, equitable and injunctive relief, and other remedies for Defendants' deceptive and unlawful conduct.

## JURISDICTION AND VENUE

19. The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the proposed class has more than 100 class members, the Plaintiff is a citizen of a state different from any Defendant, and the matter in controversy exceeds the sum of $5 million.

20. The Court has personal jurisdiction over Defendants because they are each incorporated in the State of California. Defendants also purposefully avail themselves of the benefits of doing business in the State of California by maintaining their principal places of business and marketing and selling the products at issue in California, so as to render the exercise of jurisdiction by this Court consistent with notions of fair play and substantial justice.

21. Venue is proper in the District of San Francisco pursuant to 28 U.S.C. § 1391(b) because Defendants each reside and maintain their principal place of business at 3250 Van Ness

Avenue, San Francisco, San Francisco County, California.   The wrongdoing alleged herein emanated from William-Sonoma's San Francisco Corporate Headquarters.

22.     In compliance with California Civil Code § 1780(d), Plaintiff's venue affidavit is filed concurrently herewith as **Exhibit A**.

**CHOICE OF LAW**

23.     California law governs the claims asserted herein.

24.     No enforceable choice-of-law agreement governs here or compels the application of different states' laws.

25.     California's interest in this action, which seeks to protect the rights and interests of California and other U.S. residents against a company doing business in California, is greater than any other State.

26.     A common nucleus of facts and legal issues dominates this litigation.   Although some class members may possess slightly differing remedies based on state statute or common law, the claims asserted by the Plaintiffs are predicated on the same core facts and legal claims with substantially the same relevant elements.   To the extent distinct remedies may exist, they are local variants of a generally homogenous collection of causes of action that include consumer fraud and unjust enrichment.

27.     California has the most significant relationship with the parties to the events and occurrences that form the basis of the litigation.   Each Defendant in this case is a California corporation and maintains its principal place of business in and operates out of California.   WSI operates at least one retail store for each of its Brands, if not the majority of its stores, in California.

28.     Application of California law is neither arbitrary nor fundamentally unfair, because California has significant contacts and a significant aggregation of contacts that create a state interest in this litigation.

# THE PARTIES

29.     Plaintiff WILLIAM RUSHING is a resident and citizen of Kentucky and, as described below, purchased the product at issue in this Complaint.

30.     Defendant WILLIAMS-SONOMA, INC. ("WSI") is a Delaware corporation that resides and maintains its principal place of business at 3250 Van Ness Avenue, San Francisco, San Francisco County, California.  Williams-Sonoma, Inc. is primarily in the business of selling culinary, furniture, and home furnishings through multi-channel marketing, which includes approximately 579 retail stores as well as direct to consumer channels such as catalogs and e-commerce.  Williams-Sonoma, Inc. is publicly traded on the New York Stock Exchange and owns and operates through the following wholly owned trademarks:  Williams-Sonoma, Williams Sonoma Home, Pottery Barn, Pottery Barn Kids, Pottery Barn Baby, PB Teen, PB Dorm, West Elm, Mark & Graham, and Rejuvenation.  WSI and all of its brands and trademarks identified herein will be collectively referred to as WSI's "Brands."

31.     Defendant WILLIAMS-SONOMA DTC, INC. ("WSDTC") is a California corporation and wholly owned subsidiary of WSI.  WSI operates WSDTC out of WSI's principal place of business in San Francisco, California.  WSDTC is in the business of managing WSI's online and catalog sales, which include the bedding at issue in this case.  More than half of the total revenue from all of WSI's Brands comes from its e-commerce business.  WSDTC will be referred to as WSI's "Marketing Subsidiary."

32.     Defendant WILLIAMS-SONOMA ADVERTISING, INC. ("WSA") is a California corporation and wholly owned subsidiary of WSI.  WSI operates WSA out of WSI's principal place of business in San Francisco, California.  WSA is in the business of advertising WSI's stores and products, including the bedding at issue in this case.  WSA will be referred to as WSI's "Advertising Subsidiary."

33.     Defendant DOES 1-30 are corporations, limited liability companies and individuals whose true names, identities, and relationships are not yet known to Plaintiff.  Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible

1   in some manner for the matters and damages alleged herein, and that their actions were authorized

2   by, ratified by, and known to the named Defendants.   Plaintiffs will amend this Complaint, or

3   request leave to do so if required, if and when the identities of the fictitiously-named Defendants

4   become known.

5         34.   In addition to each Defendant's individual acts and violations set forth herein, WSI

6   and its Advertising and Marketing Subsidiaries, at all times mentioned here were the alter egos,

7   agents, partners, joint venturers, joint employers, representatives, servants, employees, successors-

8   in-interest, co-conspirators and assigns, each of the other, and at all times relevant hereto were

9   acting within the course and scope of their authority as such alter egos, agents, partners, joint

10   venturers, joint employers, representatives, servants, employees, successors, co-conspirators and

11   assigns, and all acts or omissions alleged herein were duly committed with the ratification,

12   knowledge, permission, encouragement, authorization and consent of each Defendant designated

13   herein.   Defendants are, therefore, jointly and severally liable to Plaintiff and the Class for the

14   damages alleged herein.

15
16
                **WILLIAMS-SONOMA, INC. MARKETS AND ADVERTISES
ITS BEDDING UNDER DIFFERENT BRAND NAMES**

17         35.   According to WSI's 10-K for the Fiscal Year Ending January 31, 2016 ("10-K"),

18   WSI is a "multi-channel specialty retailer."

19         36.   WSI's Brands are not subsidiaries or separate legal entities from WSI.

20         37.   None of WSI's Brands are incorporated or registered as Active entities with the

21   Secretary of State's Office for California or Delaware.

22         38.   In Ex-21.1 to WSI's January 31, 2016 Form 10-K, wherein WSI identified its

23   significant subsidiaries, WSI failed to identify any of its Brands.

24         39.   None of WSI's Brands filed a Corporate Disclosure Statement with this Court.

25   Instead, Corporate Disclosure Statements were only filed by Williams-Sonoma, Inc. (Doc. No. 6),

26   WSI's Marketing Subsidiary (Doc. No. 8); WSI's Advertising Subsidiary (Doc. No. 9), and

27   Williams-Sonoma Stores, Inc. (Doc. No. 7).

28

40.     Instead, WSI's Brands are merely trademarks owned and operated by WSI and under which WSI does business.

41.     WSI's intellectual property includes, but is not limited to, the trademarks, copyrights, patents, trade secrets, and domain names of each of its respective Brands.  According to the United States Patent and Trademark Offices' records, Williams-Sonoma, Inc. is the owner of every trademark, including word marks, for "WILLIAMS-SONOMA HOME"; "POTTERY BARN," "PB TEEN," "PB Classic," "THE POTTERY BARN," "PB DORM," "PB ESSENTIAL," "PB BASIC" (collectively, the "Pottery Barn Brands"); and "WEST ELM."

42.     WSI's January 31, 2016 Form 10-K recites: "The core brand names in particular, including 'Williams-Sonoma,' 'Pottery Barn,' 'pottery barn kids,' 'PBteen,' 'west elm,' 'Williams-Sonoma Home,' 'Rejuvenation' and 'Mark and Graham' are of material importance to us."

43.     That Form 10-K further recites: "Our trademarks, service marks, copyrights, trade dress rights, trade secrets, domain names and other intellectual property are valuable assets that are critical to our success."

44.     WSI operates all of its Brands as one unit from its principal place of business at 3250 Van Ness Avenue, San Francisco, San Francisco County, California.

45.     As of January 31, 2016, WSI had approximately 28,100 employees, which includes employees assigned to WSI's Brands.

46.     WSI sells bedding through its different Brands that was and is exclusively manufactured or imported by WSI.

47.     All of the marketing and advertising for WSI's products, including its bedding, is done through WSI's Marketing Subsidiary and Advertising Subsidiary.

48.     As part of WSI's brand architecture, WSI and its Marketing and Advertising Subsidiaries market and advertise WSI's bedding to different target markets to avoid having the Brands cannibalize each other. For example, WSI describes Williams-Sonoma Home and West Elm on two ends of the spectrum.  WSI markets Williams-Sonoma Home as "a premium concept"

1   while marketing West Elm as offering "affordable designs." WSI markets Pottery Barn in between

2   Williams-Sonoma Home and West Elm as offering "exceptional . . . quality, style and value."

3       49.     In WSI's 10-K, it explains that "our retail stores serve as billboards for our brands,

4   which we believe inspires our customers to shop online and through our catalogs."  In fact, many

5   of WSI's products are only available online or in catalogs.

6       50.     WSI uses segment reporting for its financial reporting, wherein it divides its

7   business into e-commerce and retail (*e.g.*, store front) segments, not by Brands.

8       51.     According to the SEC, a publicly traded company, like WSI, can use segment

9   reporting when "when all of the following are true: (1) aggregation is consistent with the objectives

10  and principles of the standard, (2) the operating segments have similar economic characteristics,

11  and (3) the operating segments are similar with respect to five qualitative criteria."  James V.

12  Schnurr, Remarks before the 2015 AICPA Conference on Current SEC and PCAOB

13  Developments (Dec. 9, 2015), at 2, *available at* https://www.sec.gov/news/speech/schnurr-

14  remarks-aicpa-2015-conference-sec-pcaob-developments.html.  The referenced "five qualitative

15  criteria" cites to ASC 280-10-50-11, which requires that "the segments are similar in all of the

16  following areas":

17          a.  The nature of the products and services;

18          b.  The nature of the production process;

19          c.  The type or class of consumer for their products and services;

20          d.  The methods used to distribute their products or provide their services; and

21          e.  If applicable, the nature of the regulatory environment, for example, banking,

22              insurance, or public utilities.

23      52.     In Note L to WSI's January 31, 2016 Form 10-K, WSI reports that it includes all

24  of its brands in each of its two segments, it follows a common scheme in merchandising (*e.g.*, "the

25  activity of promoting the sale of goods") and operating the segment across all of its brands, and

26  the brands are "interdependent for economies of scale":

27

28

We have two reportable segments, e-commerce and retail. The e-commerce segment has the following merchandising strategies: Williams-Sonoma, Pottery Barn, Pottery Barn Kids, West Elm, PBteen, Williams-Sonoma Home, Rejuvenation and Mark and Graham, which sell our products through our e-commerce websites and direct-mail catalogs. Our e-commerce merchandising strategies are operating segments, which have been aggregated into one reportable segment, e-commerce. The retail segment has the following merchandising strategies: Williams-Sonoma, Pottery Barn, Pottery Barn Kids, West Elm and Rejuvenation, which sell our products through our retail stores. Our retail merchandising strategies are operating segments, which have been aggregated into one reportable segment, retail. Management's expectation is that the overall economic characteristics of each of our operating segments will be similar over time based on management's judgment that the operating segments have had similar historical economic characteristics and are expected to have similar long-term financial performance in the future.

***These reportable segments are strategic business units that offer similar products for the home.*** They are managed separately because the business units utilize two distinct distribution and marketing strategies. Based on management's best estimate, our operating segments include allocations of certain expenses, including advertising and employment costs, to the extent they have been determined to benefit both channels. These operating segments are aggregated at the channel level for reporting purposes ***due to the fact that our brands are interdependent for economies of scale and we do not maintain fully allocated income statements at the brand level. As a result, material financial decisions related to the brands are made at the channel level. Furthermore, it is not practicable for us to report revenue by product group.***

\*\*\*

Income tax information by reportable segment has not been included as income taxes are calculated at a company-wide level and are not allocated to each reportable segment.

Williams-Sonoma, Inc. Form 10-K as of January 31, 2016, Note L (emphasis added).

53.    WSI's sells bedding under its Williams-Sonoma Home brand directly to consumers through seven (7) WSI-owned Williams-Sonoma Home and Williams-Sonoma retail stores in California and thirteen (13) WSI-owned Williams-Sonoma Home and Williams-Sonoma retail stores located in Florida, Georgia, Illinois, Maryland, Missouri, New Jersey, New York,

Oklahoma, Oregon, Pennsylvania, Texas, and Washington.  WSI also advertises, markets, and sells bedding under its Williams-Sonoma Home brand directly to consumers through its Williams-Sonoma Home catalogs and e-commerce website, www.williams-sonoma.com. The website addresses www.williams-sonomahome.com and www.williamssonomahome.com immediately redirect consumers, without notice, to a page on the www.williams-sonoma.com website.  WSI owns each of the domain names identified in this paragraph.

54.     WSI advertises, markets, and sells bedding under its Pottery Barn Brands directly to consumers through WSI-owned retail stores nationwide, catalogs, and e-commerce websites, including       www.potterybarn.com,       www.pbteen.com,       www.pbdorm.com, www.potterybarnkids.com, www.potterybarnbaby.com.   The www.pbdorm.com webpage has none of its own bedding products and instead automatically redirects consumers to WSI's www.pbteen.com website.  The redirection is automatic and does not provide any warning to consumers that it is leaving the www.pbdorm.com webpage.   Similarly, WSI's website www.potterybarnbaby.com immediately redirects consumers, without notice, to a page on the www.potterybarnkids.com website.   WSI owns each of the domain names identified in this paragraph.

55.     WSI advertises, markets, and sells bedding under its West Elm brand directly to consumers through WSI-owned retail stores nationwide, catalogs, and an e-commerce website, www.westelm.com.  WSI owns the domain name identified in this paragraph.

56.     WSI copyrighted, owns, and operates the catalogs and e-commerce websites for all of its Brands.

57.     Upon information and belief, WSI's catalog sales operations for all of its Brands operate out the same department at WSI's corporate office—namely, Department Catalog LV, 3250 Van Ness Avenue, San Francisco, CA 94109.

58.     WSI never identifies its Brands on its website, catalog, or terms and conditions as being a subsidiary or other independent business entity separate from WSI.

59.     In fact, the terms of service for each of WSI's Brand's websites purports to be an agreement between the consumer and Williams-Sonoma, Inc., not between the consumer and the WSI Brand advertised on the website.

60.     The Privacy Policy for each of WSI's Brands represents that "We are part of the Williams-Sonoma, Inc. Brands which includes Williams-Sonoma, Pottery Barn, pottery barn kids, PBteen, west elm, Rejuvenation and Mark and Graham."

61.     As shown below, WSI's e-commerce website for each of its Brands contains links to each of WSI's other Brands, so consumers can easily navigate between all of the websites for WSI's Brands (circling added):



///

///

///

///

///

///

///



## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Defendants Created a Reputation for Being
### Luxury and Quality Brands

62.     Defendants are engaged in a continuous and concerted marketing pattern designed to instill trust and reliance with consumers and make them believe that WSI's Brands are purveyors of high quality, luxury goods.  WSI states as much on its website:

> Founded in 1956, Williams-Sonoma, Inc. is the premier specialty retailer of home furnishings and gourmet cookware in the United States. Our brands are among the best known and most-respected in the industry. We offer high-quality, stylish products for every room in the house: from the kitchen to the living room, bedroom, home office and even the hall closet.
>
> The first Williams-Sonoma store opened in 1956, selling a small array of cookware imported from France. Since then, the brand has expanded to hundreds of products from around the world, more than 250 stores nationwide, a direct-mail business that distributes millions of catalogs a year, and a highly successful e-commerce site. What has never changed is Williams-Sonoma's dedication to customer service and strong commitment to quality.[2]

63.     WSI specifically touts its Williams-Sonoma Home brand as selling luxurious home décor and furniture of the highest quality and craftsmanship:

> Expanding on the exceptional quality and exquisite craftsmanship that are hallmarks of the Williams-Sonoma brand, Williams-Sonoma Home offers a bold assortment of casually elegant furniture, lighting and decorative accessories that will stand the test of time. With a focus on exquisite materials and design details, Williams-Sonoma Home designers juxtapose textures, colors and materials to create products that are as accessible and functional as they are elegant and sophisticated. From kitchen islands and dining tables, to sofas and chairs custom-upholstered in the United States, Williams-Sonoma Home brings classic design and timeless luxury to the comforts of home.[3]

///

---

[2] *Available at* http://www.williams-sonoma.com/customer-service/about-us.html?cm_type=fnav (last visited on Nov. 10, 2015).

[3] Available at http://www.williams-sonomainc.com/brands/williams-sonoma-home.html (last visited Nov. 5, 2015).

64. WSI describes its Pottery Barn brand's quality similarly:

FOUNDED IN 1949

Pottery Barn was built on the idea that home furnishings should be exceptional in comfort, quality, style and value. From the bedroom to the bath, the kitchen to the home office, the entryway to the backyard, we have everything you need to create your dream home – and to entertain in it.

* * *

EXCLUSIVELY DESIGNED

We take great pride in our exclusive products. Our in-house designers and expert craftsmen draw inspiration from time honored designs from all over the world to create unique collections at an excellent value. And we always hold ourselves to the highest standards of quality.[4]

65. WSI describes its Pottery Barn Kids brand's quality similarly:

Launched in 1999, Pottery Barn Kids was created by two moms who realized just how much work went into designing great kids' bedrooms. Since then, our mission has been to bring the utmost in quality, comfort, safety, and style into every family's home. We're proud to offer our exclusive range of children's furnishings, textiles, toys and accessories at parttterybarnkids.com and in more than 90 stores in the US and abroad.[5]

66. WSI describes its Pottery Barn Teen brand's quality similarly:

Launched in 2003, PBteen was created with one goal in mind: to design an entire collection of furniture and décor just for teens. Since then, our mission has been to bring the utmost in quality, style and value to every teen's bedroom, study area, lounge space, and more.

* * *

We're proud to offer an exclusive range of furniture, bedding, lighting, accessories and gifts at pbteen.com and in stores across the US.[6]

---

[4] Available at http://www.potterybarn.com/about-us/?cm_type=fnav (last visited Nov. 10, 2015).

[5] Available at http://www.potterybarnkids.com/about-us/?cm_type=fnav (last visited Dec. 1, 2015).

[6] Available at http://www.pbteen.com/about-us/?cm_type=fnav (last visited Dec. 1, 2015) (emphasis added).

67.     West Elm has a variety of modern furniture, décor and bedding.  While WSI through its West Elm brand, with some exceptions, sells bedding that generally falls in a lower price point than WSI's other brands, it touts its connection with WSI to build trust with its customers and imply quality: "We're a member of the Williams-Sonoma, Inc. portfolio of brands."[7] As with its other brands, WSI stresses the exclusiveness of West Elm's products:

> West Elm launched in 2002 and quickly became a leader in home furnishings that are approachable, affordable and sustainably produced.  Each season, West Elm's talented in-house team of designers creates an exclusive collection, collaborating with artists and independent designers globally and locally.  The brand also offers handmade and one-of-a-kind discoveries from around the world, partnering with organizations that support the development of global craft communities.[8]

### ASTM D3775 Provides the Industry Standard
### Testing Protocol for Calculating Thread Count

68.     For more than 100 years, the American Society for Testing and Materials International (ASTM), a non-profit international standards organization, has developed the testing protocols universally used in the textile industry.

69.     "Thread count" represents the number of vertical and horizontal threads (a/k/a yarns) woven together in a square inch of fabric.

70.     In 1998, the ASTM Subcommittee D13.63 on Home Furnishings (the "Subcommittee") issued ASTM D3775, its first stand-alone standard for testing thread count (the "Industry Standard").  Although moved into a separate standard, the test method adopted for calculating thread count did not change from the standard that had long been understood and used in the industry.

---

[7] Available at http://www.westelm.com/pages/about-us/our-vision/ (last visited Dec. 30, 2015).

[8] Available at http://www.williams-sonomainc.com/brands/west-elm.html (last visited Dec. 30, 2015).

71.    In adopting ASTM D3775, the ASTM Subcommittee rejected attempts by importers on the Subcommittee to establish a broader industry standard based on tariff regulations that count individual plies.

72.    In 2012, ASTM updated D3775's language, but did not change the standard test protocol.

73.    According to ASTM D3775-12 § 9.1.1 the following is the Standard Test Method for determining a fabric's thread count:

> Count the number of warp yarns (ends) and filling yarns (picks) in five randomly spaced places diagonally across the width of the fabric sampling unit.  Count individual warp ends and filling picks as single units, regardless of whether they are comprised of single or plied components.[9]

74.    As shown in the figure below, the warp yarns travel lengthwise along the fabric and are the yarns that were originally held in tension on a loom or in a frame, while the filling yarns (f/k/a weft yarns) travel widthwise weaving over and under the warp yarns.

**Warp Yarns (Ends) ⇕**



**Filling Yarn (Picks) ⇔**

---

[9] Reprinted, with permission from ASTM D3775-12, § 4.1, Standard Test Method for Fabric Count of Woven Fabric, copyright ASTM International, 100 Barr Harbor Drive, West Conshohocken PA 19428, www.astm.org.

75.     ASTM D4850-03a defines the following textile industry terminology used in ASTM D3775-12 § 9.1.1:

- **end,** *n—in woven fabric,* an individual warp yarn (single or ply) or cord.

- **end count,** *n—in woven fabric,* the number of individual warp yarns per inch of fabric regardless of whether they are comprised of single or plied components.

- **pick,** *n—in woven fabric,* an individual filling yarn (single or ply) or cord source.

- **pick count,** *n—in woven fabrics,* the number of individual filling yarns per inch of fabric regardless of whether they are comprised of single or plied components.[10]

76.     The ASTM standard thread count test specifically instructs the tester to not count multiple plies when calculating threat count: "Count individual warp yarns (ends) and filling yarns (picks) as single units, regardless of whether they are comprised of single or plied components."[11] The definitions of "end count" and "pick count" contain the same instruction for the tester to not count the plies.

77.     ASTM standard test D3775 "has been used extensively in the [textile] trade" for calculating thread count, and "is applicable to all types of woven fabrics,"[12] including bedding. Digital thread counters and pick counters are also programed to comply with the ASTM D3775 Standard.

78.     ASTM D3775 is and, at all relevant times, has been generally accepted in the textile industry as the universal Industry Standard for calculating thread count.

---

[10] ASTM D4850-03a.
[11] ASTM D3775-12 § 9.1.1.
[12] *Id.*, § 1.1.

79.     ASTM D3775 has been accepted by both the American Textile Manufacturers Institute as well as the National Textile Association as the long-accepted standard in the textile industry for determining thread count.

80.     ASTM D3775 is the accepted thread count testing standard for the United States Department of Defense[13] and the vast majority, if not all, of the fabric testing laboratories in the United States.

81.     The Federal Trade Commission (FTC) considers, *inter alia*, a company's compliance with ASTM standards in determining whether a company had a reasonable basis for making claims about a product.

82.     In a FTC staff opinion, dated August 2, 2005, to the National Textile Association's Textile Bedding Committee, the FTC confirmed that a yarn's ply count should not be included in calculating thread count:

> Based upon the ASTM International, as well as the information you have provided about standard industry practices with regard to disclosing thread count, we believe that consumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example, "300 thread count, 2 ply yarn." A representation of "600 thread count" for this same product would likely mislead consumers about the quality of the product being purchased.

A true and accurate copy of the entire letter as well as the National Textile Association's April 8, 1996 letter to the FTC is attached hereto as **Exhibit B.**[14]

83.     As the number of warp yarns and filling yarns is countable, a stated thread count should be within 5% of the actual thread count. ASTM D3775-12 § 9.1.4 indicates that the coefficient of variation (also known as "relative standard deviation") of the five test samples should be 5% or less. It is also common for textile buyers, including American Textile Company,

---

[13] Department of Defense Index of Specifications and Standards (DODISS), Alphabetical Listing, Part I, July 1, 2005, at 208 ("Fabric, Wrap End Count and Filling Pick Count of Woven").

[14] Also available at https://www.ftc.gov/sites/default/files/documents/advisory_opinions/national-textile-association/natltextileassn.pdf.

Nordstrom's, Walmart, HSN, Kohl's, Gerber, Kate Spade & Company, and the United States Government, to specify that a supplied textile not exceed ± 5% or less maximum deviation between the textile's declared thread count and its actual thread count as determined using the procedures set forth in ASTM D3775.

84.     Inaccurately inflated descriptions of thread counts lead consumers to reasonable but mistaken beliefs about a product's quality and value, especially when the mislabeled thread-count is coupled with a premium price.

85.     Indeed, according to an article in the Journal of Consumer Research, Inc., many consumers equate a product's higher price with that product being of a higher quality.[15]

**Defendants Use WSI's Reputation as a
High-End Retailer to Deceive Consumers into Believing
Its False Thread Count Statements**

86.     The Textile Fiber Products Identification Act, 15 U.S.C. § 70, *et seq.*, does not require a fabric's thread count to be disclosed on labels or in advertising for fabric.

87.     Nevertheless, many manufacturers, merchants, and marketers choose to speak on this subject by indicating specific thread counts on their products' labels and in advertising for those products to compete with other products and justify their product's price.

88.     Defendants generally identify the thread counts for WSI's Brands' purportedly higher thread count bedding on the products' label, in its catalogs, and on its website.  Some of these products even state the thread count in the product's name.

89.     Defendants descriptions of WSI's Brands' bedding products in catalogs, online, and in stores create the impression that quality, comfort, elegance, style and prestige are synonymous with a high thread count and superior yarn, and that Defendants has investigated and reported these factors accurately to the consumer.  Either Defendants do nothing to substantiate their claims, or they are illegally and intentionally spreading false information.

---

[15] Journal of Consumer Research, Inc., "High quality or poor value: When do consumers make different conclusions about the same product?," ScienceDaily, www.sciencedaily.com/releases/2012/10/121022121908.htm.

90.     Defendants deceptively sell their mislabeled bedding amongst other luxury goods in sleek high-end catalogs and stores designed to appeal to sophisticated and affluent consumers. For example, WSI markets various brands of bedding that are highly priced, and shown in ornate, beautifully produced catalogs and websites.  Defendants' products, including its bedding, are often photographed in luxurious surroundings, nicely displayed, privately branded, and are said to be of the finest materials (like Egyptian cotton) and construction (like 600 thread count).

91.     Defendants misrepresented, and continue to misrepresent, the thread count in many of the bedding products they advertise and distribute throughout the country.  Defendants' misrepresentations have resulted in the sale, to consumers across the nation, of high-priced "luxury" bedding that Defendants falsely and deceptively described and advertised as containing as much as double the thread count than revealed through testing.

92.     The bedding Mr. Rushing purchased is a perfect example of WSI's deceptive practice.  WSI offers its Williams-Sonoma Home's "Signature 600-Thread-Count Sateen Bedding," depending on size, for $489 or $499.

93.     Upon information and belief, WSI has sold at least thousands of sets of its "Signature 600-Thread-Count Sateen Bedding" to consumers during the four years prior to the filing of this lawsuit.

94.     WSI and its Advertising and Marketing Subsidiaries describe Williams-Sonoma Home's "Signature 600-Thread-Count Sateen Bedding" as follows:

> Sewn from lustrous 600-thread-count two-ply Egyptian-cotton sateen, our Italian bedding becomes even richer in texture with use and laundering.  In classic ivory or white, the pieces offer an elegant foundation for layering.

///

///

///

///

///

95.     The label on the back of the "Signature 600-Thread-Count Sateen Bedding" packaging that is sold at WSI's brick-and-mortar stores and shipped to online and catalog customers, including Mr. Rushing, repeats the above uniform representations about the bedding's purported high quality:



96.     Nevertheless, testing that complies with the ASTM International Standard Designation D3775-12 reveals that William-Sonoma Home's "Signature 600-Thread-Count Sateen Bedding" is not 600 thread count as advertised, but merely 291.

97.     Specifically, the samples tested from the "Signature 600-Thread-Count Sateen Bedding" that Mr. Rushing purchased resulted in the following results:

**Pillowcases**

Average number of warp yarns (ends):  202
Average number of filling yarns (picks):  89
Thread count:  291 Threads per Inch

**Sheets**

Average number of warp yarns (ends):  202
Average number of filling yarns (picks):  89
Thread count:  291 Threads per Inch

98.     To comply with the industry's ± 5% maximum deviation allowance, a product advertised and marketed as having a 600 thread count must have an actual thread count between 570 and 630.  At 291, Williams-Sonoma Home's "Signature 600-Thread-Count Sateen Bedding" falls well below the acceptable thread count range and is more than 1000% of the allowed deviation.

99.     WSI sold its Williams-Sonoma Home's "Signature 600-Thread-Count Sateen Bedding" at a premium price of nearly $500 a set.  If properly advertised and marketed as 300 thread count, this bedding would not demand such a premium price.  For example, JC Penny offers a set of King-size 300 thread count, single ply (a more desirable feature), Egyptian Cotton Sateen Sheets for $320—two-thirds of WSI's price.  Indeed, even WSI's Pottery Barn brand purports to offer a 300 thread count Egyptian cotton sateen weave King-size bedding for only $89.

100.     Additionally, instead of paying $500 for 291 thread count sateen bedding, a consumer could have purchased WSI's "affordable" West Elm brand and purchase a "400-Thread-Count Organic Sateen Set."  Attached hereto as **Exhibit C** is a true and accurate copy of WSI's website advertisement for its West Elm "400-Thread-Count Organic Sateen Set" that captures content above-the-fold.  Testing revealed that WSI's West Elm "400-Thread-Count Organic

Sateen" bedding was accurately labeled and made of one-ply construction, a more desirable feature than two-ply. Although WSI's West Elm brand of bedding would have more than 100 additional threads per square inch, that bedding would only cost the consumer $169, instead of $499 for the 291 thread count "Signature 600-Thread-Count Sateen Bedding."

101.    Another less expensive alternative to WSI's Williams-Sonoma Home "Signature 600-Thread-Count Sateen Bedding," would have been WSI's Pottery Barn brand's purported "700-THREAD-COUNT SHEET SET," which WSI identifies as one-ply and describes as "Sateen woven of cotton to an unrivaled 700-thread count, our sheet set brings unparalleled softness and comfort to the bed." Attached hereto as **Exhibit D** is a true and accurate copy of WSI's website advertisement for its Pottery Barn "700-THREAD-COUNT SHEET SET" that captures content above-the-fold. Testing of Pottery Barn's "700 THREAD-COUNT SHEET SET" demonstrated that the actual thread count is only approximately 570. Although this bedding would have nearly 280 additional threads per square inch, the comparable size bedding would only cost the consumer $259, instead of $499 for the 291 thread count "Signature 600-Thread-Count Sateen Bedding."

102.    Defendants mislabeled, marketed, and sold and, with the exception of discontinued products, continue to mislabel, market, and sell, to class members the following lines of bedding that are comprised of two-ply construction and similarly mislabeled and marketed with inflated thread counts of 350 or greater due to Defendants' pattern and practice of counting both plies when calculating thread counts (the "Bedding Products"):[16]

> 1)    Williams-Sonoma Home Signature 600-Thread-Count Sateen Bedding
>
> 2)    Williams-Sonoma Home Greek Key Jacquard 600-Thread-Count Bedding
>
> 3)    Williams-Sonoma Home Suzani Jacquard Bedding (500 TC)
>
> 4)    Pottery Barn Foundations Hotel Sateen Bedding (600 TC)*
>
> 5)    Pottery Barn Banded Hemstitch Bedding (400 TC)*

---

[16] Because the names for products may vary slightly between Defendants' websites and their catalogs, Plaintiff primarily listed the website names here, but the list of Bedding Products includes all such products regardless of whether sold via the website or catalog by the listed name or another name.

6)      Pottery Barn Morgan 400-Thread-Count Bedding

7)      Pottery Barn PB Organic 400-Thread-Count Bedding

8)      Pottery Barn PB Classic 400-Thread-Count Bedding

9)      Pottery Barn Teen 400 Thread-Count Bedding

10)     Other bedding, including future, discontinued, and identified through discovery, that WSI sold at any time during the limitations period that was made of two-ply construction and labeled and/or advertised as having a thread count of 350 or greater.

Attached hereto as **Group Exhibit E** are true and accurate copies of WSI's website advertising for each of the above Bedding Products that captures the product's name, summary, and bedding items offered. *Indicates a discontinued line of bedding that is currently not sold on WSI's website, so a copy of the product's packaging label is provided in **Group Exhibit E** instead of the website advertisement.

103.    The resolution of the asserted claims will be the same between both the bedding Mr. Rushing purchased and the unpurchased Bedding Products because Mr. Rushing's purchased bedding and the unpurchased Bedding Products are all:

a)      bedding;

b)      made of two-ply construction;

c)      advertised as having higher-thread counts (thread counts of 350 or greater);

d)      affirmatively touted by Defendants as having a specific thread count in either the name of or narrative description for each Bedding Product in Defendants' catalogs and websites;

e)      subject to Defendants' uniform method of calculating thread count that counts individual plies;

f)      subject to the same question of whether Defendants' use of the ply-multiplication method would likely deceive a reasonable consumer;

g)  subject to the textile industry's generally accepted standard of calculating thread count, which is represented in ASTM D3775, that does not count individual plies; and

h)  labeled, marketed, and advertised as having thread counts that were artificially inflated to mislead consumers into believing the products are of a higher-thread count.

104.  The injury suffered by Mr. Rushing and the Class members is identical, because each purchased a product unaware that a material representation, the thread count, had been doubled, and each paid a higher price for that product.

105.  Potential differences between product labels or compositions would not impact the legal analysis of the claim because WSI has asserted to this Court that it is compelled by federal law to follow a uniform method of calculating the thread count for all of its two-ply bedding, which involves counting each thread in a square inch (horizontal + vertical) and then multiplying the total by two to purportedly account for both plies of two-ply thread (hereafter "ply-multiplication" or "ply-multiplication method").

106.  WSI utilizes its ply-multiplication method across all of its higher thread count bedding, regardless of brand, when calculating the thread count of its two-ply bedding.   For each of its two-ply bedding, WSI follows the same pattern of falsely, deceptively, and illegally advertising and marketing its two-ply bedding by using ply-multiplication to calculate thread count amounts. This deception also is carried out on behalf of WSI by and through the marketing and advertising actions of WSI's Marketing and Advertising Subsidiaries.

107.  For example, WSI's Pottery Barn Teen brand advertises and markets mostly bedding labeled as 200 thread count and bearing non-thread count identifying names, such as the "Peyton Sheet Set" or "Dottie Sheet Set."  But it also sells a "400 Thread-Count" set of bedding, which is the highest thread count purportedly sold at Pottery Barn Teen.

108.  Testing of Pottery Barn Teen's two-ply "400 Thread-Count" bedding demonstrated that the actual thread count is almost half that which Pottery Barn Teen, WSI, and its Advertising

and Marketing Subsidiaries purport it to be.  In actuality, this bedding only has a thread count of approximately 208—approximately half of the stated 400 thread count.  Pottery Barn Teen, WSI, and its Advertising and Marketing Subsidiaries falsely advertise and market 208 thread count bedding as having a thread count of 400 to deceive consumers and increase sales.

109.    To comply with the industry's ± 5% maximum deviation allowance, a product advertised as having a 400 thread count, must have an actual thread count between 380 and 420.  At 208, Pottery Barn Teen's "400 Thread-Count Sheet Set" falls well below the acceptable thread count range and is more than 950% of the allowed deviation.

110.    Upon information and belief, WSI appears to only use its ply-multiplication method on bedding with higher thread counts (*e.g.,* thread counts of 350 or greater), because WSI abandoned its purportedly federally mandated ply-multiplication method and instead advertised the correct thread count for one of its low thread count bedding sets.  Williams-Sonoma Home's least expensive set of non-flannel two-ply bedding is its "Everyday Luxury Oxford Sheeting." WSI advertises and markets this bedding as 150-thread count and sells one set, depending on size, for $239 or $259.  When tested pursuant to the ASTM D3775-12 Standard, the "Everyday Luxury Oxford Sheeting" was found to be made of two-ply construction and came within 5% of its advertised thread count.  According to Defendants' position that it is required by law to count both plies, one would expect Defendants to advertise the "Everyday Luxury Oxford Sheeting" as 300 thread count.

111.    For the last four (4) years and beyond, each Defendant has been engaged in the business of selling, marketing, and/or advertising falsely and deceptively described bedding products within the State of California and throughout the United States.

112.    Defendants continue to market, and advertise WSI's bedding collections to be sold without revealing to consumers the true thread counts of the Bedding Products or that their representations are false, misleading, and violate the law.

113.    Defendants' precise representations of thread count, rather than general claims of "high thread count" or "good cotton" are designed to create three impressions in the minds of

consumers.   First, thread count is important and should be material to consumers' decisions regarding bedding.   Second, yarn source is important.   Third, thread counts are accurate.   These impressions lead reasonable consumers to believe Defendants' representations about their bedding products when it comes to thread count and the source of the yarn used in making them.

114.   Consumers reasonably rely upon Defendants' statements about the Bedding Products' thread counts and remain unaware that Defendants are actually engaged in an overall deception that allows Defendants to deceive reasonable consumers through passing off goods as ones that are really something else.

115.   Defendants' marketing deceptions are found in and reinforced by, but are not limited to, its branding, advertising, packaging, labeling, pricing, product placement, store location, store appearance, and employee policies.   All have created an atmosphere of trust among customers that Defendants sell high quality products that are accurately described as to content, and that product content is material to consumers.   Hence, Defendants are trying to differentiate their products in a way that causes consumers to have faith and trust in representations concerning product content to a greater degree than consumers do for many other merchandisers of similar goods, such as flea markets, street vendors, local discount stores, and the like.   Defendants foster the belief that WSI's Brands are synonymous with high quality and truthful marketing, which allows Defendants to charge a higher price for all of the deceptively labeled Bedding Products notwithstanding their actual characteristics and qualities.

116.   Defendants' overall deception is demonstrated in many ways:

117.   First, each false and deceptive statement about a particular item is part of a larger marketing plan or strategy that is coordinated by many people, over a period of time, and through many different channels.

118.   Second, the deception is demonstrated by Defendants selling the same illegally described individual items many times over the course of years.   For example, the allegation is not that one piece of bedding was falsely described to one buyer, but that an entire segment of WSI's bedding was falsely described and sold to thousands of buyers over the course of many years.

119.    Third, the deception is demonstrated by the repetitive use of the same false and illegal statements in different channels of publication over a considerable period of time.  For example, a given item is falsely described over time on the product's label in stores, in multiple different catalogs, and in multiple different iterations of Web and print advertising.

120.    Fourth, the deception is demonstrated by falsely describing the content of many different items within the same product category (*e.g.*, higher thread count bedding) over considerable periods of time while at the same time disguising the falsity by accurately describing some items within the broader category (*e.g.*, bedding generally).

121.    Fifth, the deception is demonstrated through Defendants' activities taking place across a spectrum of different brands and marketing outlets that are all coordinated and controlled by Williams-Sonoma, Inc.  For example, WSI touts high thread count as material to the overall quality and value of bedding through several different brands that are targeted to many of the same consumers.  WSI then offers generally lower-priced goods in the same category (*e.g.*, bedding) through outlets like West Elm catalogs, which generally are not touted as better quality because of thread count.

122.    Sixth, the deception is demonstrated by Defendants' use of "private label" branding strategies designed to foster faith and trust in brand names controlled by Defendants rather than brands used by others or non-branded goods.  For example, Defendants sell its Everyday Luxury bedding and describe it accurately as to thread count while selling its "exclusive" and "signature" brands with different and false thread count claims.  No explanation is ever provided by these Defendants that thread counts are not based on the same standard for reporting this luxury-creating feature.

123.    Each of Defendants' foregoing wrongful deceptive acts or omissions, working separately and in tandem, were designed to cause consumers to believe, and do cause consumers to believe, that representations by Williams-Sonoma, Inc. are true and reliable.

124.    The Federal Trade Commission Act (FTCA), Consumer Legal Remedy Act (CLRA), and the Unfair Competition Law (UCL) all make such deceptive business practices unlawful.  The illegal conduct directly caused consumers to be deceived and overcharged.

125.    Defendants must have a factual basis for claims made about the content of the products they offer for sale.  Discovery should require each Defendant to provide a factual basis for its claims as to its various products' thread-counts because it is unfair and unreasonable to expect that Plaintiff could purchase and test every bedding item sold by Williams-Sonoma, Inc. and because the scope of the false descriptions is part and parcel of the overall improper and illegal pattern.

126.    Consumers who have purchased falsely described products are entitled to obtain the benefit of their bargain through receipt of goods made as described in advertising or they should receive a full refund plus interest of any purchase price.

127.    Defendants deliberately and wrongfully exploited the fact that consumers cannot readily discern the difference between thread counts and sources of yarn.  Consumers must necessarily rely upon Defendants' representations and advertising in their attempt to compare products and make informed purchasing decisions.

128.    Inaccurate descriptions of thread counts lead to reasonable but mistaken beliefs by consumers about the products.  Indeed, if a package label for bedding states that it contains 600 thread count bedding, no reasonable consumer would believe otherwise.

129.    Defendants have created a system that has encouraged and led to widespread fraud, deception, illegality, untruthfulness, and unfairness relating to the merchandising of the Bedding Products.

130.    Defendants have failed to stop the practices alleged herein, assert that federal law requires them to count individual plies when calculating thread count, and continue to falsely market the products and will continue to do so unless stopped by order of the Court.  Plaintiff seeks redress of this wrongdoing through issuance of an injunction and restitution to injured consumers.

131.     Defendants have consistently and repeatedly engaged in the following practices of deception in connection with the manufacture and sale of WSI's products:

     a)   Failing to make complete, proper and adequate disclosures of the composition and quality of the goods it markets, when it speaks on the subject;

     b)   Falsely describing the goods;

     c)   Overcharging consumers who buy the falsely described goods;

     d)   Concealing the facts contained in paragraphs (a), (b), and (c) above from consumers;

     e)   Falsifying advertisements and other promotional materials used to market the products to conceal Defendants' misconduct and to make it seem as if Defendants were in full compliance with industry standards;

     f)   Wrongfully procuring monies from customers; and

     g)   Engaging in a policy of collecting money and excessive prices as the probable and natural consequence of the wrongful business practices alleged herein.

132.     WSI has held itself out to Plaintiff and other consumers as being an expert in the field of identifying and offering top-shelf luxury goods, including bedding.  Accordingly, the foregoing activities, concealment, and patterns and practices of deceptive business activities have been known to or by WSI, or given its industry knowledge, reasonably should have been known to the self-described merchandisers of luxury bedding for consumers.

133.     The above-intentional acts of Defendants, and each of them, in disseminating said misleading statements from within the State of California and to the general public thereof are likely to deceive the general public of the State of California and nationwide by obfuscating the quality of the Bedding Products' thread counts.

134.     Defendants' illegal business practice should in equity be reformed and enjoined both by providing relief to individual consumers and ordering Defendants to correct the false

impression engendered in the Class and the general public by their ongoing deception.  Corrective advertising should be ordered to correct the impressions created by the illegal practices in order to fully remedy the wrong done to the Class.

## APPLICATION OF THE DISCOVERY RULE AND THE FRAUDULENT CONCEALMENT DOCTRINE

135.     Plaintiff and the Class aver that, based on the false and misleading information fed to them, and the material information concealed from them by Defendants, under the discovery rule they did not discover and did not have reason to discover their causes of action relating to Defendants' fraudulent scheme to misidentify its beddings' thread count and yarn origin before April 21, 2015, at the earliest.  Prior to that date, Plaintiff and the other customers did not have a reasonable factual basis to suspect that they had been harmed by the illegal course of conduct alleged herein.

136.     Alternatively, under California's fraudulent concealment doctrine, the limitations period was likewise tolled at least through April 21, 2015, based on Defendants' active deceptive conduct in concealing the Plaintiff's and Class's causes of action for violations of California law as alleged more fully above.

## CLASS ACTION ALLEGATIONS

137.     Plaintiffs bring this action on behalf of the following consumer class (the "Class"):

> All persons in the United States who during the limitations period purchased bedding, including sheets, pillowcases, duvet covers, and shams, from Williams-Sonoma, Inc. that was (1) advertised as having a thread count of 350 or greater and (2) made of two-ply construction as identified in the list of Bedding Products.

138.     Excluded from the Class are Defendants, their employees, co-conspirators, officers, directors, board members, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judge and court staff to whom this case is assigned.  Plaintiff reserves the right to amend the definition of the class

and propose subclasses if discovery or further investigation reveals that the class should be expanded or otherwise modified.

**Rule 23(a) & Section 1781(b) Elements**

139. **Numerosity.**  Plaintiff believes and alleges that membership in the Class is so numerous that joinder of all members is impracticable. The disposition of these claims in a class action will provide substantial benefits to the parties, class members, and the Court.  Although the number of class members and their names are presently unknown, this information can be readily determined from Defendants' records.  Upon information and belief, the Class includes thousands of purchasers geographically dispersed throughout the United States.

140. **Ascertainability.**  The Class is ascertainable as it consists of persons who purchased bedding from any of the Defendants during the limitations period.  The identities and addresses can be discovered by objective criteria found in Defendants' records.  If required, class members may be notified of the pendency of this action by mail, publication and/or other notice. If necessary to preserve the case as a class action, the court itself can redefine the Class and any subclass.

141. **Commonality.**  All members of the Class have been subject to and affected by the same conduct – Defendants' policy and practice of not following the Industry Standard for calculating thread count and then misrepresenting and artificially inflating their bedding's thread count to consumers.  The relief sought is common, unitary, and class-wide in nature.

142. **Typicality.** Plaintiff is a member of the class of victims described herein.  Plaintiff purchased bedding advertised as containing 600 thread count from WSI that, upon testing, was proven to only be 291 thread count, two-ply.  Plaintiff's claims or defenses are typical of the Class's claims and defenses, because they both rely upon application of the correct Industry Standard that applies to both Plaintiff and the class members.  If brought and prosecuted individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

143.   **Adequacy.**  Plaintiff will fairly and adequately represent and protect the interests of the Class and have no interests adverse to, or that directly and irrevocably conflict with, the interests of other class members.  Plaintiff is willing to serve the Court and Class in a representative capacity with all of the obligations and duties material thereto.

144.   Plaintiff has retained the services of counsel, identified on the caption and signature page, who are experienced in complex litigation, class actions, consumer fraud, and thread-count litigation.  Plaintiff's counsel will adequately prosecute this action, and will otherwise assert, protect, and fairly and adequately represent Plaintiff and all absent class members.

**Rule 23(b)(3)**

145.   This action is appropriate as a class action pursuant to Rule 23(b)(3).

146.   **Predominance.**  Numerous and substantial questions of law and fact are common to all class members and predominate over questions that may only affect individual members of the Class.  These questions of law and fact include, but are not limited to, the following:

a)   Whether Defendants violated and are liable for violations of California Civil Code § 1750, *et seq.*;

b)   Whether Defendants violated and are liable for violations of California's Business and Professions Code § 17500, *et seq.*;

c)   Whether Defendants violated and are liable for violations of Business and Professions Code § 17200, *et seq.*

d)   Whether Defendants made false misrepresentations to and omitted material facts and/or actively concealed material information from Plaintiffs and the Class concerning the thread count of any of the bedding sold by WSI's Brands;

e)   Whether ASTM D3775 Standard Test Method for Warp (End) and Filling (Pick) Count of Woven Fabrics represented, at all times during the limitations period, the generally accepted method in the textile industry for calculating thread count in the United States;

f) Whether Defendants calculated their advertised thread count pursuant to the ASTM D3775 Standard;

g) Whether 19 C.F.R. § 141.89(a) represents the generally accepted method for importers to calculate, advertise, market, and label bedding being sold to consumers;

h) Whether Defendants calculated their advertised thread count pursuant to 19 C.F.R. § 141.89(a);

i) Whether Plaintiff and the Class have sustained injury by reason of Defendants' actions, misrepresentations, and omissions;

j) Whether Defendants are jointly and severally liable for their actions, misrepresentations and omissions;

k) Whether Plaintiffs and the other members of the Class are entitled to equitable relief; and

l) Whether Plaintiffs and the other members of the Class are entitled to recover damages and the amount of damages that members of the Class are entitled to recover.

147. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because proceeding as a class action will permit an orderly and expeditious administration of the Class's claims, will foster economies of time, effort and expense and will ensure uniformity of decisions. Specifically, a class action is superior to other available methods for the fair and efficient adjudication of this litigation for the following reasons:

a) The Court can use the class action device to orderly and expeditiously resolve several common issues that affect all class members instead of using the time and resources required to resolve thousands of individual actions asking those same question;

b)   Economies of time, effort, and expense will be fostered and uniformity of decisions will be insured;

c)   Individual litigation presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by legal and factual issues of the case;

d)   The damages sustained by individual class members are relatively small and the expense and burden of individual litigation makes it impossible for the class members to individually redress the wrongs done to them;

e)   In addition to monetary relief, Plaintiffs are seeking class-wide injunctive relief to stop Defendants' unlawful conduct going forward, which relief cannot be obtained absent class certification;

f)   After determining the common issues of Defendants' liability, the class members' claims can be administered efficiently under the direction of or as determined by the Court;

g)   Without a class action, Defendants will continue to violate the law and consumers will continue to purchase misrepresented bedding at inflated prices.  Such action will proceed without a remedy while Defendants continue to reap and retain the substantial proceeds of their wrongful conduct; and

h)   A class action presents fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

148.   Plaintiff knows of no difficulty that would be encountered in managing this litigation as a class action.

149.   Therefore, class treatment of Plaintiff's claims is both appropriate and necessary.

**PLAINTIFF WILLIAM RUSHING**

150.     Mr. Rushing had been a prior Williams-Sonoma customer, received their catalogs in the mail, and had previously visited a Williams-Sonoma store.  However, the Williams-Sonoma store he had visited was a culinary supply store, and did not have bedding on display.  From Williams-Sonoma's catalogs (a/k/a Williams-Sonoma Home catalogs), Mr. Rushing learned that Williams-Sonoma also sold purportedly high thread count bedding.

151.     For Valentine's Day 2015, Mr. Rushing decided to give his wife a set of bedding. But he was not interested in buying her average quality bedding for Valentine's Day.  Rather, he wanted to give her soft, luxurious, high-quality bedding for this special occasion.  Like most consumers, Mr. Rushing equated higher thread count with high quality, fine bedding.  On or before February 10, 2015, Mr. Rushing, looking for bedding to purchase for his wife's gift, reviewed one of the Williams-Sonoma (a/k/a Williams-Sonoma Home) catalogs he had previously received.  He had purchased other items from Williams-Sonoma and was aware that it would be more expensive than buying from many other retailers.  Based on Williams-Sonoma's reputation, however, Mr. Rushing believed it would be worth the extra expense when purchasing what he believed would be soft, luxurious, high-quality bedding.

152.     As Mr. Rushing was shopping for Valentine's Day, he did not wish to order using the catalog's mail order form, so he went to the website indicated on WSI's catalog.  On or about February 10, 2015, Mr. Rushing reviewed WSI's bedding options again, this time on WSI's website, and selected and purchased WSI's Williams-Sonoma Home's King-size "Signature 600-Thread-Count Sateen Bedding" because WSI's website advertised them as being 600 thread count, made in Italy, made of Egyptian cotton, and the retailer's "Signature" line.  He also ordered an extra pair of matching pillowcases.  Mr. Rushing viewed WSI's misleading catalog and website descriptions of its bedding options and reasonably relied in substantial part on those representations.  Mr. Rushing was thereby deceived by both descriptions in deciding to purchase the "Signature 600-Thread-Count Sateen Bedding" for a premium price.

153.   As Williams-Sonoma Home products are not sold in Mr. Rushing's home state, he had to, and did, reasonably rely on WSI and its Advertising and Marketing Subsidiaries' representations about the product on WSI's website and in its catalog.

154.   As illustrated below, on Williams-Sonoma Home's website, WSI, through its Advertising and Marketing Subsidiaries, boasted that the bedding was 600 thread count and of Egyptian cotton thread: "Sewn from lustrous 600-thread-count two ply Egyptian-cotton sateen, our Italian bedding becomes even richer in texture with use and laundering.  In classic ivory or white, the pieces offer an elegant foundation for layering."

155.   The following is a true and accurate image of WSI's webpage offering for Williams-Sonoma Home's "Signature 600-Thread-Count Sateen Bedding":



///
///
///
///
///

156.   Mr. Rushing's final cost for one set of king size sheets and an extra set of pillowcases was $774.20:

|  |  |
|---|---|
| SG 600TC STN K IV | $499.00 |
| S600 ST CSPR KGIVR | $159.00 |
| Subtotal | $658.00 |
| Shipping and Processing | $72.38 |
| Tax | $43.82 |
| Total | $774.20 |

157.   Mr. Rushing had never paid this much money for bedding, but he was not purchasing them for himself.  He planned to give them to his wife as a gift for Valentine's Day.

158.   While Mr. Rushing thought the bedding to be expensive, he believed the higher price was supported by WSI and its Advertising and Marketing Subsidiaries' representations that the bedding was 600 thread count, Egyptian cotton, and its most luxurious "Signature" bedding. Like most consumers, Mr. Rushing equated higher thread count numbers with better quality bedding.  He also understood that Egyptian cotton bedding was the highest quality. Like most consumers, he also believed Italian made bedding was high quality.   Trusting WSI's representations, Mr. Rushing believed the higher price he paid by buying this bedding would be reflected in the quality of the bedding and, therefore, worth the money.

159.   Based on WSI and its Advertising and Marketing Subsidiaries' representations of this line of bedding, Mr. Rushing expected the bedding to be of high quality, extremely soft and luxurious.  But they were not.  Mr. Rushing was so disappointed in the quality of the bedding that arrived, that he decided not to give them to his wife for Valentine's Day.

160.   Mr. Rushing was not only disappointed, but felt betrayed by WSI and did not know until April 21, 2015, when he received the results of the thread count testing, that the bedding was only approximately 291 thread count.  Had he known this fact, Mr. Rushing would not have purchased the bedding at such a high price.

161.    As a direct result of the conduct alleged herein, Mr. Rushing has been damaged in an approximate amount of $774.20.

162.    Mr. Rushing would likely purchase bedding from Defendants in the future if the advertised thread counts were accurately calculated according to Industry Standards and advertised according to the FTC's recommendations, because that proper labeling would allow him to make an informed decision in selecting bedding for different purposes and at different price points.

### CLAIMS FOR RELIEF

### COUNT ONE
**Consumer Legal Remedies Act**
**(California Civil Code § 1750, *et seq.*)**

163.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

164.    Plaintiff brings this count pursuant to California's Consumer Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*, for Defendants' omissions made actionable by misleading affirmative misrepresentations and/or exclusive knowledge of material facts, as well as its active concealment of the truth.

165.    The CLRA designates certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer" to be "unlawful."

166.    The Bedding Products at issue are "goods" as defined by the CLRA in California Civil Code § 1761(a).

167.    Defendants are "persons" as defined by the CLRA in California Civil Code § 1761(c).

168.    Plaintiff and the class members are "consumers" as defined by the CLRA in California Civil Code § 1761(d).

169.    Plaintiff's and class members' purchases of the Bedding Products are "transactions" as defined by the CLRA in California Civil Code § 1761(e).

*Affirmative Misrepresentations*

170. Thread count is a specific and measurable attribute of fabric based on visual inspection under magnification of a fabric sample coupled with simple addition.

171. Thread count is not required to be included on bedding products' labels or in advertising or marketing of those products.

172. To increase sales and profits, Defendants induced a false belief by consumers that the Bedding Products were of high thread count by affirmatively labeling, advertising, and marketing their two-ply bedding, including the bedding Mr. Rushing purchased, as having specific and measurable thread counts of 350 or greater, which are double their true thread counts.

173. Defendants labeled, advertised, and marketed the bedding Mr. Rushing purchased as being constructed of 600 thread count fabric, and even included the specific thread count in the product's name. Testing revealed that Defendants' representation about the thread count was false. The true thread count was only 291.

174. Defendants' admitted that they count each both plies in all of their bedding constructed of two-ply fabric. In their motion to dismiss, Defendants claimed that "federal customs regulations require that individual threads within multi-ply yarns in an imported textile like the WSH Bedding be counted individually, such that a textile 'containing 100 two-ply yarns in one square centimeter [is] reported as 200 single threads' . . . ."[17]

175. Accordingly, as with Mr. Rushing's purchase, the true thread counts of each of the Bedding Products, all of which are two-ply, is false, because it has been doubled from the true thread count.

176. Defendants' mislabeling of the Bedding Products to assert false thread counts is prohibited pursuant to the CLRA, since such mislabeling is "undertaken by [Defendants] in a transaction intended to result or which results in the sale or lease of [the Bedding Products] to any consumer."

---

[17] Defendants' Memorandum of Points and Authorities in Support [of their Motion to Dismiss Third Amended Complaint] (Doc. No. 26), at 13:19-22.

177.    Defendants engaged in unfair and deceptive acts declared unlawful by the CLRA by knowingly and intentionally mislabeling the Bedding Products to reflect a thread count materially higher than that which they actually had.

178.    Defendants violated the CLRA's proscription against misrepresentation of the "approval, characteristics, ingredients, uses, benefits, or quantities" of the Bedding Products by affirmatively misrepresenting at all times to Plaintiff, class members, and everyone in the chain of distribution in all of its broadly disseminated marketing and advertising, that the Bedding Products were of a specific higher thread count when, in fact, they were not.  Specifically, Defendants' misrepresentations of this material fact regarding the Bedding Products' superior qualities violated (a) California Civil Code § 1770(a)(5)'s proscription against representing that goods have characteristics and quantities that do not actually have; (b)  § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality or grade when they are of another; and (c) § 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised.

### *Exclusive Knowledge of Material Facts*
### *Not Known or Reasonably Accessible to Consumers*

179.    Defendants have a duty to disclose accurate information about the Bedding Products' advertised thread counts because they have exclusive knowledge concerning the actual thread count of the bedding they manufacture, import, and sell.

180.    Defendants provide thread count information on their bedding, which implies that they have access to it.  Indeed, Williams-Sonoma informs its customers on its websites that "At Williams-Sonoma, we take great pride in the quality and craftsmanship of our products. Attention to design, materials, safety and ***construction*** are our priority."  *Available at* http://www.williams-sonoma.com/products/monogrammed-classic-greek-key-bedding/?pkey=chome-sheet-sets&&chome-sheet-sets (emphasis added).

181.    Additionally, in support of their motion to dismiss, Defendants asserted to the Court that as importers, they are required to provide thread count information to U.S. Customs.  Although the information Williams-Sonoma purportedly provides to U.S. Customs is neither required for

1     bedding nor applicable to consumer advertising, marketing, or labeling, such a statement

2     establishes that WSI possesses sufficient information to be able to calculate thread count amounts

3     under the Industry Standard, as it merely required WSI to divide the thread counts it provided to

4     U.S. Customs by two.

5         182.    Information about Williams-Sonoma's bedding products' true thread counts is

6     exclusive to Williams-Sonoma. Consumers, including Mr. Rushing, cannot distinguish by the

7     naked eye or hand bedding of different thread counts. This is particularly true when bedding is

8     sold via catalogs and on the internet, where consumers, including Mr. Rushing, are forced to rely

9     upon photographs and Defendants' representations describing the bedding offered. To verify

10    Defendants' assertions about their products' thread counts, consumers would have to do as Mr.

11    Rushing did and hire a textile expert to test the bedding they purchased. Consumers cannot test

12    products being offered before they buy them. Besides being impractical and expensive, the testing

13    process damages the bedding being tested.

14                         ***Omissions of Material Facts***

15         183.    Contrary to its affirmative representations as to thread count, Defendants concealed

16    from consumers, including Mr. Rushing, that the thread counts listed on and for the Bedding

17    Products (1) have no relation to the thread counts used by others manufacturers and retailers in the

18    bedding industry; (2) include in the count not only each thread, but also each ply within each thread

19    contrary to the Textile Industry's Standard for calculating thread count, (3) are double the actual

20    thread counts if they were calculated under the Industry Standard; and (4) are purportedly

21    calculated, at least in part, using an inapplicable tariff regulation, namely 19 C.F.R. § 141.89(a).

22         184.    A reasonable consumer, including Mr. Rushing, would and did attach importance

23    to Defendants' affirmative representations about their bedding products' thread counts in making

24    the decision to purchase the particular bedding from WSI and deciding if the price associated with

25    such product was or is reasonable, with such thread count representations playing a substantial and

26    material part in that decision.

27

28

185.    Notwithstanding these deceptive representations and material omissions, Defendants conveyed and continue to convey a uniform message: The Bedding Products are luxurious high thread count bedding.

186.    Without the disclosure of the above-omitted information, reasonable consumers, like Mr. Rushing, were and are likely to continue to be deceived by Defendants' specific, yet false, thread count assertions.

187.    Defendants violated the CLRA by representing and failing to disclose material facts on the product labels and associated advertising, as described above, when they knew, or should have known, that the representations were unsubstantiated, false and misleading, and that the omissions were of material facts they were obligated to disclose.

188.    Williams-Sonoma also knew, or had reason to know, that its misrepresentations and omissions would induce Class members to purchase their bedding and pay higher prices for such bedding.

189.    Defendants' failure to disclose material facts contrary to its affirmative misrepresentations violated § 1770(a)(5)'s proscription against representing that goods have characteristics and quantities that they do not actually have.

190.    Defendants' failure to disclose material facts contrary to its affirmative misrepresentations violated or § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality or grade when they are of another.

191.    Defendants' failure to disclose material facts contrary to its affirmative misrepresentations violated § 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised.

192.    Defendants' failure to disclose material facts despite their duty to disclose them violated § 1770(a)(5)'s proscription against representing that goods have characteristics and quantities that they do not actually have.

193.   Defendants' failure to disclose material facts despite their duty to disclose them violated or § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality or grade when they are of another.

194.   Defendants' failure to disclose material facts despite their duty to disclose them violated § 1770(a)(9)'s proscription against advertising goods with the intent not to sell them as advertised.

*Active Concealment*

195.   Defendants actively concealed the above-material information from consumers.

196.   In 2003, Williams-Sonoma, Inc. and others were named as defendants in a putative class action, captioned *Schickel v. Williams-Sonoma, Inc.*, that asserted virtually identical allegations that Williams-Sonoma's advertised thread counts were double (or even triple, in that case) the actual thread count if calculated using the Industry Standard represented by ASTM D3775.  **Exhibit F** (Complaint)**.**

197.   Williams-Sonoma defended itself in the *Schickel* case by arguing, as here, that its actions were "barred under the safe harbor provision of Business and Professions Code section 17200 because Defendants' actions were specifically permitted by law."  They also argued that the plaintiff's claims were subject to federal preemption.  **Exhibit G**, at 2-3 (Defendants' Answer to Fourth Amended Complaint).

198.   19 C.F.R. § 141.89(a)'s "cotton fabric" requirements that plies be included in counting threads, upon which WSI has long relied, only apply to five categories of cotton fabric set forth in Chapter 52 of the Harmonized Tariff Schedule of the United States ("HTSUS"), namely HTSUS headings 5208, 5209, 5210, 5211, and 5212. Sheets and pillowcases do not fall within any of those five HTSUS categories or Chapter 52, which applies to the general topic of cotton fabric, such as bolts of fabric one would find at a fabric store.  A true and accurate copy of excerpts from HTSUS's Chapter 52 and General Rules of Interpretation are attached hereto as **Exhibits H** and **I**, respectively.

199.    Prior to Mr. Rushing's purchase, Williams-Sonoma knew or should have known that 19 C.F.R. § 141.89(a)'s "cotton fabric" ply-multiplication rule did not apply to the bedding at issue here.  On at least three separate occasions from 2005 through 2011, WSI asked U.S. Customs for a ruling to clarify under which HTSUS category its imported sheets and pillowcases fall, and in response to each, U.S. Customs held that WSI's bedding was properly classified under HTSUS Chapter 63, which narrowly focuses on "[b]ed linen, table linen, toilet linen and kitchen linen," with Category 6302.31 focusing specifically on cotton bedding, including sheets and pillowcases. True and accurate copies of U.S. Custom's above-referenced tariff classification rulings dated June 15, 2005; August 24, 2005; and June 6, 2011 are attached hereto as **Exhibits J**, **K,** and **L**, respectively.  True and accurate excerpts from HTSUS Chapter 63 is attached hereto as **Exhibit M**.

200.    Despite this knowledge, Defendants have engaged in an affirmative campaign to continue to use 19 C.F.R. § 141.89(a)'s "cotton fabric" ply-multiplication rule to calculate the inflated thread counts they advertise for their Bedding Products (without simultaneously converting its thread count total to represent the number of threads in a square centimeter, as opposed to a square inch, as § 141.89(a)'s cotton fabric formula requires).

201.    On June 3, 2016, in response to Mr. Rushing's CLRA Notice Letter, Defendants' response again denied the fact that ASTM D3775 is the Industry Standard for calculating thread count for bedding and failed to offer any relief to Mr. Rushing.

202.    Defendants' Request for Judicial Notice in Support of its Reply Brief also continued to make the false arguments that ASTM D3775-12 is not the Industry Standard applicable to its bedding. (Doc. No. 31-2, at 2.)

203.    In Defendants' motion to dismiss, Defendants also continued their false assertions that Defendants are required by federal law, specifically § 141.89(a), to count both plies of their two-ply bedding when calculating thread count. (Doc. No. 26, at 14.)

204.    WSI knew or should have known for at least eleven years that its use of § 141.89(a)'s "cotton fabric" ply-multiplication rule to calculate the thread counts it advertised for

its bedding was improper and would result in doubling the true thread count.  Despite this knowledge, and to increase sales from consumers like Mr. Rushing, Defendants have engaged in more than a decade long campaign to deny that their thread count representations are false by affirmatively asserting that they are required under federal law to count individual plies.

205.    Defendants' active concealment of material facts violated § 1770(a)(5)'s proscription against representing that goods have characteristics and quantities that they do not actually have.

206.    Defendants' active concealment of material facts violated or § 1770(a)(7)'s proscription against representing that goods are of a particular standard, quality or grade when they are of another.

207.    Defendants' active concealment of material facts violated § 1770(a)(9)'s proscription against advertising good with the intent not to sell them as advertised.

208.    Defendants' concealment and deceptive practices, in violation of the CLRA, were designed to induce Plaintiff and the members of the Class to purchase the Bedding Products.

209.    Defendants intended to do the act that was deceptive and/or fraudulent, namely, to market, distribute and sell the Bedding Products.

210.    To this day, Defendants continue to violate the CLRA by concealing the false thread counts of their Bedding Products and by failing or refusing to reveal to class members that the Bedding Products they purchased were of a much lower thread count than labeled and advertised.

211.    Plaintiff and the class members reasonably relied on Defendants' representations regarding thread count in their purchase of the Bedding Products.

212.    As a direct and proximate result of Defendants' unfair and deceptive acts or practices, Plaintiff and the class members have suffered damages in that they purchased misbranded Bedding Products they would not have bought, purchased more of the Bedding Products than they would otherwise have bought, or paid more for the Bedding Products than they would have if the Bedding Products had been honestly advertised and labeled.

213.   By reason of the foregoing and pursuant to California Civ. Code §§ 1780(a)(2) and 1782(d), Plaintiff, on behalf of himself and all others similarly situated, demands judgment against Defendants under the CLRA for injunctive relief in the form of an injunction requiring Defendants to correct their misstatements through notice to the Class; an injunction requiring Defendants to replace the mislabeled Bedding Products with bedding of the same quality, characteristics, and thread count advertised free of charge; and a permanent injunction requiring Defendants to rectify their goods going forward by following the ASTM D3775 Standard for calculating their products' thread count, if contained on labels or advertised; and an award of attorneys' fees.

214.   Defendants' conduct is fraudulent, wanton and malicious.

215.   In compliance with California Civ. Code § 1780(d), Plaintiff's venue affidavit attached as **Exhibit A**.

216.   The CLRA requires anyone seeking damages under it to provide notice to the defendant as specified in California Civil Code § 1782(a) (hereafter, the "CLRA Notice Letter").

217.   Pursuant to stipulation of the parties (Doc. No. 19), Defendants agreed to accept Plaintiff's CLRA Notice Letter via email to Defendants' counsel.  On May 4, 2016, Plaintiff's Counsel sent, and Defendants received, Plaintiff's CLRA Notice Letter to Defendants via email to their counsel pursuant to the Parties' stipulation (Doc. No. 19).  In compliance with § 1782(a), Plaintiff's CLRA Notice notified Defendants, *inter alia*, of the particular alleged violations of § 1770.  Plaintiff also sent courtesy copies via U.S. Postal Service Certified Mail to Defendants' principal places of business in California.  True and accurate copies of (i) Plaintiff's CLRA Notice Letter, dated May 4, 2016, and a transmittal email of the same date from Plaintiff's Counsel K. Honecker to Defense Counsel B. Aigboboh are attached as **Exhibit N**, and (ii) Certified Mail receipts are attached as **Exhibit O**.

218.   Within 30 days of receiving Plaintiff's CLRA Notice Letter, Defendants had not (i) made any corrections, repairs, replacements, or other remedies to Plaintiff; (ii) provided notice to Plaintiff that Defendants agree to do so in the future; or (iii) otherwise provided appropriate relief

1  for the violations of CLRA §§ 1770(a)(5), (7) and (9) that Plaintiff's CLRA Notice Letter

2  identified.

3       219.    Pursuant to Cal. Civil Code § 1782(d), on or after June 3, 2016, Plaintiff was

4  therefore entitled to, and did, amend his complaint without leave of court to include a request for

5  damages under the CLRA.

6       220.    On September 14, 2016, Plaintiff submitted an amended CLRA notice letter

7  ("Amended CLRA Notice Letter") to Defendants via certified mail to Defendants' principal place

8  of business in California with a courtesy copy provided via email to their counsel of record.  The

9  United States Postal Service's ("USPS") records show that it successfully delivered the Amended

10 CLRA Notice Letter on September 19, 2016.  The amended notice identified additional two-ply

11 bedding advertised as having thread counts of 350 or greater that were not included in Plaintiff's

12 original CLRA notice (the "Additional Bedding").  True and accurate copies of (i) Plaintiff's

13 Amended CLRA Notice Letter, dated September 14, 2016, and a transmittal email of the same

14 date from Plaintiff's Counsel's paralegal, R. Reynolds, to Defense Counsel B. Aigboboh are

15 attached as **Exhibit P**, (ii) Certified Mail receipts are attached as **Exhibit Q**; and USPS.com's

16 USPS Tracking® webpage showing delivery on September 19, 2016, as **Exhibit R**.

17      221.    Within 30 days of receiving Plaintiff's Amended CLRA Notice Letter, Defendants

18 had not (i) made any corrections, repairs, replacements, or other remedies to Plaintiff; (ii) provided

19 notice to Plaintiff that Defendants agree to do so in the future; or (iii) otherwise provided

20 appropriate relief for the violations of CLRA §§ 1770(a)(5), (7) and (9) that Plaintiff's CLRA

21 Notice Letter identified.

22      222.    Pursuant to Cal. Civil Code § 1782(d), on or after October 20, 2016, Plaintiff was

23 therefore entitled to, and does through this amendment, amend his complaint without leave of court

24 to include a request for damages under the CLRA for the Additional Bedding.

25      223.    In accordance with California Civil Code § 1782(d), Plaintiff seeks the following

26 relief for Defendants' violations of CLRA §§ 1770(a)(5), (7) and (9) with regard to all of the

27 Bedding Products identified herein:

28

a.   Actual damages under Civil Code Section 1780(a)(1);

b.   Punitive damages under Civil Code Section 1780(a)(4);

c.   Restitution of funds paid to Defendants under Civil Code Section 1780(a)(3);

d.   Attorneys' fees and costs under Civil Code Section 1780(d); and

e.   Any other relief the Court deems proper under Civil Code Section.

## COUNT TWO
### Misleading and Deceptive Advertising
**(Business and Professions Code § 17500, *et seq.*)**

224.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

225.    Plaintiff asserts this cause of action for violations of California Business and Professions Code § 17500 for misleading advertising against all Defendants.

226.    At all times relevant hereto, Defendants have engaged in a deceptive offering for sale items of bedding and sheeting to the general public by way of disseminating commercial advertisements, including on the Internet, which were false and misleading as described herein. Said advertisements and inducements were made from within the State of California and come within the definition of advertisements as contained in the Business and Professions Code § 17500 in that such promotional materials are intended inducements to the public to purchase the bedding and sheeting described or depicted therein, and are statements disseminated by Defendants to the general public or intended to reach the general public. Such statements Defendants knew, or in the exercise of reasonable care should have known, were misleading.

227.    In furtherance of said plan, Defendants have prepared and distributed from within the State of California via the Internet, catalogs, and showrooms, marketing and promotional materials with misleading and deceptive descriptions of its offerings.   Defendants have also distributed from within the State of California Bedding Products with misrepresented thread counts.  Defendants have engaged in deceptive ways of what is known as "passing off."

228.    The above-intentional acts of Defendants, and each of them, in disseminating said misleading statements from within the State of California and to the general public thereof are likely to deceive the general public of the State of California and nationwide by obfuscating the quality of the bedding thread count, all in violation of the misleading prong of California Business and Professions Code § 17500.

229.    As a result of the above violations of the misleading prong of Business and Professions Code § 17500 and pursuant to Business and Professions Code § 17535, Plaintiff and class members have been injured and are entitled to an order of this court enjoining such future conduct on the part of Defendants, and each of them, and such other orders and judgments that may be necessary, including the appointment of a receiver, to restore to any person in interest any money paid for bedding and sheeting as a result of the acts of Defendants or for replacement of the materials with goods of the type and quality described in the misleading and deceptive advertisements.

230.    By reason of the foregoing, Plaintiff and class members pray for relief as set forth hereinafter.

**COUNT THREE**
**Untrue Advertising**
**(Business and Professions Code § 17500, *et seq.*)**

231.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

232.    Defendants' conduct constitutes false advertising in violation of California Business and Professions Code § 17500, *et seq.*, for untrue advertising.

233.    At all times relevant hereto, Defendants were offering for sale the Bedding Products to Plaintiff and to the general public by way of disseminating commercial advertisements via catalogs, their websites, and retail showrooms. These advertisements contained untrue or misleading statements about the Bedding Products' thread count.

234.    Defendants knew, or in the exercise of reasonable care should have known, that its statements as to the Bedding Products' statements were untrue.

235.    Defendants' untrue or misleading advertisements and inducements were made from within the State of California and come within the definition of advertisements as contained in Business and Professions Code § 17500 in that such promotional materials were intended to induce to the public to purchase the Bedding Products described or depicted in the advertising, and are untrue statements disseminated by Defendants to the general public.

236.    In furtherance of said plan, Defendants prepared and distributed from within the State of California advertising with untrue descriptions of the Bedding Products as alleged herein and as will be discovered through discovery in this action.

237.    Defendants' acts and practices in disseminating said untrue advertising from within the State of California and to the general public thereof deceived the general public of the State of California and nationwide by obfuscating the nature and quality of the Bedding Products in violation of California Business and Professions Code § 17500.

238.    As a result of Defendants' violation of the False Advertising Law, Plaintiff and other class members were likely to be deceived and/or were deceived into purchasing the Bedding Products and thereby suffered loss of money or property.

239.    By reason of the foregoing and pursuant to Business and Professions Code § 17535, Plaintiff and class members seek all remedies available under the False Advertising Law, including an order of this court enjoining such future conduct on the part of Defendants, and each of them, and such other orders and judgments which may be necessary, including restitution and the appointment of a receiver, to restore to any person in interest any money paid for the Bedding Products, or replacement goods, as a result of the Defendants acts.

**COUNT FOUR**
**Unlawful Business Practices**
**(Unfair Competition Law - Business and Professions Code § 17200, *et seq.*)**

240.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

241.    Such acts of Defendants as described above, constitute unlawful business practices and constitute violations of California's Unfair Competition Law, Business and Professions Code

§ 17200, *et seq.* (the "UCL").  The UCL prohibits unlawful business practices, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business and Profession Code § 17500.

242.   The Defendants' business practices alleged above are unlawful under the Federal Trade Commission Act (FTCA) § 5(a), 15 U.S.C.A. § 45(a), which designates as "unlawful" all "unfair or deceptive acts or practices in or affecting commerce."

243.   The Defendants' business practices alleged above are "unfair" under the FTCA § 5(a) as they are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n).

244.   The business practices alleged above are "deceptive" under the FTCA § 5(a) as they include a material representation, omission, or practice that is likely to mislead consumers acting reasonably under the circumstances.

245.   As alleged in Count 1, the business practices alleged above are unlawful under California's Consumer Legal Remedy Act ("CLRA").

246.   As alleged in Counts 2 and 3, the business practices alleged above are unlawful under § 17200 by virtue of violating California Business and Professions Code § 17500, *et seq.*

247.   Such acts of Defendants as described above constitute unlawful business practices by virtue of violations of the FTCA, CLRA, and California Business and Professions Code § 17500, *et seq.*, and therefore constitute violations of the UCL.

248.   As a result of the business practices described above and pursuant to Business and Professions Code § 17203, Plaintiff and class members have been injured and are entitled to an order enjoining such future conduct on the part of Defendants, and each of them, and such other orders and judgment which may be necessary, including the appointment of a receiver, to restore to any person in interest any money paid for bedding and sheeting, or replacement of the goods, and/or excessive payments made for items in the product categories as a result of Defendants' acts.

249.    By reason of the foregoing, Plaintiff and class members pray for relief as set forth hereinafter.

**COUNT FIVE**
**Unfair Business Practices**
**(Unfair Competition Law - Business and Professions Code § 17200, *et seq.*)**

250.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

251.    Such acts of Defendants as described above, constitute unfair competition in that, for reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, unscrupulous, and substantially injurious to the public.

252.    Such acts of Defendants as described above constitute unfair business practices by virtue of violations of the FTCA, CLRA, and California Business and Professions Code § 17500, *et seq.*, and therefore are tied to specific statutory provisions and constitute violations of the UCL. The UCL prohibits unfair business practices, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business and Profession Code § 17500.

253.    The business practices alleged above are unlawful under FTCA § 5(a). By virtue of these violations, Defendants have engaged in unfair business practices as defined by the UCL.

254.    The business practices alleged above are unlawful under the CLRA. By virtue of these violations, Defendants have engaged in unfair business practices as defined by the UCL.

255.    The business practices alleged above are unlawful under California Business and Professions Code § 17500, *et seq.*  By virtue of these violations, Defendants have engaged in unfair business practices as defined by the UCL.

256.    Purchasers of Defendants' mislabeled Bedding Products suffered a substantial injury by virtue of paying an excessive price for unfairly advertised bedding.

257.    There is no benefit to consumers or competition by falsely advertising bedding or allowing Defendants to use their own method for calculating thread counts that generates higher thread counts than competitors using the Industry Standard.  Indeed, the harm to consumers and

1   competition is substantial.  Competitors are also injured when one cheats and others do not, and

2   consumers are always harmed.

3       258.    Consumers have no way of reasonably knowing that the bedding they are buying is

4   not as advertised because of a lack of skill and knowledge that they are relying upon Defendants

5   to supply.  It takes testing or a well-trained eye to discern the truth regarding the bedding.  Thus,

6   consumers could not have reasonably avoided the injury each of them suffered.

7       259.    As a result of the business practices described above and pursuant to Business and

8   Professions Code § 17203, Plaintiff and class members have been injured and are entitled to an

9   order enjoining such future conduct on the part of Defendants, and each of them, and such other

10   orders and judgment which may be necessary, including the appointment of a receiver, to restore

11   to any person in interest any money paid for bedding, or replacement of the goods, and/or excessive

12   payments made for items in the product categories as a result of the acts of Defendants.

13       260.    By reason of the foregoing, Plaintiff and class members pray for relief as set forth

14   hereinafter.

15   **COUNT SIX**
**Fraudulent Business Practices**
16   **(Unfair Competition Law - Business and Professions Code § 17200, *et seq.*)**

17       261.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully

18   set forth herein.

19       262.    Defendants' acts as described above, and each of them, constitute fraudulent

20   business practices under California Business and Professions Code sections 17200, *et seq.*

21       263.    As more fully described above, Defendants represented the Bedding Products to be

22   of a specified thread count, intending consumers rely on such representations in purchasing the

23   Bedding Products.

24       264.    As more fully described above, such representations were false and Defendants

25   knew or should have known them to be false.

26       265.    As more fully described above, the representations of thread count by Defendants

27   were material in Plaintiff's and class members' decision to purchase the Bedding Products.

28

266.    As more fully described above, Defendants' advertising of the Bedding Products as a certain thread count was and continues to be likely to deceive reasonable bedding purchasers, who reasonably rely on such representations.   Indeed, purchasers are certain to be deceived regarding the thread counts of Defendants' bedding.

267.    Defendants' fraud and deception caused the Bedding Products' purchasers, including Plaintiff, to pay too much for the Bedding Products given their true thread counts.

268.    As a result of the business practices described above, Plaintiff, individually and on behalf of the Class pursuant to Business and Professions Code section 17203, is entitled to an order enjoining such future conduct on the part of Defendants, and each of them, and such other orders and judgments which may be necessary, including the appointment of a receiver, to restore to any person in interest any money paid for bedding and sheeting, or replacement goods, as a result of the acts of Defendants.

269.    By reason of the foregoing, Plaintiff and class members pray for relief as set forth hereinafter.

**COUNT SEVEN**
**Unjust Enrichment**
*(As to Defendants' WSI)*

270.    Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

271.    As a result of its unfair and deceptive conduct described above, including the false and misleading labeling and advertising of the Bedding Products, WSI received monies as a result of Plaintiff's and the class members' purchases of the Bedding Products.

272.    WSI wrongfully accepted and retained these benefits to the detriment of Plaintiff and the Class.

273.    WSI's enrichment at the expense of Plaintiff and the class members was unjust.

274.    It would be unjust and inequitable for WSI to retain its profits earned from misrepresenting the Bedding Products' thread counts to increase sales.

275.    As a result of WSI's wrongful conduct, Plaintiff and the Class are entitled to restitution from and the institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by WSI, plus attorneys' fees, costs, and interest thereon.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays that this case be certified and maintained as a class action and for judgment to be entered in favor of Plaintiff and the Class against Defendants as follows:

A.      certifying the Class under Federal Rule of Civil Procedure 23(b)(3) and California Civil Code § 1781(b), appointing the named Plaintiff as the representative of the Class, and appointing the law firms representing the named Plaintiff as counsel for the Class;

B.      enjoining Defendants from further misstating thread count in advertising and marketing their bedding;

C.      directing Defendants to disgorge profits from its misleading and deceptive practice and to pay restitution to the Class; awarding Plaintiff and the Class rescission;

D.      awarding Plaintiff and the Class actual, compensatory damages in an amount to be proven at trial;

E.      awarding Plaintiff and the Class restitution of all monies paid to Defendants as a result of unlawful, deceptive, and unfair business practices;

F.      awarding Plaintiff and the Class exemplary damages in an amount to be proven at trial;

G.      awarding Plaintiff and the Class reasonable attorneys' fees, costs, and pre- and post-judgment interest in amounts to be determined by the Court; and

H.      granting any other relief that the Court may deem just, equitable, and proper.

1

**REQUEST FOR JURY TRIAL**

2        Plaintiff hereby requests a trial by jury for all causes of action, claims or issues in this

3   action that are triable as a matter of right to a jury pursuant to Federal Rule of Civil Procedure

4   38(b).

5   Dated:  October 24, 2016.                    Respectfully submitted,

6                                                **ROSE LAW GROUP, PC**

7                                                */s/ Kathryn Honecker*

8                                                Kathryn Honecker (admitted *pro hac vice*)
                                                 Audra Petrolle (admitted *pro hac vice*)
9                                                7144 E Stetson Drive, Suite 300
                                                 Scottsdale, Arizona 85251
10                                               Telephone:  480.505.3936

11
                                                 **BAKER LAW, PC**
12                                               George Richard Baker (SBN 224003)
                                                 436 N. Stanley Avenue
13                                               Los Angeles, California 90036
                                                 richard@bakerlawpc.com
14                                               Phone: 323.452.9685

15
                                                 *Attorneys for Plaintiff*
16

17

18

19

20

21

22

23

24

25

26

27

28