1 | SHEPPARD MULLIN RICHTER & HAMPTON LLP
P. CRAIG CARDON, Cal. Bar No. 168646
2 | ROBERT J. GUITE, Cal. Bar No. 244590
BENJAMIN O. AIGBOBOH, Cal. Bar No. 268531
3 | ALYSSA SONES, Cal. Bar No. 318359
Four Embarcadero Center, 17th Floor
4 | San Francisco, California 94111-4109
Telephone:   415.434.9100
5 | Facsimile:   415.434.3947
Email:      ccardon@sheppardmullin.com
6 |            rguite@sheppardmullin.com
            baigboboh@sheppardmullin.com
7 |            asones@sheppardmullin.com

8 | *Attorneys for Defendants*

9 | **UNITED STATES DISTRICT COURT**

10 | **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| 11 · WILLIAM RUSHING and ELIZABETH PERLIN, individually and on behalf of all others similarly situated, | Case No. 3:16-cv-01421-WHO |
| 12 | |
| | *Assigned to the Hon. William H. Orrick* |
| 13 ·            Plaintiff, | |
| | **CLASS ACTION** |
| 14 ·      v. | |
| | **OPPOSITION TO MOTION FOR CLASS CERTIFICATION** |
| 15 · WILLIAMS-SONOMA, INC., a Delaware corporation, also d/b/a Williams-Sonoma, Williams-Sonoma Home, and Pottery Barn; WILLIAMS-SONOMA DTC, INC., a California corporation; WILLIAMS-SONOMA ADVERTISING, INC., | |
| 16 | Hearing |
| | Date:          August 16, 2023 |
| 17 | Time:          2:00 p.m. |
| | Courtroom:   2 |
| 18 ·            Defendants. | |
| | Complaint Filed:   January 29, 2016 |
| 19 | Action Removed:   March 23, 2016 |
| | 8AC Filed:          June 5, 2020 |
| 20 | Trial Date:          None Set |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................1

II.    FACTUAL BACKGROUND ................................................................................2

       A.    The Parties ..................................................................................................2

       B.    Plaintiffs' Purchases ...................................................................................2

III.   RELEVANT PROCEDURAL HISTORY ............................................................3

       A.    Rushing's Complaints .................................................................................3

       B.    Defendants Seek Summary Judgment Of Rushing's Claims ......................3

       C.    Plaintiffs File The *8AC* .............................................................................3

       D.    Defendants Seek Summary Judgment Of Perlin's Claims .........................4

       E.    Perlin Files The *Motion* ............................................................................4

IV.    LEGAL STANDARD ...........................................................................................4

V.     THE *MOTION* SHOULD BE DENIED ...............................................................5

       A.    The *Motion* Does Not Satisfy Federal Rule Of Civil Procedure 23(a) .....................5

             1.    The *Motion* Does Not Establish Commonality .................................5

             2.    The *Motion* Does Not Establish Typicality .......................................6

                   a.    The Limitations Defense To Perlin's Claims Renders Her Atypical ...............................6

                   b.    Perlin Is Not Typical Because Class Members Agreed To Arbitrate ...............................9

             3.    The *Motion* Does Not Establish Adequacy ...................................12

       B.    The *Motion* Does Not Satisfy Federal Rule Of Civil Procedure 23(b)(2) ..............12

             1.    The *Motion* Does Not Establish The Rule 23(b)(2) Class Can Be Certified ...............................12

                   a.    Perlin Lacks Standing To Pursue Injunctive Relief ........................13

                   b.    The Rule 23(b)(2) Class Cannot Be Certified Because California Law Cannot Be Applied Nationwide ..............................14

             2.    The *Motion* Does Not Satisfy Federal Rule Of Civil Procedure 23(b)(3) ...............................17

a.    The *Motion* Does Not Establish Predominance ...............................17

(1)    Deception Is A Predominant Individual Question ...............17

(2)    Individual Reliance, Causation, And Injury Questions Predominate...........................................................................23

(3)    The Motion Does Not Establish A Valid, Common Method Sufficient To Measure Damages............................28

    a)    The Proposed Direct Benchmark Approach............29

    b)    The Proposed Hedonic Pricing Model ...................32

(4)    The Statutes of Limitations Are A Predominant Individual Question ............................................................36

(5)    Arbitration Is A Predominant Individual Issue ...................37

b.    The *Motion* Does Not Establish Superiority ....................................38

VI.    CONCLUSION ......................................................................................................39

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3   Federal Cases

4   *In re 5-Hour Energy Mktg. & Sales Practices Litig.*
5       2017 U.S. Dist. LEXIS 220969 (C.D. Cal. June 7, 2017) .................................... 23, 24, 25, 26

6   *Adam v. AQ Textiles LLC*
        2021 U.S. Dist. LEXIS 147642 (M.D.N.C. Aug. 6, 2021) ........................................ 19, 20, 26
7

8   *Algarin v. Maybelline, LLC*
        300 F.R.D. 444 (S.D. Cal. 2014) ......................................................................... 24, 30, 32

9   *Allen v. ConAgra Foods, Inc.*
10      331 F.R.D. 641 (N.D. Cal. 2019) ................................................................................. 6, 26

11  *Alvarado v. Wal-Mart Assocs.*
        2021 U.S. Dist. LEXIS 245799 (C.D. Cal. Nov. 3, 2021) ........................................ 5
12

13  *Andrade v. Am. First Fin., Inc.*
        2022 U.S. Dist. LEXIS 146378 (N.D. Cal. Aug. 16, 2022) ................................... 10

14  *Andrews v. Ring LLC*
15      2020 U.S. Dist. LEXIS 199322 (C.D. Cal. Sep. 17, 2020) ................................... 10

16  *Ang v. Bimbo Bakeries USA, Inc.*
        2018 U.S. Dist. LEXIS 149395 (N.D. Cal. Aug. 31, 2018) ................................... 35
17

18  *Astiana v. Kashi Co.*
        291 F.R.D. 493 (S.D. Cal. 2013) ...................................................................... 26

19  *Avilez v. Pinkerton Gov't Servs.*
20      596 Fed. Appx. 579 (9th Cir. 2015) .................................................................. 10

21  *Badella v. Deniro Mktg. LLC*
        2011 U.S. Dist. LEXIS 128145 (N.D. Cal. Nov. 4, 2011) ................................... 26
22

23  *Bailey v. Rite Aid Corp.*
        2021 U.S. Dist. LEXIS 194038 (N.D. Cal. May 26, 2021) ................................... 22

24  *Barraza v. C. R. Bard Inc.*
        322 F.R.D. 369 (D. Ariz. 2017) ........................................................................ 17
25

26  *Bateman v. Am. Multi-Cinema, Inc.*
        623 F.3d 708 (9th Cir. 2010) ............................................................................ 38
27

28  *Bates v. UPS*
        511 F.3d 974 (9th Cir. 2007) ............................................................................ 13

*Berman v. Freedom Fin. Network, LLC*
    400 F. Supp. 3d 964 (N.D. Cal. 2019) ................................................... 10

*Blackwell v. Skywest Airlines*
    245 F.R.D. 453 (S.D. Cal. 2007)............................................................... 6

*Boumaiz v. Charter Communs. LLC*
    2021 U.S. Dist. LEXIS 102608 (C.D. Cal. May 19, 2021)..........................6, 10, 12

*Brazil v. Dole Packaged Foods, LLC*
    2014 U.S. Dist. LEXIS 157575 (N.D. Cal. Nov. 6, 2014) ................................ 34, 36

*Brazil v. Dole Packaged Foods, LLC*
    2014 U.S. Dist. LEXIS 74234 (N.D. Cal. May 30, 2014) ................................ 15

*Brown v. Electrolux Home Prods.*
    817 F.3d 1225 (11th Cir. 2016) .............................................................. 5

*Bruton v. Gerber Prods. Co.*
    2018 U.S. Dist. LEXIS 30814 (N.D. Cal. Feb. 13, 2018)............................... 13, 32, 36

*Burton v. Mt. W. Farm Bureau Mut. Ins. Co.*
    214 F.R.D. 598 (D. Mont. 2003) ............................................................ 6

*Campanelli v. Image First Healthcare Laundry Specialists, Inc.*
    2018 U.S. Dist. LEXIS 215287 (N.D. Cal. Dec. 21, 2018) ................................ 10

*Cherewick v. State Farm Fire & Cas.*
    578 F. Supp. 3d 1136 (S.D. Cal. 2022) ...................................................... 25

*Chow v. Neutrogena Corp.*
    2013 U.S. Dist. LEXIS 17670 (C.D. Cal. Jan. 22, 2013)................................. 26

*Comcast Corp. v. Behrend*
    569 U.S. 27 (2013) .......................................................................*passim*

*Compaq Comput. Corp. v. Packard Bell Elecs.*
    163 F.R.D. 329 (N.D. Cal. 1995) ........................................................... 19

*In re Conagra Foods, Inc.*
    302 F.R.D. 537 (C.D. Cal. 2014) .......................................................... 24

*Conde v. Open Door Mktg., LLC*
    223 F. Supp. 3d 949 (N.D. Cal. 2017) ..................................................... 10

*Conde v. Sensa*
    2018 U.S. Dist. LEXIS 154031 (S.D. Cal. Sep. 10, 2018) ............................... 37, 38

*Corley v. Entergy Corp.*
    220 F.R.D. 478 (E.D. Tex. 2004)............................................................ 37

*Cormier v. Carrier Corp.*
2019 U.S. Dist. LEXIS 53222 (C.D. Cal. Mar. 25, 2019) ............................................. 25

*Cover v. Windsor Surry Co.*
2016 U.S. Dist. LEXIS 16475 (N.D. Cal. Feb. 10, 2016)................................................. 14, 16

*Darisse v. Nest Labs, Inc.*
2016 U.S. Dist. LEXIS 107938 (N.D. Cal. Aug. 15, 2016) ....................................... 14, 15, 16

*Davison v. Kia Motors Am., Inc.*
2015 U.S. Dist. LEXIS 85080 (C.D. Cal. June 29, 2015).............................................. 15, 16

*In re Dial Complete Mktg. & Sales Practices Litig.*
312 F.R.D. 36 (D.N.H. 2015)........................................................................................ 34, 35

*Dunn v. Costco Wholesale Corp.*
2021 U.S. Dist. LEXIS 179838 (C.D. Cal. July 30, 2021) .............................................. 22, 27

*Ellsworth v. Schneider Nat'l Carriers, Inc.*
2021 U.S. Dist. LEXIS 246084 (C.D. Cal. Oct. 28, 2021) ..................................................... 10

*Farr v. Acima Credit LLC*
2021 U.S. Dist. LEXIS 126431 (N.D. Cal. July 7, 2021) ...................................................... 10

*Faulk v. Sears Roebuck & Co.*
2013 U.S. Dist. LEXIS 57430 (N.D. Cal. Apr. 19, 2013)........................................... 17, 24, 28

*Fisher v. Ciba Specialty Chems. Corp.*
238 F.R.D. 273 (S.D. Ala. 2006)............................................................................................ 37

*Forrett v. Gourmet Nut, Inc.*
2022 U.S. Dist. LEXIS 185674 (N.D. Cal. Oct. 11, 2022) ................................................... 18

*Frompovicz v. Niagara Bottling, LLC*
420 F. Supp. 3d 361 (E.D. Pa. 2019) ...................................................................................... 8

*Gallardo v. UPS*
2011 U.S. Dist. LEXIS 165174 (C.D. Cal. Aug. 22, 2011) ................................................... 39

*Gianino v. Alacer Corp.*
846 F. Supp. 2d 1096 (C.D. Cal. 2012)...................................................................... 14, 15, 16

*Gile v. Dolgen Cal. LLC*
2022 U.S. Dist. LEXIS 151255 (C.D. Cal. Aug. 2, 2022) ..................................................... 10

*Glenn v. Hyundai Motor Am.*
2016 U.S. Dist. LEXIS 181318 (C.D. Cal. June 24, 2016).......................................... 14, 15, 16

*Hadjavi v. CVS Pharmacy, Inc.*
2011 U.S. Dist. LEXIS 86341 (C.D. Cal. July 25, 2011) ...................................................... 39

*Haley v. Medtronic, Inc.*
    169 F.R.D. 643 (C.D. Cal. 1996) ........................................................................ 39

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) ............................................................................. 6

*Heejim Lim v. Helio, LLC*
    2012 U.S. Dist. LEXIS 197229 (C.D. Cal. Apr. 18, 2012) .................................... 39

*Henson v. Fid. Nat'l Fin., Inc.*
    300 F.R.D. 413 (C.D. Cal. 2014) ........................................................................ 37

*Heredia v. Sunrise Senior Living LLC*
    2021 U.S. Dist. LEXIS 42447 (C.D. Cal. Feb. 9, 2021) ........................................ 10

*Herron v. Best Buy Stores, LP*
    2016 U.S. Dist. LEXIS 52486 (E.D. Cal. Apr. 18, 2016) ....................................... 12

*Herron v. Best Buy Stores, Ltd. P'ship*
    2018 U.S. Dist. LEXIS 70556 (E.D. Cal. Apr. 26, 2018) ................................... 29, 33

*Hill v. T-Mobile USA, Inc.*
    2011 U.S. Dist. LEXIS 157669 (N.D. Ala. May 16, 2011) ..................................... 37

*Horvath v. LG Elecs. MobileComm U.S.A., Inc.*
    2012 U.S. Dist. LEXIS 19215 (S.D. Cal. Feb. 13, 2012) ....................................... 15

*Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc.*
    340 F.R.D. 383 (N.D. Cal. 2021) ........................................................................ 13

*Jones v. ConAgra Foods, Inc.*
    2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014) ............................... passim

*King v. Capital One Bank (USA), N.A.*
    2012 U.S. Dist. LEXIS 163562 (W.D. Va. Nov. 15, 2012) .................................... 12

*Kosta v. Del Monte Foods, Inc.*
    308 F.R.D. 217 (N.D. Cal. 2015) ........................................................................ 25

*Kottaras v. Whole Foods Mkt., Inc.*
    281 F.R.D. 16 (D.D.C. 2012) ............................................................................. 34

*LaBauve v. Olin Corp.*
    231 F.R.D. 632 (S.D. Ala. 2005) ........................................................................ 37

*Lack v. Mizuho Bank, Ltd.*
    2019 U.S. Dist. LEXIS 127963 (C.D. Cal. Apr. 30, 2019) ................................ 24, 28

*Larsen v. Vizio, Inc.*
    2017 U.S. Dist. LEXIS 223667 (C.D. Cal. Apr. 27, 2017) .................................... 30

*Leyva v. Medline Indus. Inc.*
    716 F.3d 510 (9th Cir. 2013) ................................................................. 29

*Lindblom v. Santander Consumer USA, Inc.*
    2018 U.S. Dist. LEXIS 13267 (E.D. Cal. Jan. 26, 2018) ......................... 6

*Lozano v. AT&T Wireless Servs.*
    504 F.3d 718 (9th Cir. 2007) ................................................................. 37

*Lucas v. Breg, Inc.*
    212 F. Supp. 3d 950 (S.D. Cal. 2016) ............................................. 36, 37

*Maine State Retirement Sys. v. Countrywide Fin. Corp.*
    722 F. Supp. 2d 1157 (C.D. Cal. 2010) .................................................. 9

*Markson v. Crst Int'l*
    2022 U.S. Dist. LEXIS 47768 (C.D. Cal. Feb. 24, 2022) ................. 10, 11

*Martel v. Writers Guild of Am. W.*
    2021 U.S. Dist. LEXIS 252015 (C.D. Cal. Dec. 7, 2021) ....................... 37

*Mazza v. Am. Honda Motor Co.*
    666 F.3d 581 (9th Cir. 2012) ......................................................... *passim*

*Millam v. Energizer Brands, LLC*
    2022 U.S. Dist. LEXIS 239864 (C.D. Cal. Dec. 9, 2022) ....................... 18

*Moheb v. Nutramax Labs., Inc.*
    2012 U.S. Dist. LEXIS 167330 (C.D. Cal. Sep. 4, 2012) ....................... 23

*Morales v. Kraft Foods Grp.*
    2016 U.S. Dist. LEXIS 204427 (C.D. Cal. Dec. 2, 2016) ....................... 25

*In re MyFord Touch Consumer Litig.*
    2016 U.S. Dist. LEXIS 179487 (N.D. Cal. Sep. 14, 2016) ..................... 38

*Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co.*
    2019 U.S. Dist. LEXIS 125810 (S.D.N.Y. July 27, 2019) ....................... 39

*Nguyen v. Nissan N. Am., Inc.*
    487 F. Supp. 3d 845 (N.D. Cal. 2020) ......................................... 6, 7, 8, 9

*In re NJOY Consumer Class Action Litig.*
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) ................................................. 29

*O'Connor v. Boeing N. Am., Inc.*
    197 F.R.D. 404 (C.D. Cal. 2000) ........................................................... 36

*O'Connor v. Uber Techs.*
    904 F.3d 1087 (9th Cir. 2018) ......................................................... 10, 37

*Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*
2017 U.S. Dist. LEXIS 123645 (S.D. Cal. Aug. 4, 2017).................................... 25

*Oddo v. Arocaire Air Conditioning & Heating*
2020 U.S. Dist. LEXIS 150601 (C.D. Cal. May 18, 2020).................................. 24

*Owino v. CoreCivic, Inc.*
2020 U.S. Dist. LEXIS 58268 (S.D. Cal. Apr. 1, 2020) ......................................... 6

*Pablo v. Servicemaster Glob. Holdings, Inc.*
2011 U.S. Dist. LEXIS 87918 (N.D. Cal. Aug. 9, 2011)..................................... 39

*Pierce-Nunes v. Toshiba Am. Info. Sys.*
2016 U.S. Dist. LEXIS 149847 (C.D. Cal. June 23, 2016)....................... 12, 26, 27

*Plascencia v. Lending 1st Mortg.*
259 F.R.D. 437 (N.D. Cal. 2009) ......................................................................... 6

*In re POM Wonderful, LLC*
2014 U.S. Dist. LEXIS 40415 (C.D. Cal. Mar. 25, 2014) ............................. 32, 35

*Price v. L'Oréal USA, Inc.*
2021 U.S. Dist. LEXIS 187099 (S.D.N.Y. Sep. 29, 2021) ................................... 29

*Quesada v. Banc of Am. Inv. Servs.*
2013 U.S. Dist. LEXIS 32588 (N.D. Cal. Feb. 19, 2013)................................... 37

*Quezada v. Loan Ctr. of Cal., Inc.*
2009 U.S. Dist. LEXIS 122537 (E.D. Cal. Dec. 17, 2009)......................... 7, 8, 37

*Randolph v. J.M. Smucker Co.*
303 F.R.D. 679 (S.D. Fla. 2014) ....................................................................... 34

*Renton v. Kaiser Found. Health Plan, Inc.*
2001 U.S. Dist. LEXIS 20015 (W.D. Wash. Sep. 24, 2001) ................................. 6

*Robinson v. Onstar*
2021 U.S. Dist. LEXIS 237818 (S.D. Cal. Mar. 31, 2021)................................. 37

*Roley v. Google LLC*
2020 U.S. Dist. LEXIS 250987 (N.D. Cal. July 20, 2020) ................................. 17

*Roundy's Inc. v. NLRB*
674 F.3d 638 (7th Cir. 2012)............................................................................. 18

*Sali v. Corona Reg'l Med. Ctr.*
909 F.3d 996 (9th Cir. 2018)........................................................................ 9, 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sandoval v. Pharmacare US, Inc.*
  2016 U.S. Dist. LEXIS 140717 (S.D. Cal. June 10, 2016),
  *aff'd in relevant part*, 730 Fed. Appx. 417 (9th Cir. 2018)....................................... 24

*Saulsberry v. Meridian Fin. Servs.*
  2016 U.S. Dist. LEXIS 86419 (C.D. Cal. Apr. 14, 2016)........................................ 37

*Schechner v. Whirlpool Corp.*
  2019 U.S. Dist. LEXIS 171642 (E.D. Mich. Aug. 13, 2019) ................................. 33

*Shanks v. Jarrow Formulas, Inc.*
  2019 U.S. Dist. LEXIS 160199 (C.D. Cal. Aug. 27, 2019) ............................. 24, 28

*Siino v. Foresters Life Ins. & Annuity Co.*
  340 F.R.D. 157 (N.D. Cal. 2022) ..................................................................*passim*

*Singh v. Google LLC*
  2022 U.S. Dist. LEXIS 4796 (N.D. Cal. Jan. 10, 2022) ...................................... 11

*Singleton v. Fifth Generation, Inc.*
  2017 U.S. Dist. LEXIS 170415 (N.D.N.Y. Sep. 27, 2017)............................... 34, 36

*Skinner v. Best Buy Co.*
  2008 U.S. Dist. LEXIS 130354 (C.D. Cal. Mar. 18, 2008) .................................. 38

*Spotswood v. Hertz Corp.*
  2019 U.S. Dist. LEXIS 20536 (D. Md. Feb. 7, 2019)............................................. 6

*Stearns v. Ticketmaster Corp.*
  655 F.3d 1013 (9th Cir. 2011)......................................................................... 17, 24

*Stromberg v. Qualcomm Inc.*
  14 F.4th 1059 (9th Cir. 2021)............................................................................. 5, 15

*Sykes v. Mel S. Harris & Assocs. LLC*
  780 F.3d 70 (2d Cir. 2015) ..................................................................................... 38

*Taafua v. Quantum Glob. Techs., LLC*
  2020 U.S. Dist. LEXIS 3806 (N.D. Cal. Jan. 8, 2020) ............................. 6, 7, 8, 12

*Tan v. GrubHub, Inc.*
  2016 U.S. Dist. LEXIS 186342 (N.D. Cal. July 19, 2016),
  *aff'd sub nom*, *Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021)................ 6, 10, 12, 39

*In re Titanium Dioxide Antitrust Litig.*
  962 F. Supp. 2d 840 (D. Md. 2013) ........................................................................ 6

*Torrent v. Yakult U.S.A., Inc.*
  2016 U.S. Dist. LEXIS 130700 (C.D. Cal. Jan. 5, 2016)...................................... 13

*Townsend v. Monster Bev. Corp.*
303 F. Supp. 3d 1010 (C.D. Cal. 2018)...................................................................23, 26, 27

*In re Tropicana Orange Juice Mktg. & Sales Practices Litig. MDL 2353*
2019 U.S. Dist. LEXIS 102566, at **35-36 (D.N.J. June 18, 2019) .....................................19

*In re Tropicana Orange Juice Mktg. & Sales Practices Litig. MDL 2353*
2019 U.S. Dist. LEXIS 102566 (D.N.J. June 18, 2019) .........................................................24

*Tschudy v. J.C. Penney Corp.*
2015 U.S. Dist. LEXIS 165897 (S.D. Cal. Dec. 9, 2015) ................................................10, 12

*Turrey v. Vervent, Inc.*
2023 U.S. Dist. LEXIS 5500 (S.D. Cal. Jan. 11, 2023) ...........................................................6

*Urena v. Cent. Cal. Almond Growers Ass'n*
2019 U.S. Dist. LEXIS 95546 (E.D. Cal. June 5, 2019) .........................................................10

*Valencia v. Vf Outdoor*
2021 U.S. Dist. LEXIS 214998 (E.D. Cal. Nov. 4, 2021) .......................................................10

*Vinole v. Countrywide Home Loans, Inc.*
571 F.3d 935 (9th Cir. 2009).................................................................................................17

*Vizcarra v. Unilever U.S.*
339 F.R.D. 530 (N.D. Cal. 2021) .................................................................................*passim*

*Vizcarra v. Unilever U.S. Inc.*
2023 U.S. Dist. LEXIS 38208 (N.D. Cal. Feb. 24, 2023)..........................................................5

*Vizzi v. Mitsubishi Motors N. Am., Inc.*
2010 U.S. Dist. LEXIS 155770 (C.D. Cal. Feb. 22, 2010) ..........................................6, 7, 12

*Wal-Mart Stores, Inc. v. Dukes*
564 U.S. 338 (2011) .......................................................................................................5, 17

*Werdebaugh v. Blue Diamond Growers*
2014 U.S. Dist. LEXIS 71575 (N.D. Cal. May 23, 2014) ...............................................13, 15

*Whitewater W. Indus. v. Pac. Surf Designs, Inc.*
2019 U.S. Dist. LEXIS 159260 (S.D. Cal. Sep. 13, 2019) .....................................................18

*Williams v. Sinclair*
529 F.2d 1383 (9th Cir. 1975).........................................................................................17, 36

*Woods v. Vector Mktg. Corp.*
2015 U.S. Dist. LEXIS 118678 (N.D. Cal. Sep. 4, 2015)......................................................12

*Zinser v. Accufix Research Inst., Inc.*
253 F.3d 1180 (9th Cir. 2001)..............................................................................................38

Case No. 3:16-cv-01421-WHO
OPPOSITION TO MOTION FOR CLASS CERTIFICATION

State Cases

*Davis-Miller v. Auto. Club of S. Cal.*
    201 Cal. App. 4th 106 (2011)............................................................................................... 22

*Downey v. Pub. Storage, Inc.*
    44 Cal. App. 5th 1103 (2020).............................................................................................. 23

*Jolly v. Eli Lilly & Co.*
    44 Cal. 3d 1103 (1988)........................................................................................................... 8

Federal: Statutes, Rules, Regulations, Constitutional Provisions

15 U.S.C.
    §§ 70 *et seq.*............................................................................................................... 20, 21

Federal Rule Of Civil Procedure
    Rule 23 .................................................................................................................. 2, 5, 10
    Rule 23(a) ..................................................................................................................... *passim*
    Rule 23(a)(4) ........................................................................................................................ 12
    Rule 23(b) ........................................................................................................................ 2, 5
    Rule 23(b)(2) ............................................................................................................... *passim*
    Rule 23(b)(3) ............................................................................................................... *passim*

Other Authorities

2 William B. Rubenstein,
    Newberg on Class Actions § 4.72 (5th ed. West 2014) ................................................... 38

Newberg on Class Actions § 4:55 (5th ed. 2017) ....................................................... 17

## I.   <u>INTRODUCTION</u>

Despite bearing the certification burden, Plaintiff Elizabeth Perlin ("Perlin") has filed a *Motion for Class Certification* ("*Motion*") that often ignores the facts and issues that render certification improper.  It ignores the fact that Perlin – whose claims the Court found are time barred unless she proves the discovery rule applies at trial – seeks to represent classes spanning two decades that include individuals who (like Perlin) will require trial on a limitations defense. Nor does it address the fact that a significant percentage of the putative classes agreed to arbitrate with Defendants Williams-Sonoma, Inc. ("WSI"), Williams-Sonoma DTC, Inc., and Williams-Sonoma Advertising, Inc. (collectively, "Defendants").  The *Motion* ignores these facts because it must.   The Court, however, cannot ignore them or the undeniable commonality, typicality, adequacy, predominance, and superiority issues they create. each of which merits denial of the *Motion* on its own.

When not ignoring facts and issues, the *Motion* glosses over them.  It tries to paper over the lack of consumer evidence by disregarding the question necessary to establish liability – would reasonable consumers be deceived?  It, instead, focuses on questions that, even if answered in the affirmative, would not establish deception or liability:  (1) whether a non-public, voluntary, and technical commercial shipment acceptance standard that even Perlin's textile expert does not understand represents an "industry standard"; and (2) whether the yarns in the at-issue bedding were counted in compliance with it.  Even if the *Motion* proved these are common questions answerable with common evidence (it does not), certification would still be denied because, even if the answer to both were "yes," that would not prove reasonable consumers have been deceived. And there is no evidence that the reasonable consumer question can be decided with common proof given, *inter alia*, that the *Motion* does not offer any evidence of consumer understanding, evidence of universal exposure to the same alleged misrepresentation, or evidence establishing the alleged misrepresentations were the same.

These are not the only deficiencies.  With regard to certification of a Federal Rule of Civil Procedure ("Rule") 23(b)(2) injunctive class under California law, the *Motion* ignores that Perlin no longer purchases the at-issue bedding and the Court found California law cannot apply to out-

of-state purchasers (including Plaintiff William Rushing ("Rushing")).  With regard to the Rule 23(b)(3) damages class, the *Motion* hopes to avoid the individual reliance, causation, and injury issues by claiming materiality by *ipse dixit* of Perlin's experts.  But, again, the *Motion* asks the wrong question (is thread count material to general bedding consumers?) and, even then, fails to prove it can be answered with common evidence.[1]  It fails to prove it because it cannot – as Defendants' evidence (including a survey of WSI's customers) demonstrates materiality (and, therefore, reliance, causation, and injury) are individual questions that must be decided on a consumer-by-consumer basis.  Similarly, the *Motion* concludes that damages (here, an alleged price premium) can be measured on a class-wide basis.  But when the (sparse) details of the proposed (and aspirational) models are considered, it is clear they do not satisfy Rule 23's requirements and that the *Motion* again merely asks the Court to take Perlin's, her counsel's, and her experts' word for it.

In short, it is Perlin's burden to demonstrate, with evidence, that each required element of Rule 23(a) and 23(b) is satisfied.  Despite having years to meet this burden, the *Motion* – which is light on evidence and heavy on conclusions – does not.  As such, Defendants respectfully request that the *Motion* be denied with prejudice.

## II.  FACTUAL BACKGROUND

**A.    The Parties**

Rushing is a Kentucky resident.  Dkt. 217 ¶ 32.  Perlin is a California resident.  *Id*. ¶ 33. WSI sells, *inter alia*, home décor and furnishings through its retail stores, catalogs, and websites and under brands such as *Williams-Sonoma Home* and *Pottery Barn* .  Dkt. 262 ¶ 34.  Williams-Sonoma DTC, Inc is responsible for direct-to-consumer sales and marketing, and Williams-Sonoma Advertising, Inc. is responsible for retail sales and marketing.  *Id*. ¶¶ 35-36.

**B.    Plaintiffs' Purchases**

In January 2011, Perlin decided she wanted new bedding, so she purchased "PB Classic 400-Thread-Count Sheet Set" and "PB Classic 400-Thread-Count Extra Pillowcases" from the

---

[1]  As set forth herein, the correct question is whether WSI's consumers find material the fact that yarns were counted is a manner other than in a non-public and non-binding commercial acceptance protocol for businesses.

1  *Pottery Barn* website on January 19, 2011.  Dkt. 217 ¶¶ 172-74.  The bedding started ripping a

2  few days after Perlin purchased it, but she did not seek to return it.  *Id*.  ¶¶ 174, 179-81.  She,

3  instead, bought the exact same bedding on January 28, 2011, which, again, started ripping.  *Id*. ¶

4  181-83.  Rushing purchased *Williams-Sonoma Home* "Signature 600-Thread-Count Sateen" sheets

5  and pillowcases as a gift for his wife on February 10, 2015.  *Id*. ¶¶ 159-60, 164.  Rushing did not

6  gift it because he decided immediately upon feeling it that it was not "high quality," "extremely

7  soft," or "luxurious."  *Id*. ¶ 167.  Rushing was "disappointed" and felt "betrayed." but did not

8  return the unused bedding; instead, he sent it to a lab to have its thread count tested.  *Id*. ¶ 168.

9  ### III.  RELEVANT PROCEDURAL HISTORY

10  **A.  Rushing's Complaints**

11  Rushing filed the *Class Action Complaint* and *First Amended Class Action Complaint* in

12  state court in January and March 2016.  Dkt. 1.  Following removal, Defendants moved to dismiss

13  the *First Amended Class Action Complaint*, and the subsequently filed *Third Amended Class

14  Action Complaint* and *Fifth Amended Class Action Complaint*.  Dkt. 12; Dkt. 26; Dkt. 50.  After

15  the Court granted the motions to dismiss in part (Dkt. 36, Dkt. 64), Rushing filed the *Sixth

16  Amended Class Action Complaint* in March 2017 and *Seventh Amended Class Action Complaint*

17  ("*7AC*") on April 4, 2017.  Dkt. 74; Dkt. 81.  Defendants answered on April 10, 2017.  Dkt. 83.

18  **B.  Defendants Seek Summary Judgment Of Rushing's Claims**

19  On April 10, 2018, Defendants sought summary judgment because Rushing – a Kentucky

20  resident – lacked standing to pursue the California Consumer Legal Remedies Act ("CLRA"),

21  Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and unjust enrichment claims

22  in the *7AC*.  Dkt. 119.  In October 2018, the Court found Rushing could not pursue the California

23  claims, but ordered (later vacated by the Ninth Circuit) Defendants to produce customer

24  information to help Rushing find a plaintiff to pursue the claims.  Dkt. 170; Dkt. 204.

25  **C.  Plaintiffs File The *8AC***

26  Plaintiffs filed the *Eighth Amended Class Action Complaint* ("*8AC*") on June 5, 2020.  In

27  it, Plaintiffs allege they were deceived when purchasing bedding because the thread counts were

28  not calculated using American Society for Testing and Materials International's ("ASTM")

1   D3775-12 commercial acceptance testing method.  Dkt. 217 ¶¶ 71, 76, 100-02, 185-86.  Perlin

2   asserts CLRA, FAL, UCL, and unjust enrichment claims individually and on behalf of all persons

3   in the United States (other than Kentucky residents) that purchased the specifically-defined

4   "Bedding Products" from WSI (Rushing asserts a Kentucky claim).  *Id*. ¶¶ 19, 146-47, 190-319.

5   After dismissal and arbitration motions, Defendants answered on December 14, 2021.  Dkt. 262.

6   **D.      Defendants Seek Summary Judgment Of Perlin's Claims**

7           In April 2022, Defendants sought summary judgment of Perlin's claims on statute of

8   limitations grounds.  Dkt. 268.  Defendants argued that Perlin's claims – which accrued in January

9   2011 – were facially time-barred, and that the Perlin could not prove applicability of the discovery

10  rule or fraudulent concealment doctrine.  *Id*.  Perlin repeatedly argued that whether discovery rule

11  or fraudulent concealment doctrine applied to her claims was a "genuine issue of material fact for

12  trial."  Dkt. 272 at 23:2-4;[2]  *see also id*. at 6:9-12, 12:22-24, 16:17-18, 18:4-6, 21:9-10.  On July

13  20, 2022, the Court found Perlin's claims "time-barred unless she c[ould] show that an exception

14  to the statute of limitations applies" and that Perlin had not introduced evidence sufficient to

15  establish a fact issue regarding the applicability of the fraudulent concealment doctrine, but

16  deemed summary judgment improper because there are "genuine issues of material fact" about

17  whether the discovery rule applies to Perlin's claims.  Dkt. 283 at 1:27-2:2, 7:26-13:17.

18  **E.      Perlin Files The *Motion***

19          Perlin filed the *Motion* on September 28, 2022, seeking to certify a nationwide Rule

20  23(b)(2) injunctive relief class that purchased a "Bedding Product",[3] and a Rule 23(b)(3) damages

21  subclass consisting of California purchasers.  Dkt. 292 at 2:7-3:16, 10:17-11:13.

22                           **IV.    LEGAL STANDARD**

23          "The class action is an exception to the usual rule that litigation is conducted by and on

24

25  [2] Dkt. page number references are to the header page numbers applied by ECF system post-filing.

26  [3] The "Bedding Products" are Williams-Sonoma Home Signature 600-Thread-Count Sateen
    Bedding ("WSH Signature Bedding"), Williams-Sonoma Home Greek Key Jacquard 600-Thread-
    Count Bedding ("WSH Greek Key Bedding"), Williams-Sonoma Home Suzani Jacquard Bedding

27  (500 TC) ("WSH Suzani Bedding"), Pottery Barn Foundations Hotel Sateen Bedding ("PB
    Foundations Bedding"), Pottery Barn Morgan 400-Thread-Count Bedding ("PB Morgan

28  Bedding"), Pottery Barn PB Organic 400-Thread-Count Bedding ("PB Organic Bedding"), and
    Pottery Barn PB Classic 400-Thread-Count Bedding ("PB Classic Bedding").  Dkt. 292 at 2:7-19.

1   behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

2   (2011) (quotations omitted).  "To come within [it], a party seeking to maintain a class action 'must

3   affirmatively demonstrate his compliance' with" Rule 23.  *Comcast Corp. v. Behrend*, 569 U.S.

4   27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350).  The party seeking certification must first satisfy

5   Rule 23(a)'s threshold requirements:   numerosity, commonality, typicality, and adequacy.

6   *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1066 (9th Cir. 2021).  That party must also satisfy at

7   least of Rule 23(b) provision "through evidentiary proof."  *Comcast*, 569 U.S. at 33.

8         Certification is only proper if the court is satisfied that all requirements are met after a

9   "rigorous analysis" of the evidentiary proof.  *Comcast*, 569 U.S. at 33.  This analysis "frequently

10  entail[s] overlap with the merits of the plaintiff's underlying claim[.]"  *Id.* And, when presented

11  with "conflicting evidence," a court "must resolve any factual disputes necessary to determine

12  whether the requirements of Rule 23 have been satisfied."  *Vizcarra v. Unilever U.S. Inc.*, 2023

13  U.S. Dist. LEXIS 38208, at **27-28 (N.D. Cal. Feb. 24, 2023).  A "court that has doubts about

14  whether [they] have been met" after undertaking the required rigorous analysis "should refuse

15  certification[.]"  *Brown v. Electrolux Home Prods.*, 817 F.3d 1225, 1233-34 (11th Cir. 2016).

16                    V.    **THE *MOTION* SHOULD BE DENIED**

17  A.    **The *Motion* Does Not Satisfy Federal Rule Of Civil Procedure 23(a)**

18         1.    **The *Motion* Does Not Establish Commonality**

19         "Given the relationship between Rule 23(a)'s commonality requirement and Rule

20  23(b)(3)'s predominance requirement, courts often analyze those requirements together."  *Siino v.*

21  *Foresters Life Ins. & Annuity Co.*, 340 F.R.D. 157, 161–62 (N.D. Cal. 2022).[4]   As such,

22  Defendants generally address the lack of predominant common issues below.   Section V.B.2.a

23  *infra*.   However, they note the *Motion* cannot establish commonality for a simple reason – an

24  arbitration and class action waiver clause precludes a significant percentage of putative class

25

26  _____

    [4] "[C]ommonality requires that the class members' claims 'depend upon a common contention'
    such that 'determination of its truth or falsity will resolve an issue that is central to the validity of
27  each [claim] in one stroke.'"  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012)
    (quoting *Dukes*, 564 U.S. at 350).  "Succinctly, [a] [p]laintiff must identify a common question
28  with a common answer that can be proved with common evidence."  *Alvarado v. Wal-Mart*
    *Assocs.*, 2021 U.S. Dist. LEXIS 245799, at *21 (C.D. Cal. Nov. 3, 2021).

1    members from litigating their claims in this class action.  *Id.*  Thus, the *Motion* "cannot satisfy the

2    commonality requirement."  *Tan v. GrubHub, Inc.*, 2016 U.S. Dist. LEXIS 186342, at **10-11

3    (N.D. Cal. July 19, 2016), *aff'd sub nom*, *Lawson v. GrubHub, Inc.*, 13 F.4th 908 (9th Cir. 2021).[5]

4              **2.        The *Motion* Does Not Establish Typicality**

5              "The purpose of the typicality requirement is to assure that the interests of the named

6    representative align with the interests of the class."  *Nguyen v. Nissan N. Am., Inc.*, 487 F. Supp.

7    3d 845, 858 (N.D. Cal. 2020).  With those interests in mind, the Ninth Circuit has held that a class

8    representative is not typical "if she is 'subject to unique defenses which threaten to become the

9    focus of the litigation.'"  *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.

10   1992)).  It "reasoned that where 'there is a danger that absent class members will suffer if their

11   representative is preoccupied with defenses unique to it,' class certification should not be

12   granted."  *Id.* (quoting *Hanon*, 976 F.2d at 508); *see also Allen v. ConAgra Foods, Inc.*, 331

13   F.R.D. 641, 655 (N.D. Cal. 2019) ("certification is not appropriate if unique defenses threaten to

14   preoccupy the class representatives and thus cause absent members to suffer").

15              **a.        The Limitations Defense To Perlin's Claims Renders Her Atypical**

16             Courts in the Ninth Circuit "hold that statutes of limitations issues can preclude a finding

17   of typicality."  *Nguyen*, 487 F. Supp. 3d at 858.  Indeed, these courts "routinely preclude

18   potentially time-barred plaintiffs from serving as class representatives when they seek to represent

19   members with timely claims."  *Lindblom v. Santander Consumer USA, Inc.*, 2018 U.S. Dist.

20   LEXIS 13267, at **11-12 (E.D. Cal. Jan. 26, 2018).[6]  This includes where, as here, the class is

21

22   [5]  *See also Spotswood v. Hertz Corp.*, 2019 U.S. Dist. LEXIS 20536, at *31 (D. Md. Feb. 7, 2019)
     ("threshold issues of arbitrability predominate" because arbitration agreement and class action
23   waiver "divides the class, leaving some susceptible to unique defenses and others impervious to
     them"); *In re Titanium Dioxide Antitrust Litig.*, 962 F. Supp. 2d 840, 861 (D. Md. 2013) (existence
24   of arbitration agreement applicable to part of the class "destroyed…commonality and typicality");
     *Renton v. Kaiser Found. Health Plan, Inc.*, 2001 U.S. Dist. LEXIS 20015, at **15-16 (W.D.
25   Wash. Sep. 24, 2001) (no commonality where some class members may be subject to arbitration).
     [6]  *See also Turrey v. Vervent, Inc.*, 2023 U.S. Dist. LEXIS 5500, at *17 (S.D. Cal. Jan. 11, 2023);
26   *Boumaiz v. Charter Communs. LLC*, 2021 U.S. Dist. LEXIS 102608, at **8-10 (C.D. Cal. May
     19, 2021); *Owino v. CoreCivic, Inc.*, 2020 U.S. Dist. LEXIS 58268, at **46-49 (S.D. Cal. Apr. 1,
27   2020); *Taafua v. Quantum Glob. Techs., LLC*, 2020 U.S. Dist. LEXIS 3806, at **17-24 (N.D. Cal.
     Jan. 8, 2020); *Vizzi v. Mitsubishi Motors N. Am., Inc.*, 2010 U.S. Dist. LEXIS 155770, at **4-7
28   (C.D. Cal. Feb. 22, 2010); *Plascencia v. Lending 1st Mortg.*, 259 F.R.D. 437, 444-45 (N.D. Cal.
     2009); *Blackwell v. Skywest Airlines*, 245 F.R.D. 453, 462-63 (S.D. Cal. 2007); *Burton v. Mt. W.*

defined to include members who like the named plaintiff are subject to the limitations defense. *See, e.g.*, *Nguyen*, 487 F. Supp. 3d at 858-60; *Taafua*, 2020 U.S. Dist. LEXIS 3806, at **17-24; *Vizzi*, 2010 U.S. Dist. LEXIS 155770, at **4-7; *Quezada v. Loan Ctr. of Cal., Inc.*, 2009 U.S. Dist. LEXIS 122537, at **23-25 (E.D. Cal. Dec. 17, 2009).[7]

For example, in *Vizzi*, plaintiff sought to represent purchasers of model year 2000 to 2008 vehicles. 2010 U.S. Dist. LEXIS 155770, at **3, 5. Plaintiff's UCL and CLRA claims were "potentially time-barred" because he owned a 2003 vehicle and filed suit in 2008. *Id*. at *5. Plaintiff tried to avoid this "difficulty" by pleading fraudulent concealment but the limitations issue remained a "hurdle" for plaintiff (and any class members with similar issues) but not for class members whose claims were no facially time-barred. *Id*. Thus, certification was improper because plaintiff represented "only those claims subject to [the limitations] defense." *Id*. at *7. Similarly, in *Nguyen*, plaintiff sought to represent purchasers of model year 2007 to 2015 vehicles. 487 F. Supp. 3d at 854. Plaintiff's claims – which arose from a January 2012 purchase but not asserted until September 2016 – were "untimely on their face[.]" *Id*. at 854-57. The court, following "ample" Ninth Circuit precedent, denied certification on typicality grounds, because plaintiff would need to "overcom[e] the statute of limitations" while "class members whose claims are within the statute of limitations do not face this difficulty." *Id*. at 859-60 (quotations omitted). That plaintiff "opted to define the class...broadly" – such that it would "include some individuals [with] time-barred [claim], as well as individuals...whose claims cannot be time-barred" – did "not change the result." *Id*. Plaintiff was not typical of those class members whose claims were not time-barred and, because there were no other named plaintiffs, there was no one "who could represent th[ose] individuals[.]" *Id*. at 860.

The result should be the same here. Perlin seeks to represent individuals that purchased bedding from January 2007 to the present. But her claims are untimely on their face. Dkt. 283 at

---

*Farm Bureau Mut. Ins. Co.*, 214 F.R.D. 598, 609 (D. Mont. 2003).

[7] Telling, when Rushing sought certification, he limited the proposed class to individuals that purchased bedding within four years of action's filing date (January 29, 2016), despite alleging that he intended to seek to represent consumers with facially time-barred claims (*i.e.*, consumers who purchased sheets more than four years before January 2016). Dkt. 150-1 at 2:13-28.

5:24-6:26.  To overcome this hurdle, Perlin pleads the discovery rule.  Dkt. 217 ¶ 144.[8]  However, as Perlin argued and the Court found, whether it applies is a fact question to be decided at trial. Section III.D *supra*.  This is a hurdle those not subject to a limitations defense will not face.

And Perlin's hurdle is not a minor one.[9]  She twice purchased sheets she expected to be durable based on thread count, only to have them immediately rip twice.  Dkt. 268 at 10:7-11:22; Dkt. 273 at 7:15-9:5.  Perlin contacted WSI years later and, when she did, she said the sheets should have lasted longer given the advertised thread count.  Dkt. 268 at 11:23-24; Dkt. 268-2 ¶ 3, Ex. B; Dkt. 292-3 ¶ 54, Ex. 52.  Perlin waited another six years to file suit.  A trial on the limitations defense – ***the trial the Court has already found necessary*** – will require, *inter alia*, evidence (including expert evidence) about Perlin's experiences, thread count and its impact on durability (including ripping), and consumer perception of thread count's effect on the same.  *See*, *e.g.*, Dkt. 272; Dkt. 283 at 7:26-11:17.  Thus, while Perlin may ultimately establish her claims are not time barred, doing so will "require devot[ion] of time and effort…at the expense of issues that are common and controlling for the class[.]"  *Frompovicz v. Niagara Bottling, LLC*, 420 F. Supp. 3d 361, 370-71 (E.D. Pa. 2019) (quotations omitted).[10]

Just as in *Nyugen*, that the *Motion* defines the putative classes broadly to include members with facially time-barred claim and those who do not does not change the result.  487 F. Supp. 3d at 858.[11]  Perlin is not typical of class members whose claims are not facially time-barred and

---

[8]  Perlin also pleads fraudulent concealment doctrine tolling.  Dkt. 217 ¶ 145.  As set forth above, the Court found the doctrine – which requires affirmative acts to mislead, lack of actual or constructive knowledge of the facts giving rise to the claim due to the affirmative acts. and diligence from plaintiff to uncover facts giving rise to the claim – does not apply because Perlin's unique evidence was insufficient to create a genuine fact issue.  Dkt. 283 at 11:18-13:7.  This fact-based analysis is necessary for each putative class member with facially time-barred claims.

[9]  Under the discovery rule, a claim accrues when a reasonable person would be on notice "that someone has done something wrong to her."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110-11 (1988).  To invoke it, a plaintiff must show the time and manner of discovery and the inability to have made earlier discovery despite reasonable diligence.  Dkt. 283 at 7:8-25.  Applicability of the rule is normally a fact question for the jury.  *Id.*

[10]  *See also Taafua*, 2020 U.S. Dist. LEXIS 3806, at *24 (no typicality where "there is a real possibility that class members who have no limitations issues would be harmed by the time and preoccupation [plaintiff] and other affected class members would have to devote to" them).

[11]  *See also Quezada*, 2009 U.S. Dist. LEXIS 122537, at **23-25 (plaintiff with facially time-barred claim not typical where broad class definition "guarantee[d]" that some class members will have statutes of limitations issues that will need to be resolved, while others will not").

cannot represent them.  And, even if a class of individuals subject to and not subject to a limitations defense could be certified, Perlin is not typical of class members subject to the defense. The Court found she cannot pursue fraudulent concealment tolling.  Dkt. 283.  Her discovery rule contention depends on the determination of facts unique to her.[12]  And unlike other putative class members, Perlin cannot argue the her limitations periods were tolled by Rushing's January 2016 complaint because they had already expired by January 2016.  *See Maine State Retirement Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166 (C.D. Cal. 2010).[13]  Class redefinition cannot save certification.  If the classes were redefined to include only those individuals with purchases within the limitation periods, Perlin would not be a class member (as she must be).  *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018).  If the classes were redefined to include only individuals with purchases outside of the limitations period, Perlin would still be atypical because, *inter alia*, her unique facts.  Even more, such a redefinition would simply magnify the already predominant individual limitations issues.  Section V.B.2 *infra*.

It is Perlin's burden to establish typicality by, *inter alia*, addressing defense defenses like the repeatedly-raised limitations defense.  Despite this, the *Motion* "entirely fails to explain…how many members of the proposed class would be subject to the statute[s] of limitations" or "explain why the statute[s] of limitations would not defeat typicality."  *Nguyen*, 487 F. Supp. 3d at 860. Thus, Perlin has not (and cannot) meet her typicality burden and the *Motion* should be denied.

### b.   Perlin Is Not Typical Because Class Members Agreed To Arbitrate

Since March 2016, any consumer making an online purchase from WSI has been required to agree to Terms and Conditions ("**Terms**") that include an individual arbitration and class

---

[12]  Like Perlin, each individual's discovery rule argument will depend on unique facts.  Rushing's allegations evidence this.  Rushing purchased his bedding because the advertised thread count led him to believe it would "be of high quality, extremely soft and luxurious."  Dkt. 217 ¶ 167; *see also id*. ¶ 2.  Rushing, however, knew the bedding was none of those things as soon as he received it, and immediately sent it for thread count testing.  *Id.* ¶¶ 167-68.  These are types of facts that must be considered to determine whether and when any putative class member had reason to know that someone has done something wrong to her.  *See* Dkt. 64 (denying motion to dismiss because applicability of discovery rule "depends on facts that have not yet been developed").

[13]  WSI disputes that the filing of the action tolled any California statutes of limitations because, *inter alia*, Rushing never had standing to pursue California claims. Dkt. 268 at 21:12-28.

1  waiver provision (which was revised in January 2023).  Ex. 4 ¶¶ 2-10, Exs. A-H;[14] *see also* Dkt.

2  219; Dkt. 219-1.  Perlin did not agree to such a provision during her 2011 purchase, but did agree

3  to one in 2020.  Dkt. 219; Dkt. 219-1; Dkt. 233 at 8:24-4:14.  The Court compelled to arbitration

4  as a result, but the arbitrator found the provision inapplicable to Perlin's decade-old *8AC* claims.

5  Dkt. 257.  Thus, Perlin is not subject to an arbitration provision in this case.

6       Despite this, Perlin seeks to represent a "class that includes [members] who are subject to

7  arbitration agreements.  The Ninth Circuit has foreclosed the viability of that proposition."

8  *Campanelli v. Image First Healthcare Laundry Specialists, Inc.*, 2018 U.S. Dist. LEXIS 215287,

9  at *19 (N.D. Cal. Dec. 21, 2018).[15]  This is because, *inter alia*, Perlin "cannot satisfy Rule 23's

10  typicality…requirement[] with respect to…putative class members who are subject to arbitration

11  agreements."  *Boumaiz*, 2021 U.S. Dist. LEXIS 102608, at *14.  A named plaintiff who, like

12  Perlin, is not subject to an arbitration agreement has "no standing to challenge the arbitration

13  agreements" of "unnamed class members[.]"  *Gile*, 2022 U.S. Dist. LEXIS 151255, at *5.[16]  In

14  fact, Perlin has no "individual incentive to make any argument whatsoever" about the arbitration

15  agreement.  *Markson v. Crst Int'l*, 2022 U.S. Dist. LEXIS 47768, at *19 (C.D. Cal. Feb. 24,

16  2022).[17]  Thus, Perlin is not typical of the putative class members potentially subject to one.

17  _____

18  [14]  All citations that begin with "Ex. __" are to the concurrently-filed *Compendium of Evidence*.

19  [15]  *See also Lawson*, 13 F.4th at 913; *O'Connor v. Uber Techs.*, 904 F.3d 1087, 1094 (9th Cir. 2018); *Avilez v. Pinkerton Gov't Servs.*, 596 Fed. Appx. 579 (9th Cir. 2015); *Andrade v. Am. First Fin., Inc.*, 2022 U.S. Dist. LEXIS 146378, at **12-17 (N.D. Cal. Aug. 16, 2022); *Gile v. Dolgen*

20  *Cal. LLC*, 2022 U.S. Dist. LEXIS 151255, at **5-7 (C.D. Cal. Aug. 2, 2022); *Valencia v. Vf Outdoor*, 2021 U.S. Dist. LEXIS 214998, at **10-15 (E.D. Cal. Nov. 4, 2021); *Ellsworth v. Schneider Nat'l Carriers, Inc.*, 2021 U.S. Dist. LEXIS 246084, at **6-9 (C.D. Cal. Oct. 28, 2021);

21  *Farr v. Acima Credit LLC*, 2021 U.S. Dist. LEXIS 126431, at *19 (N.D. Cal. July 7, 2021); *Heredia v. Sunrise Senior Living LLC*, 2021 U.S. Dist. LEXIS 42447, at **7-9 (C.D. Cal. Feb. 9,

22  2021); *Andrews v. Ring LLC*, 2020 U.S. Dist. LEXIS 199322, at **8-13 (C.D. Cal. Sep. 17, 2020); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 986 (N.D. Cal. 2019); *Conde v.*

23  *Open Door Mktg., LLC*, 223 F. Supp. 3d 949, 958-63 (N.D. Cal. 2017); *Tschudy v. J.C. Penney Corp.*, 2015 U.S. Dist. LEXIS 165897, at *11 (S.D. Cal. Dec. 9, 2015).

24  [16]  *See also Ellsworth*, 2021 U.S. Dist. LEXIS 246084, at *7 (plaintiff not subject to arbitration

25  agreement atypical, as he could not "assert any rights the…putative class members might have to preclude [defendant] from moving to compel arbitration" and had "no cognizable stake in the

26  outcome of that question") (quotations omitted); *Urena v. Cent. Cal. Almond Growers Ass'n*, 2019 U.S. Dist. LEXIS 95546, at *11 (E.D. Cal. June 5, 2019) ("a plaintiff not subject to an arbitration

27  agreement lacks standing to challenge the[ir] applicability or enforceability").

28  [17]  Even if Perlin did have the right to and interest in asserting defenses to arbitration clauses she is not subject to, she would still be atypical.  Because Perlin agreed to arbitrate a decade after her purchases, she had a unique arbitration defense, which led the arbitrator to find the agreement not

1   The number of purchasers of one of the *Williams-Sonoma Home* and/or *Pottery Barn*

2   Bedding Products potentially subject to an arbitration clause is significant.   Since 2016,

3   approximately 92% of *Williams-Sonoma Home* bedding sales were online, while online purchases

4   accounted for approximately 77% of *Pottery Barn* bedding sales.  Ex. 5 ¶ 9; Ex. 6 ¶ 9.  Thus, since

5   2016, approximately 8 out of every 10 Bedding Product purchases were likely online.  These are

6   not the only putative class members potentially subject to arbitration.  Any consumer who – like

7   Perlin – purchased a Bedding Product before 2016 and later agreed to arbitrate by making an

8   online purchase – must arbitrate.  The same is true of consumers that agreed to arbitrate before or

9   after they purchased bedding offline.  In other words, the arbitration issue cannot be shortcut by

10   only identifying individuals that purchased a Bedding Product online after March 2016.  The

11   transactions of each in-store purchaser, catalog purchaser, and pre-March 2016 website purchaser

12   must be reviewed to determine if they include a post-March 2016 website purchase.  This is yet

13   another reason why arbitration is a predominant individual issue and the class action is

14   unmanageable.  Section V.B.2 *infra*.[18]  And, as with Perlin, arbitrability questions (*e.g.*, whether

15   the agreement applies to the particular class member's claims) must be decided by an arbitrator in

16   individual proceedings.  Dkt. 219 at 17:6-19:8; Dkt. 252 at 3:2-4; Ex. 4 at ¶¶ 3-10, Exs. A-H.

17   In short, because "certification is properly denied based upon the existence of an

18   arbitration agreement and class action waiver appliable to unnamed class members" – here a

19   provision likely applicable to a significant proportion of class members – "but not the proposed

20   class representative[,]" the *Motion* should be denied.  *Singh v. Google LLC*, 2022 U.S. Dist.

21   _____

22   binding on her.  The (potentially common) defenses Perlin asserted in opposition to WSI's
arbitration motion – waiver and improper class communication – were rejected by the Court.  Dkt.

23   252.  Perlin, however, did not argue that no agreement to arbitrate exists; she could not given she
agreed to arbitrate after she retained her counsel (who was aware of the arbitration provision) and

24   the day before she filed the *8AC*.  Dkt. 219; Dkt. 233.  That Perlin did not assert a common
defense to arbitration (one that other putative class members could want to assert) due to her

25   unique facts provides an example of what happens when a named plaintiff has no "individual
incentive" to assert arbitration defenses.  *Markson*, 2022 U.S. Dist. LEXIS 47768, at *19.

26   [18] Amending the class definitions to exclude those subject to arbitration would not save
certification.  Although such an amendment ***could*** address typicality and adequacy issues, it would

27   not solve the commonality, predominance, and superiority issues caused by an arbitration
agreement.  The question of whether any putative class member agreed to one remains an

28   individual one.  And other arbitration questions (including arbitrability) would need to be decided
by an arbitrator in individual arbitration proceedings.

1    LEXIS 4796, at *19 (N.D. Cal. Jan. 10, 2022) (quotations omitted).[19]

2        **3.    The *Motion* Does Not Establish Adequacy**

3        Certification is only proper if "the representative parties will fairly and adequately protect

4    the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Adequacy – which requires that the named

5    plaintiff has no conflicts of interest and will prosecute the class action vigorously – is "closely

6    related…to typicality"; in fact, the "typicality and adequacy inquiries tend to significantly

7    overlap."  *Woods v. Vector Mktg. Corp.*, 2015 U.S. Dist. LEXIS 118678, at **37-38 (N.D. Cal.

8    Sep. 4, 2015).  Thus, Perlin is inadequate for the same reasons she is atypical.  She is she subject

9    to a limitations defense while others are not.  *See*, *e.g.*, *Taafua*, 2020 U.S. Dist. LEXIS 3806, at

10   *25; *Vizzi*, 2010 U.S. Dist. LEXIS 155770, at **8-9.  And a named plaintiff like Perlin who is not

11   subject to an arbitration agreement is not an adequate representative of those whose may be.  *See*,

12   *e.g.*, *Boumaiz*, 2021 U.S. Dist. LEXIS 102608, at **14-17; *Tan*, 2016 U.S. Dist. LEXIS 186342,

13   at **8-10; *Tschudy*, 2015 U.S. Dist. LEXIS 165897, at *11; *King v. Capital One Bank (USA),*

14   *N.A.*, 2012 U.S. Dist. LEXIS 163562, at **42-43 (W.D. Va. Nov. 15, 2012).

15   **B.    The *Motion* Does Not Satisfy Federal Rule Of Civil Procedure 23(b)(2)**

16       **1.    The *Motion* Does Not Establish The Rule 23(b)(2) Class Can Be Certified**

17       Rule 23(b)(2) certification requires satisfaction of Rule 23(a)'s requirements and Rule

18   23(b)(2)'s requirement that defendant has acted or refused to act on grounds that apply generally

19   to the class, so that final injunctive relief is appropriate respecting the class as a whole.  *Siino*, 340

20   F.R.D. at 161.  Because the *Motion* does not satisfy Rule 23(a)'s requirements, Rule 23(b)(2)

21   certification must be denied.  *See*, *e.g.*, *Pierce-Nunes v. Toshiba Am. Info. Sys.*, 2016 U.S. Dist.

22   LEXIS 149847, at *5 n.4 (C.D. Cal. June 23, 2016).  Even if the *Motion* did satisfy Rule 23(a), its

23   attempt to certify a nationwide Rule 23(b)(2) class under California law fails.

24

25

---

26   [19]  Perlin is also atypical because the alleged thread count disclosure she saw did not reference
     plies, which is different from the marketing allegedly encountered by others (including Rushing).
27   Section V.B.2 *supra*; *see also Herron v. Best Buy Stores, LP*, 2016 U.S. Dist. LEXIS 52486, at
     **18-20 (E.D. Cal. Apr. 18, 2016).  Moreover, that Perlin was located and recruited using
28   customer information the Ninth Circuit determined Defendants should not have been required to
     produce for this purpose is more evidence of her lack of typicality or adequacy.

1

### a.    Perlin Lacks Standing To Pursue Injunctive Relief

2    "A Rule 23(b)(2) class can only be certified if the named plaintiff shows that she herself is

3    subject to a likelihood of future injury."  *Bruton v. Gerber Prods. Co.*, 2018 U.S. Dist. LEXIS

4    30814, at *13 (N.D. Cal. Feb. 13, 2018).  "Allegations that a defendant's conduct will subject

5    unnamed class members to the alleged harm is insufficient to establish standing to seek injunctive

6    relief on behalf of the class."  *Id*.  To establish standing, a named plaintiff must prove that:  (1) she

7    has suffered or is threatened with a concrete and particularized legal harm; (2) there is a sufficient

8    likelihood that she will again be wronged in a similar way; and (3) the claimed threat of injury is

9    likely to be redressed by the injunctive relief.  *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007).

10    The second prong requires that a plaintiff establish a real and immediate threat of repeated injury

11    that is neither conjectural or hypothetical.  *Id*.  "[W]here a named plaintiff lacks standing as to the

12    requested relief, there is no class."  *Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care,*

13    *Inc.*, 340 F.R.D. 383, 388 (N.D. Cal. 2021).

14    The *Motion* does not establish a real and immediate threat of repeated injury that is not

15    conjectural or hypothetical.  The *8AC* alleges that:

16
> WSI is engaged in a pattern and practice of not following the textile industry's
> generally accepted method for calculating thread count and instead improperly
17
> inflates the advertised thread counts for many of its most expensive bedding
> products, specifically its bedding labeled as having a thread count of 350 or greater
18
> (hereafter referred to as "higher thread count").

19    Dkt. 217 ¶ 8.  But the *8AC* alleges, and Perlin's declaration confirms, that she no longer purchases

20    this "higher thread count" bedding.  *Id*. ¶ 184; Dkt. 292-5 ¶ 6.  And neither asserts Perlin desires or

21    intends to purchase it from WSI (or anyone else) in the future.  Dkt. 217 ¶ 189; Dkt. 292-5.

22    Because Perlin "has not alleged, let alone offered evidentiary proof, that she "intends or desires to

23    purchase" Bedding Products, "there is no likelihood of future injury" that is "redressable through

24    injunctive relief," and Perlin "lacks standing to pursue" it.  *Werdebaugh v. Blue Diamond*

25    *Growers*, 2014 U.S. Dist. LEXIS 71575, at **28-33 (N.D. Cal. May 23, 2014); *see also Torrent v.*

26    *Yakult U.S.A., Inc.*, 2016 U.S. Dist. LEXIS 130700, at **6-12 (C.D. Cal. Jan. 5, 2016).

27

28

1
2

      **b.**      **The Rule 23(b)(2) Class Cannot Be Certified Because California Law Cannot Be Applied Nationwide**

3
4
5
6
7
8
9
10
11
12
13

     Even if Perlin had standing, the Rule 23(b)(2) class cannot be certified because California's choice-of-law rules – which determine the controlling substantive law (*Darisse v. Nest Labs, Inc.*, 2016 U.S. Dist. LEXIS 107938, at *26 (N.D. Cal. Aug. 15, 2016)) – bar nationwide application of California law here.  California requires the class action proponent to first establish application of California law is constitutional.  *Mazza*, 666 F.3d at 589.  For purposes of the *Motion*, Defendants do not dispute this.  Thus, the burden shifts to Defendants to demonstrate that foreign law should apply under California's three-step governmental interest test.  *Id*. at 590.  California law may only be used class-wide if, after application of the test, the interests of other states are not found to outweigh California's interest in having its law applied.  *Id*.  As the Court has already found (Dkt. 170), the governmental interest test proves California law cannot be applied on class-wide basis.  There is no reason why the result should change now.

14
15
16
17
18
19
20
21
22
23
24

     ***There are material differences.***  The first step of the test asks whether the law of each potentially-affected jurisdiction is materially different.  *Mazza*, 666 F.3d at 590.  Courts consistently find material differences between the UCL, FAL, and CLRA and other states' consumer protection laws ***including the Court in this case.***  *See, e.g.*, *id*. at 590-91; *Darisse*, 2016 U.S. Dist. LEXIS 107938, at **28-30; *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1100-01 (C.D. Cal. 2012); Dkt. 170 6:11-7:21.  Exhibit 7 to the *Compendium* demonstrates why.  Among other things:  (1) California requires reliance while other states (*e.g.*, AK, CT, DE, FL, KY) do not; (2) California has no scienter requirement unlike other states (*e.g.*, AL, AK, AZ, AR, CT, ID, IL, IN, IA, KS, KY, MD, MI, MN, NH, OR); and (3) California's consumer protection limitations periods (three or four years) differ from the limitations period in other states (one to six years).[20] Ex. 7.  These differences are material.[21]

25

26
27

[20]  Unlike California, certain states (CT, FL, KS, KY, MN) do not recognize the discovery rule and/or fraudulent concealment doctrine (Ex. 7) – another material issue, as the *Motion* attempt to certify classes whose members' claims are facially-barred by the applicable statute of limitations.

28

[21]  *See, e.g.*, *Mazza*, 666 F.3d at 591; *Darisse*, 2016 U.S. Dist. LEXIS 107938, at **28-31; *Glenn v. Hyundai Motor Am.*, 2016 U.S. Dist. LEXIS 181318, at **16-21 (C.D. Cal. June 24, 2016); *Cover v. Windsor Surry Co.*, 2016 U.S. Dist. LEXIS 16475, at **17-19 (N.D. Cal. Feb. 10, 2016);

1    These are not the only material differences.  At least 9 states (AL, GA, KY, LA, MS, MT,

2    SC, TN, VA) prohibit class actions.  Ex. 7; *see also Darisse*, 2016 U.S. Dist. LEXIS 107938, at

3    *28 (statutes that allow class actions "differ significantly" from those that do not); *Brazil*, 2014

4    U.S. Dist. LEXIS 72432, at *43 (differences in "restrictions on consumer protection class actions"

5    are "material").  This Court has confirmed that the fact that Kentucky's consumer protection

6    statute does not authorize class actions renders it materially different from California's consumer

7    protection law.  Dkt. 170 at 7:11-21.  And several states do (or did) not authorize a private plaintiff

8    (or anyone) to seek injunctive relief (AR, CO, LA, MD, PA, SC, SD. VA).  Ex. 7; *see also Glenn*,

9    2016 U.S. Dist. LEXIS 181318, at **17-18 ("[D]ifferences in remedies are 'material'"); *Darisse*,

10   2016 U.S. Dist. LEXIS 107938, at **28-31 (remedy difference "plainly are material").

11   The *Motion* contends the differences courts regularly find material do not matter because it

12   seeks to certify a Rule 23(b)(2) class.  Dkt. 292 at 27:13-28:2.  It cites no authority for this

13   contention – one that ignores, *inter alia*, that certain states do not authorize class actions and/or

14   injunctive relief.  Nor does it offer any reason why a plaintiff seeking Rule 23(b)(2) certification

15   can impose California law on states that do not prohibit the allegedly unlawful conduct, do not

16   authorize a class action to remedy it, and/or do not permit injunctive relief.  Clearly, these

17   differences would "'have a significant effect on the outcome of the trial'" (Dkt. 292 at 27:15-22

18   (quoting *Mazza*, 666 F.3d at 59)), as a court applying non-California law could, *inter alia*, find no

19   statutory violation, and reject class claims and/or injunctive relief where not authorized.[22]

20   ***The non-California states have a strong interest in applying their own laws.***  Every state

21   has an interest in having its law applied to its residents.  *Mazza*, 666 F.3d at 592.  And each state

22   has a strong interest in applying its own consumer protection laws to transactions within in its

23   borders (*Stromberg*, 14 F.4th at 1069) even where the misrepresentations emanated from other

24   *Davison v. Kia Motors Am., Inc.*, 2015 U.S. Dist. LEXIS 85080, at **7-8 (C.D. Cal. June 29,

25   2015); *Brazil v. Dole Packaged Foods, LLC*, 2014 U.S. Dist. LEXIS 74234, at *43 (N.D. Cal.
     May 30, 2014); *Werdebaugh*, 2014 U.S. Dist. LEXIS 71575, at *68; *Gianino*, 846 F. Supp. 2d

26   1096 at 1100-02; *Horvath v. LG Elecs. MobileComm U.S.A., Inc.*, 2012 U.S. Dist. LEXIS 19215,
     at **7-9 (S.D. Cal. Feb. 13, 2012).

27   [22] The *Motion* argues that, because WSI is located in California, any injunction would necessarily
     have "nationwide effect[.]"  Dkt. 292 at 27:22-28:2.  Far from supporting certification of a

28   nationwide Rule 23(b)(2) class under California law, this contention establishes that Rule 23(b)(2)
     certification is not necessary.

1    states (Dkt. 170 at 7:24-28).  Relatedly, each state "has a valid interest in 'setting the appropriate

2    level of liability for companies conducting business within its territory'" (like Defendants) "in

3    order to 'create a more favorable business climate for the companies that the state seeks to attract

4    to do business in the state.'"  *Id*. at *20 (quoting *Mazza*, 666 F.3d at 592).

5           **The non-California states' interests would be more impaired.**  Where each state has an

6    interest in the application of materially different laws, courts must apply the law of the state whose

7    interest would be more impaired if its laws were not applied.  *Darisse*, 2016 U.S. Dist. LEXIS

8    107938, at *38.  To make this determination, courts must evaluate the nature and strength of the

9    interest of each state in the application of its law (*Glenn*, 2016 U.S. Dist. LEXIS 181318, at *23)

10   and "must recognize the importance of federalism and every state's right to protect its consumers

11   and promote those businesses within its borders" (*Darisse*, 2016 U.S. Dist. LEXIS 107938, at

12   *38).  Although California has a "significant interest" in applying its laws to transactions within

13   its borders, its interest in applying its laws to non-residents is "much more attenuated."  *Id*. at *39.

14   Indeed, California recognizes that with respect to regulating or affecting conduct within its

15   borders, the "place of the wrong" – "the state where the last event necessary to make the actor

16   liable occurred" (*id*. at 593-94), not the state in which defendant is located or from which an

17   alleged misrepresentation emanated – has the predominant interest.  *Mazza*, 666 F.3d at 593.[23]

18          Here, the Court has found that a foreign state's interest "would be more significantly

19   impaired than California's" when it found California law cannot apply to Rushing.  Dkt. 170 at

20   11:7-11.  There is no reason this should change now.  The non-California states in which non-

21   California consumers purchased bedding have the predominant interest.  Application of California

22   law to these consumers would significantly impair that state's "compelling interest in protecting

23   [its] consumers from in-state injuries" and "in setting the scope of recovery for consumers under

24   their own laws."  *Darisse*, 2016 U.S. Dist. LEXIS 107938, at *40.

25

26

27   ────────────────
     [23]  *See*, *e.g.*, Dkt. 170 at 9:7-18; *Glenn*, 2016 U.S. Dist. LEXIS 181318, at **23-25; *Darisse*, 2016
28   U.S. Dist. LEXIS 107938, at *39; *Cover*, 2016 U.S. Dist. LEXIS 16475, at **20-23; *Davison*, 2015 U.S. Dist. LEXIS 85080, at **9-11; *Gianino*, 846 F. Supp. 2d at 1103.

1          **2.       The *Motion* Does Not Satisfy Federal Rule Of Civil Procedure 23(b)(3)**

2                     **a.       The *Motion* Does Not Establish Predominance**

3          Rule 23(b)(3) certification requires proof of predominance.  *Comcast*, 569 U.S. at 33.

4    While "a single significant question of law or fact" can satisfy commonality, predominance "is far

5    more demanding." *Mazza*, 666 F.3d 581 at 589.  When evaluating predominance, a court must to

6    take a close look at whether common questions predominate, and ensure that individual questions

7    do not overwhelm questions common to the class.  *Sali*, 909 F.3d at 1008; *see also Vinole v.*

8    *Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  Predominance is not met

9    where, after adjudication of class-wide issues, plaintiffs must still introduce substantial

10   individualized proof or argue significant individualized legal points as to the elements of their

11   individual claims.  *Faulk v. Sears Roebuck & Co.*, 2013 U.S. Dist. LEXIS 57430, at *15 (N.D.

12   Cal. Apr. 19, 2013).  Finally, while it is true that the "mere existence of affirmative defenses 'does

13   not compel a finding that individual issues predominate over common ones,'" defenses "cannot be

14   ignored when [deciding] predominance." *Barraza v. C. R. Bard Inc.*, 322 F.R.D. 369, 379-80 (D.

15   Ariz. 2017) (quoting *Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975)).  "'The potentially

16   individualized nature of affirmative defenses requires that courts consider [them] in undertaking

17   the predominance analysis.'" *Id.* (quoting NEWBERG ON CLASS ACTIONS § 4:55 (5th ed. 2017)).  A

18   "class cannot be certified on the premise that [defendant] will not be entitled to litigate [its]

19   statutory defenses to individual claims." *Dukes*, 564 U.S. at 367.

20                     (1)      *Deception Is A Predominant Individual Question*

21         It is not sufficient, as the *Motion* implies, to merely assume that common questions

22   predominate because Perlin asserts UCL, FAL, and CLRA claims.  *See* Dkt. 292 at 29:22-30:6;

23   *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011); *Vizcarra v. Unilever*

24   *U.S.*, 339 F.R.D. 530, 548 (N.D. Cal. 2021); *Roley v. Google LLC*, 2020 U.S. Dist. LEXIS

25   250987, at **29-30 (N.D. Cal. July 20, 2020).  A rigorous analysis must be conducted – an

26   analysis that proves that predominance has not been established.

27         ***There is no proof that deception can be determined with common evidence***.  UCL, FAL,

28   and CLRA claims require proof individuals are likely to be deceived (referred to as the

                                                   -17-                    Case No. 3:16-cv-01421-WHO

1  "reasonable consumer test").  *Forrett v. Gourmet Nut, Inc.*, 2022 U.S. Dist. LEXIS 185674, at *5

2  (N.D. Cal. Oct. 11, 2022).[24]  Despite conceding this test applies, the *Motion* offers no common

3  evidence demonstrating that a consumer (reasonable or otherwise) would understand the Bedding

4  Products' advertised thread counts to be determined using ASTM D3775's commercial acceptance

5  test methodology or would be deceived if yarns were not counted using the method.  There is no

6  evidence any consumer is aware of ASTM D3775 or its methodology including Perlin, who could

7  not even identify the basis of her *8AC* claims.  Ex. 1 at 63:20-66:18; Ex. 3 at 75:22-76:4.

8       The *Motion* attempts to distract from the fact that there is no evidence of consumer

9  understanding by focusing on alleged predominant questions that are not those necessary to

10  determine liability:  (1) whether ASTM D3375 "represents the industry standard for calculating

11  thread count"; and (2) whether the Bedding Products' advertised thread counts "do not comport

12  with ASTM D775."  Dkt. 292 at 30:3-4:1.[25]  According to the *Motion*, liability turns on these

13  questions because "[e]ither the industry standard allows WSI to include plies in [its] thread count

14  or it does not."  *Id*.  In other words, the *Motion* contends that advertising that does not comport

15  with an "industry standard" is *per se* deceptive under the UCL, FAL, and CLRA.[26]  Not so.  While

16  advertising could run afoul of an (undefined) "industry standard" **and** be likely to deceive

17  reasonable consumers, that does not mean, as the *Motion* posits, that the latter determination

18  necessarily follows from the former.[27]  Tellingly, the *Motion* cites no authority establishing that

19  _____

20  [24]  "Likelihood of deception" requires a probability that a significant portion of the general public
    or of targeted consumers, acting reasonably in the circumstances, could be misled.  *Millam v.*

21  *Energizer Brands, LLC*, 2022 U.S. Dist. LEXIS 239864, at *7 (C.D. Cal. Dec. 9, 2022).  Whether
    a statement or advertisement is likely to mislead is generally a question of fact, and plaintiff bears

22  an evidentiary burden of demonstrating, consistent with the definition of likelihood of deception,
    that it is probable that a significant portion of the consuming public could be confused by the

23  allegedly misleading labeling of defendant's products.  *Vizcarra*, 339 F.R.D. at 548.
    [25]  The *Motion* does not define "industry standard" – a vague term made vaguer because the

24  *Motion* implies it incorporates consumers and their perceptions, while, at best, the "industry"
    addressed by ASTM D3775 is the textile manufacturing industry that uses it for acceptance testing

25  (*i.e.*, to determine if a product was manufactured to specifications).
    [26]  By conflating "industry standards" and consumer perception, the *Motion* tries to transform

26  Rhodes' ASTM D3775 opinions into one that consumers were deceived – an inadmissible legal
    opinion if offered by any expert (let alone a non-consumer one)  *See, e.g.*, *Roundy's Inc. v. NLRB*,

27  674 F.3d 638, 648 (7th Cir. 2012); *Whitewater W. Indus. v. Pac. Surf Designs, Inc.*, 2019 U.S.
    Dist. LEXIS 159260, at *6 (S.D. Cal. Sep. 13, 2019); Ex. 3 at 17:19-22, 20:22-21:5, 75:13-21).

28  [27]  For example, a court could also find that a statement does not comport with an "industry
    standard" and does not deceive reasonable consumers, comports with an "industry standard" and

1   failure to comply with an "industry standard" makes advertising *per se* deceptive, a contention that

2   would render the reasonable consumer test a nullity and usurp lawmakers' roles by giving the

3   private, non-binding, and voluntary ASTM D3775 the force of law – all without evidence that any

4   consumer is aware of ASTM D3775 or its commercial acceptance method.[28]

5        The *Motion*'s attempt to give ASTM D3775 the same status as law has been rejected.

6   *Adam v. AQ Textiles LLC*, 2021 U.S. Dist. LEXIS 147642 (M.D.N.C. Aug. 6, 2021).  In *Adam*,

7   plaintiffs alleged defendants deceived consumers by displaying thread counts that "were not

8   accurate according to the ASTM method."  *Id.* at **1-8.  Plaintiffs argued "correspondence

9   between two industry associations and the FTC" demonstrates ASTM D3775 creates a

10  "mandatory guideline" and, therefore, a "distributor may only use the ASTM method to count

11  threads and label [its] products if [it is] to be in compliance with the law."  *Id.*  The court rejected

12  this argument.  Particularly relevant here, it reviewed the August 2005 FTC letter responding to a

13  May 2005 National Textile Association letter (and upon which the *Motion* relies (Dkt. 292 at

14  13:12-13)), noting it was a mere staff advisory opinion that, nonetheless, did not adopt ASTM

15  D3775 as the "industry standard":

16       [p]laintiffs next provide a second letter written by the FTC dated August 2005 that
         appears to be written in response to a subsequent request for an opinion letter on

17       this issue….  Here, the FTC reiterates much of its 2002 letter verbatim….[29]
         However, [p]laintiffs attempt to distinguish this correspondence by pointing out

18  ————————————————————————————————————————————

19  deceives reasonable consumers, or comports with an "industry standard" and does not deceive
    reasonable consumers.  In other words, the two concepts – "industry standard" and deception – are

20  not coterminous.  *See In re Tropicana Orange Juice Mktg. & Sales Practices Litig. MDL 2353*,
    2019 U.S. Dist. LEXIS 102566, at **35-36 (D.N.J. June 18, 2019) (former FDA commissioner's

21  opinion that product was misbranded under federal law and, therefore, misleading not evidence of
    whether "reasonable consumers would have considered the 'pasteurized' label at all or what
    meaning, if any, a reasonable consumer would have attached to it").

22  [28]  The sole decision cited – *Compaq Comput. Corp. v. Packard Bell Elecs.*, 163 F.R.D. 329, 334

23  (N.D. Cal. 1995) – arose under the Lanham Act, addressed a motion to quash subpoenas, and
    related, solely, to whether certain discovery fell within the extremely broad relevance standard.

24  [29]  The "2002 letter" refers to a March 2002 FTC staff advisory opinion.  This letter was a
    response to one from the "Executive Vice President of the American Textile Manufacturers

25  Institute," which claimed "that some companies in the industry are achieving…'extremely high'
    thread counts 'by counting yarns within a ply as individual yarns,'" stated that "his association

26  'believes this method of labeling products…to be a deceptive practice,'" "suggest[ed] that the
    ASTM…should be used," and "request[ed] a staff opinion from the FTC on this question."  *Adam*,

27  2021 U.S. Dist. LEXIS 147642, at **9-10.  The FTC's reply "expressly state[d] that the
    question…presented" was "'not appropriate for issuance of a staff advisory opinion,'" did "not

28  attempt to identify any standard in the industry," and did not "make any judgment as to whether
    Mr. Moore's suggested standard for counting threads is appropriate."  *Id.* at *10.

that, in this letter, the FTC also writes that 'consumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn.'… Yet Plaintiffs neglect to point out that the FTC starts this sentence by writing that it is basing such a conclusion entirely on "the information you have provided about standard industry practices" and has not conducted its own investigation or a comprehensive review of the matter…. Further, the Associate Director for Enforcement who composed the letter was also clear that, in accordance with policy, he was providing merely "a staff opinion [that] has not been reviewed or approved by the Commission or any individual Commissioner, and is given without prejudice to the right of the Commission later to rescind the advice."

2021 U.S. Dist. LEXIS 147642, at **10-11.  Thus, the court found the FTC letters "merely show[] that two associations had once lobbied for the ASTM method to be the industry standard" and did not transmute the non-binding ASTM D3775 commercial acceptance testing protocol into the "only lawful method" for counting yarns.  *Id*. at **11-12.[30]  *Adam* is not alone in confirming ASTM D3775 is not law; Perlin's textile expert Jennifer Rhodes ("Rhodes") and the evidence upon which she relies confirm the same.  *See* Ex. 3 at 25:17-26:5, 63:7-70:1, 90:4-7, 92:21-93:5; Dkt. 292-1, Ex. 13.[31]

[30]  *Adam*'s analysis applies equally to the administrative law judge's ("ALJ") *Initial Determination Granting Complainant's AAVN, Inc.'s Motion for Summary Determination* and the subsequent *General Exclusion Order* ("*GEO*") issued by the International Trade Commission. Dkt. 292 at 13:13-20; Dkt. 292-2 ¶¶ 23, 28, Exs. 22, 27.  The ALJ determination and *GEO* arose from claims asserted by AAVN, Inc. ("AAVN"), the alleged owner of "Alpha Cotton," a "high thread count cotton and polyester blend" that is "made possible by" AAVN's alleged patent "titled 'Proliferated Thread Count of a Woven Textile by Simultaneous Insertion within a Single Pick Insertion Event of a Loom Apparatus Multiple Adjacent Parallel Yarns Drawn from a Multi-Pick Yarn Package[.]''"  Ex. 8 ¶¶ 2, 10, 67.  One the respondents, Pradip Overseas Ltd. ("Pradip"), terminated its counsel and refused to further participate in the investigation. Ex. 9.  AAVN moved for summary determination. Ex. 10.  The ALJ granted the unopposed motion, adopting wholesale AAVN's assertions about ASTM D3775 and the FTC letters addressing it.  Dkt. 292-3 ¶ 23, Ex. 22.  As such, the ALJ found (1) that Pradip's advertised thread count was "literally false" and "actual[ly] decepti[ve]" because AAVN alleged it was not calculated using ASTM D3775, and (2) that "thread counts are material to consumers" based, solely, on the May 2005 National Textile Association claim to the FTC that thread count "is an important indicator of fabric quality for consumers[.]"  *Id*.  In other words, the ALJ did what *Adam* found improper – used unsupported assertions in industry association lobbying letters to find that advertised thread counts not calculated using ASTM D3775 are *per se* unlawful.  Nonetheless, the resultant *GEO* only bars importation of "[w]oven textile fabrics and products containing same that are falsely advertised through misrepresentation of thread count"; it does cite ASTM D3775 or adopt it as the required method for counting yarns and advertising thread count or the metric by which thread count advertising is judged.  Dkt. 292-3 ¶ 28, Ex. 27.  There is no evidence any Bedding Product was barred from importation under the *GEO*; regardless, the ALJ determination and *GEO* have no bearing here because the *GEO* has been rescinded.  Ex. 11.

[31]  There is a law that governs textile labelling and advertising– the Textile Fiber Products Identification Act.  Ex. 3 at 23:25-25:25.  It does not require that thread count be determined or disclosed in any particular manner including pursuant to ASTM D3775.  15 U.S.C. §§ 70 *et seq.*

The *Motion* does not prove that an "industry standard" may be used to establish a *per se* violation of the UCL, FAL, CLRA.  Even if it had, the *Motion* does not show Perlin can prove with common evidence that ASTM D3775 is the "industry standard" for acceptance testing of commercial shipments (its stated purpose), let alone set the "industry standard" for thread count advertising to consumers (the issue in this case).  The ASTM in a non-governmental organization that develops non-public, non-binding, voluntary standards.  Dkt. 292-1, Exs. 10-12.  According to the ASTM, the non-public ASTM D3775 – which must be purchased and cannot be reprinted without permission – is "satisfactory for acceptance testing of commercial shipments."  Dkt. 292-1, Ex. 10.  As such, it sets forth a detailed testing process that requires, *inter alia*, a "lot sample" determined by the "applicable material specification or other agreement between the purchaser and the supplier" and a "laboratory sample," which requires the tester to "take a full width swatch at least 2 m (2 yd) long from each roll of fabric in the lot sample."  *Id*.  It also requires, *inter alia*, that specimen be conditioned and be run through a series of testing steps, and that reports of test results include, *inter alia*, a disclosure that testing was conducted pursuant to ASTM D3775,[32] the thread count for each roll and for the lot (when requested), and the atmospheric conditions under which the tests were conducted.  *Id*.  In other words, ASTM D3775 is intended to provide a technical standard for businesses to use when buying and selling fabric rolls, not guidance on thread count marketing to consumers.[33]  Although she is "not an expert in ASTM standards" or "on thread count disclosures to public," and could not even explain what ASTM D3775's stated purpose – "acceptance testing" – is, Rhodes conceded that ASTM D3775 "doesn't cover the purview of how things should be marketed to consumers."  Ex. 3 at 32:3-7, 76:16-80:8.

In short, ASTM D3775 is not a substitute for evidence of consumer understanding of advertised thread counts.  Because there is no evidence of consumers' understanding, there is no showing that the question of whether consumers would be deceived by thread counts that count

[32]  That the tester must disclose it used ASTM D3775 is, itself, evidence that ASTM D3775 is not the "industry standard."  If it were, there would be no need to specify the method used.

[33]  Notably, ASTM D3775 only uses the term "thread count" once and, even then, merely references it without explanation.  Dkt. 292-1, Exs. 10-11 at § 3.1.1.  It otherwise uses terms like "fabric court" and "yarns" including in the sections addressing the counting method Plaintiffs contend dictates how thread counts are advertised – terms that the *Motion* makes no attempt to establish consumers are aware of or would equate with thread count.  *Id*.

1    yarns in some way other than under ASTM D3775's commercial acceptance method can be

2    answered with common evidence.  *See Vizcarra*, 339 F.R.D. 530, 550 (certification denied where

3    plaintiff "failed to point to common proof…capable of answering [deception and materiality]

4    questions on a classwide basis").  A lack of common (or any) evidence of deception is not the only

5    predominance deficiency.  There are other reasons why predominance is not met.

6           ***The Motion does not address exposure.***  The *Motion* contends that "[t]hread count claims

7    appear prominently on all WSI's marketing materials for the Bedding Products."  Dkt. 292 at

8    12:12-13.[34]  This is incorrect.  Whether a "thread count claim" appeared on any specific

9    "marketing material" depends on, *inter alia*, when and/or where the purchase was made, making

10    the question of the exposure an individual one.  *See Bailey v. Rite Aid Corp.*, 2021 U.S. Dist.

11    LEXIS 194038, at *5 (N.D. Cal. May 26, 2021) ("Exposure to the allegedly misleading statement

12    is a precondition for finding likelihood of deception….under the UCL, FAL, or CLRA").  For

13    example, PB Organic Bedding, PB Hemstitch Bedding, and PB Morgan Bedding labels did not

14    include any thread count representation.  Ex. 5 at ¶ 10, Ex. A; Ex. 12; Ex. 13.  Any person that

15    was only exposed to the label was not exposed to any alleged false advertising.  Certain WSH

16    Signature Bedding labels did not include thread count in the name (although it was included in the

17    name at other times and in different contexts (Dkt. 292-3 ¶ 4, Ex. 3)) and only reference thread

18    count on the back label.  Ex. 14.  The only reference to thread count on at least some labels for

19    WSH Greek Key Bedding and WSH Suzani Bedding was on the back.  Ex. 15.  These examples

20    demonstrate the exposure question is an individual one.  *See, e.g.*, *Dunn v. Costco Wholesale*

21    *Corp.*, 2021 U.S. Dist. LEXIS 179838, at *17-18 (C.D. Cal. July 30, 2021) (predominance not

22    established because "not all members of the class saw" the alleged misrepresentation); *Davis-*

23    *Miller v. Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 121 (2011) ("certification denial will be

24    upheld when individual evidence will be required to determine whether the representations at issue

25    were actually made to each member of the class").

26           ***The Motion does not address advertising variation.***  The *Motion* ignores that the alleged

---

27    [34]  How the *Motion* makes this assertion is unclear.  Before Perlin joined, Rushing sought to

28    certify a class going back to January 2012 and class discovery was accordingly limited.  It was
only after Perlin filed the *Motion* that the proposed classes were defined to go back to 2007.

1    misrepresentations are different.  For example, Perlin purchased bedding allegedly marketed as

2    "400-thread-count" while Rushing purchased bedding marketed as "600 thread-count two-ply[.]"

3    Dkt. 217 ¶¶ 163, 177.[35]   Other Bedding Products were advertised as "two-ply" including on the

4    front of labels (Ex. 16), on the back of labels (Ex. 17; Dkt. 292-3 ¶ 21, Ex. 20), on both front and

5    back labels (Dkt. 292-3 ¶ 19, Ex. 19), in catalogs (Ex. 18), and in online product descriptions (Dkt.

6    292-3 ¶¶ 8-9, Exs. 7-8).  Some "marketing" included both a "thread count claim" with and without

7    ply references.  *See, e.g.*, Dkt. 292-3 ¶¶ 8, 53, Exs. 7, 51.  For example, the front label for some PB

8    Morgan Bedding and PB Classic Bedding stated "400 thread count," while the back label

9    referenced ply ("400 thread count (2 ply)").  Ex. 19.  These are not innocuous variations; they go

10   to the heart of the *8AC*'s claims – whether a reasonable person would be deceived by advertised

11   thread counts determined by counting plies.[36]   The *Motion* does not establish that whether a

12   consumer would be deceived by a two-ply thread count representation may be determined in the

13   same manner and with the same evidence as whether a consumer would be deceived by a thread

14   count representation that is silent as to plies.  Thus, predominance is not met.[37]

15              (2)    *Individual Reliance, Causation, And Injury Questions Predominate*

16         The UCL, FAL, and CLRA permit an inference of reliance, causation, and damages for

17   certification purposes if plaintiff proves defendant made a "material" misrepresentation.

18   *Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1043 (C.D. Cal. 2018).  Although such "a

19   class-wide presumption is "***available*,"** plaintiffs must show *"they are **entitled** to"* it by

20   introducing "sufficient evidence of materiality across the class."  *In re 5-Hour Energy Mktg. &*

21   *Sales Practices Litig.*, 2017 U.S. Dist. LEXIS 220969, at **17, 21 (C.D. Cal. June 7, 2017)

22

23   [35]  At other times, the WSH Signature Bedding was marketed as "600-thread-count" only.  Ex. 14.
     [36]  These marketing differences must also be considered in connection with a determination of
24   whether the discovery rule or fraudulent concealment doctrine apply to any particular plaintiff.
     For example, the existence of a ply disclosure is relevant to whether a particular plaintiff's
25   investigation was reasonable under the circumstances.
     [37]  *See, e.g.*, *Moheb v. Nutramax Labs., Inc.*, 2012 U.S. Dist. LEXIS 167330, at **20-21 (C.D.
26   Cal. Sep. 4, 2012) ("Plaintiff cannot demonstrate that common issues predominate because some
     [class] members…never saw…[d]efendant's representation"); *Downey v. Pub. Storage, Inc.*, 44
27   Cal. App. 5th 1103, 1117 (2020) ("Common issues do not predominate (and class certification is
     properly denied) when the evidence demonstrates variations in how—and, critically, ***whether*—**
28   class members were exposed to an allegedly deceptive advertisement") (emphasis in original)

1  (emphasis in original).[38]   A misrepresentation is material if a reasonable man would attach

2  importance to its existence or nonexistence in determining his choice of action.  *In re 5-Hour*

3  *Energy*, 2017 U.S. Dist. LEXIS 220969, at *17; *see also Algarin v. Maybelline, LLC,* 300 F.R.D.

4  444, 453 (S.D. Cal. 2014).  If the misrepresentation is not material "to all class members, the issue

5  of reliance would vary from consumer to consumer and the class should not be certified."  *Stearns*

6  *v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011) (quotations omitted).

7       As with deception, the *Motion* asks the wrong materiality question.  The question is not

8  whether "a reasonable person shopping for bedding would attach importance to the stated thread

9  count's accuracy in making her purchase decision" (Dkt. 292 at 31:17-20); it is whether

10  consumers find it material that yarns were not counted using ASTM D3775's commercial

11  acceptance method.  There is no evidence that any consumer is aware of ASTM D3775 or has any

12  understanding of its method, let alone that its use would be material to a purchase decision.[39]   As

13  such, there is no evidence establishing that purchasers would find it material that yarns were not

14  counted using ASTM D3775's commercial acceptance method.  Without such evidence, the

15  *Motion* cannot demonstrate materiality sufficient to invoke the available presumptions or prove

16  materiality is a common issue.[40]

17       Because it is not enough to simply claim that thread count is important to consumers, the

18  *Motion*'s materiality contentions are misplaced.  For example, the *Motion* contends that Dr.

19

20  [38]  *See also Oddo v. Arocaire Air Conditioning & Heating*, 2020 U.S. Dist. LEXIS 150601, at *95 n.17 (C.D. Cal. May 18, 2020); *Shanks v. Jarrow Formulas, Inc.*, 2019 U.S. Dist. LEXIS 160199, at **13-14 (C.D. Cal. Aug. 27, 2019); *Lack v. Mizuho Bank, Ltd.*, 2019 U.S. Dist. LEXIS 127963, at **11-12 (C.D. Cal. Apr. 30, 2019)

21

22  [39]  *See Sandoval v. Pharmacare US, Inc.*, 2016 U.S. Dist. LEXIS 140717, at *13 (S.D. Cal. June 10, 2016), *aff'd in relevant part*, 730 Fed. Appx. 417 (9th Cir. 2018) (materiality not established where plaintiffs "did not submit sufficient evidence…that any significant portion of consumers shared their understanding of" the allegedly deceptive advertising); *Faulk*, 2013 U.S. Dist. LEXIS 57430, at *30 (N.D. Cal. Apr. 19, 2013) (no predominance because plaintiff "does not point to common proof that would establish the materiality element of his own claim and his conclusory arguments do not meet that burden").

25  [40]  *See, e.g.*, *In re Tropicana*, 2019 U.S. Dist. LEXIS 102566, at **30-32 (no materiality where "[t]here [wa]s scant evidence in the record "regarding reasonable customers' understanding of the…label and whether it was likely to deceive a reasonable consumer"); *In re 5-Hour Energy*, 2017 U.S. Dist. LEXIS 220969, at *18 (no materiality where plaintiffs failed to provide research establishing consumers purchased the product because of the alleged misrepresentation); *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 576-77 (C.D. Cal. 2014) (no materiality where no research showing "the actual reaction of consumers" to the alleged product label misrepresentation).

1    Russell Lamb ("Lamb") – Perlin's "economist expert" – demonstrates thread count is material.

2    Dkt. 292 at 31:17-20.  Again, this says nothing of whether a consumer would consider the yarn

3    counting method material.[41]  Regardless, Lamb is not a consumer behavior expert and disclaimed

4    any opinion other than (1) that all class members were injured and (2) that damages may be

5    measured using one of two methodologies.  Ex. 2 at 17:3-19:7.[42]  Similarly, the purported

6    "common evidence described in Dr. Lamb's report" (Dkt. 292 at 31:20-23:4) does not address the

7    issue here – whether a consumers attach importance to yarn counting method.[43]  Finally, the

---

[41]  *See Vizcarra*, 339 F.R.D. at 548-50 (expert that did not consider actual representations made "not capable of answering the question of whether a reasonable consumer would find the [actual representations made] material when purchasing the product at issue"); *Cormier v. Carrier Corp.*, 2019 U.S. Dist. LEXIS 53222, at *39 (C.D. Cal. Mar. 25, 2019) (materiality not established by in product defect case by surveys not addressing the actual defect).

[42]  Even if Lamb did purport (and was qualified) to opine that thread count is "material," the opinion would be inadmissible legal conclusion.  *See, e.g., Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1166 n.17 (S.D. Cal. 2022); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 2017 U.S. Dist. LEXIS 123645, at **10-11 (S.D. Cal. Aug. 4, 2017).

[43]  Even more, Lamb undertook no independent or empirical analysis of consumers' behavior or preferences with regard to thread count in general or with regard to yarn counting method (the issue here).  Ex. 20 ¶¶ 22-25.  He could not explain could not explain the methodology or validate the results of the only arguable empirical (and consumer) evidence he cited – a third-party survey conducted by a cotton industry organization.  Ex. 2 at 198:6-201:19; Ex. 20 ¶ 25; *see also Morales v. Kraft Foods Grp.*, 2016 U.S. Dist. LEXIS 204427, at **22-24, 45 (C.D. Cal. Dec. 2, 2016)).  Other than the survey, Lamb relied on unsupported assertions about thread count in, *inter alia*, textile textbooks, press releases, and buying guides (Dkt. 292-2 ¶¶ 19-23), but did not conduct any analysis of them (Ex. 20 ¶¶ 22-25) or even know if he located them (Ex. 2 at 30:7-40:20).  None indicate any consumer was asked what he considers important when making a bedding purchase.  Dkt. 292-2 ¶¶ 19-23; Ex. 20 ¶ 25.  Thus, they are not market or consumer behavior research; at best, they reflect the author's opinions – opinions that Lamb (who is not a consumer expert) improperly uses to infer that thread count must be material.  Even if this evidence could establish that thread count, alone, is material, Lamb ignores that the same evidence shows thread count does not matter.  *See* Ex. 20 ¶ 29.  And Lamb did nothing to connect these sources to the issue – the alleged use of an improper yarn counting method.  In fact, he does not appear to have done much (if any) analysis specific to this case; he was not even aware the Perlin and Rushing alleged saw different misrepresentations.  Ex. 2 at 23:11-24:20; *see also Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 230 (N.D. Cal. 2015) ("A fill-in-the-blanks declaration from an expert, without any real consideration of the specific product attributes at issue…, is not sufficient to establish that the materiality of the label statements…is a common question").  Moreover, Lamb's reliance on one-off documents he claims show WSI "emphasize[s] the importance of thread counts in bedding products" (Dkt. 292-2 ¶ 24) to establish the materiality is misplaced.  The documents contradict the claim.  Dkt. 292-3 ¶ 2, Ex. 1 ("There is a common misconception that higher thread counts equates to better quality").  Regardless, WSI's purported beliefs about the importance thread count (or lack thereof) do not evidence "how consumers reacted to the…alleged misstatement[.]"  *In re 5-Hour Energy*, 2017 U.S. Dist. LEXIS 226969, at *17; *see also Cormier*, 2019 U.S. Dist. LEXIS 53222, at **39-40 (evidence that defendant "believed that the alleged defect was material" not sufficient to establish that materiality can be proven on class-wide basis "because the materiality analysis focuses on whether a reasonable consumer—not [defendant]—would have considered information about the alleged defect to be important in their decision to purchase").

1   *Motion* contends that an ALJ's summary judgment determination is "common evidence" of

2   materiality.  But, as set forth above, the ALJ did what the *Adam* court would not and this Court

3   should not – rely on the unsubstantiated assertions of "industry" organizations lobbying for ASTM

4   D3775 (in a proceeding in which the respondent failed to even participate).  Telling, the ALJ did

5   not rely on any consumer evidence in reaching his determination.  Dkt. 292-3 ¶ 23, Ex. 22.  The

6   Court should not accept the *Motion*'s invitation to make the same mistake.

7        Even if the materiality question were as simple as whether consumers consider thread

8   count in their purchasing decisions, the *Motion* would not satisfy Perlin's burden.  The *Motion*

9   offers no evidence of a "controlling definition" of thread count.  *In re 5-Hour Energy*, 2017 U.S.

10  Dist. LEXIS 220969, at *21.  It could not because, as Rhodes testified, "[t]hread count is a very

11  ambiguous term."  Ex. 3 at 160:8-9; *see also id.* at 73:23-74:7, 75:22-76:4 ("the average consumer

12  does not understand what thread count is").  Without such a controlling definition, "courts have

13  found that materiality is not subject to common proof."  *In re 5-Hour Energy*, 2017 U.S. Dist.

14  LEXIS 220969, at *21.[44]  Moreover, thread count is only one "attribute" of bedding; the *Motion*,

15  however, offer no evidence showing how consumers "valued" it "compared to other attributes of

16  the product[.]"  *Id.*[45]  And, as the *Expert Report of Sarah Butler* ("*Butler Report*") demonstrates,

17  this question (and the materiality question in general) cannot be answered with common evidence.

18       The *Butler Report* describes the survey conducted to determine, *inter alia*, (1) whether

19  thread count, alone, has an impact on WSI consumers' decisions to purchase bedding and, if so,

20  the level of importance consumers place on such information, and (2) whether the importance of

21  _____

22  [44]   *See also Allen*, 331 F.R.D. at 659 ("Where individuals are likely to have different
    understandings for a word with no fixed meaning, this lack of cohesion can prevent plaintiffs from

23  satisfying…predominance"); *Pierce-Nunes*, 2016 U.S. Dist. LEXIS 149847, at **22-23
    (predominance not met where no common meaning of "LED TV"); *Jones*, 2014 U.S. Dist. LEXIS

24  81292, at *54 ("[E]ven if the challenged statements were facially uniform, consumers'
    understanding of those representations would not be"); *Astiana v. Kashi Co.*, 291 F.R.D. 493, 508

25  (S.D. Cal. 2013) (certification denied because no common definition of "all natural").

    [45]   *See also Townsend*, 303 F. Supp. 3d at 1045 (evidence must show "statements were in fact

26  material to [consumers'] purchases, as opposed to, or in addition to, price, promotions, retail
    positioning, taste, texture or brand recognition") (quotations omitted); *Jones*, 2014 U.S. Dist.

27  LEXIS 81292, at *60 (no materiality where there were "numerous reasons a customer might buy"
    defendant's item and a no evidence of "the impact of the challenged label statements"); *Chow v.*

28  *Neutrogena Corp.*, 2013 U.S. Dist. LEXIS 17670, at **4-5 (C.D. Cal. Jan. 22, 2013); *Badella v.*
    *Deniro Mktg. LLC*, 2011 U.S. Dist. LEXIS 128145, at **25-26 (N.D. Cal. Nov. 4, 2011).

thread count (and/or other features) differed from person to person.  Ex. 21 ¶¶ 8, 21, 27.[46]  The survey demonstrates that:  (1) only *1.6%* of respondents identified thread count in response to the open-question for the "reason or reasons you bought this bedding item"; (2) only approximately 10% identified thread count in response to the open-ended question "[w]hat product feature or features (if any) were most important to you when selecting this product for purchase";[47] (3) only approximately 34% of respondents selected thread count (along with other factors) as an important factor when given a finite list of features;[48] and (4) respondents allocated, on average, only *5.8* out of a total of *100* points (all 100 points were required to be allocated) to thread count when asked to indicate the importance of various features.[49]  *Id.* at ¶¶ 10, 30, 38-39, 47-51, 65-66.  In short, the survey demonstrates that consumers consider a wide-range of factors when purchasing WSI's bedding,[50] that thread count is, most often, not one of those factors, and that, even when it is, it is given little to no weight by consumers.  *Id.*; *see also* Ex. 20 ¶¶ 26-38.  Certification is improper under these circumstances.[51]

    Not only does the *Butler Report* demonstrate that purchase decisions vary (which, itself,

---

[46]  The raw survey data is not included with the *Butler Report*, as converting it to PDF is not feasible, but it can be provided to the Court in native format upon request.

[47]  Approximately 78% of respondents that identified thread count in response to the open-end question indicated other factors were also important.  Ex. 21 at ¶¶ 48-49.

[48]  On average, respondents selected six features from the finite list.  Ex. 21 at ¶ 50.  Options like color, design, price, or fabric type were much more popular than thread count.  *Id.*

[49]  Respondents allocated, on average, approximately two to three times more points to factors like color, design, print, pattern, fabric type, size, and price.  Ex. 21 at ¶ 50.

[50]   Several of the factors identified demonstrate thread count was likely not a purchase consideration at all for many consumers.  For example, any person that purchased a Bedding Product because it was on a gift registry (6% of respondents) did so because it was placed on the registry by someone else and not because of any advertised attribute.  Ex. 21 at ¶ 50.  Individuals that purchased based on a recommendation (*id.* ¶ 47) or based on their own feel of the item (*id.* ¶¶ 47-50) are unlikely to have considered thread count (or any other discrete attribute) to be important to the purchase decision.  *See Dunn*, 2021 U.S. Dist. LEXIS 179838, at *14 (purchasers buying based on recommendation or experience with the products would not have found "the representations on the [p]roduct's packaging…important to their purchasing decision").  Similarly, repeat purchasers (approximately 10%) would be purchasing the bedding item based on their prior experience and satisfaction and may not have cared about any individual attribute (including thread count) at all.  Ex. 21 at ¶ 50.  Thus, not only does materiality differ between consumers, the inquiry could be different between purchases by the same consumer.

[51]  *See, e.g.*, *Townsend*, 303 F. Supp. 3d at 1047-48 (materiality not shown where "[o]nly 7.3% of respondents selected the [at-issue] statement as a factor in their purchasing decision"); *Pierce-Nunes*, 2016 U.S. Dist. LEXIS 149847, at **23-25 (certification denied where defendant introduced survey evidence that consumers purchase products at-issue for a variety of reasons); *Jones*, 2014 U.S. Dist. LEXIS 81292, at **59-61.

1    renders certification improper), it proves that any class-wide inference about materiality of thread

2    count is infeasible.  Survey respondents often cited benefits (*e.g.*, durability, feel, breathability) –

3    and not bedding attributes such as thread count – as purchase factors.  Ex. 21 ¶¶ 46-50.  This is

4    unsurprising given that, as Rhodes testified, the evaluation of bedding is so subjective ("[w]hat's

5    good to me might be really crappy to you") that Rhodes herself "won't buy textiles [she] can't

6    touch" and that, when she does purchase bedding online, she does not decide whether to keep it

7    until she actually feels it.  Ex. 3 at 166:16-167:15.  That consumers confirmed that they (like

8    Rhodes) make decisions based on observed benefits makes it difficult to disentangle the extent to

9    which a physical attribute like thread count (which, as Rhodes confirmed, is just one of "so many

10   things" that could impact observed benefits (*id.* at 163:6-164:9)) would have affected a purchase

11   decision – an exercise Lamb does not even attempt to undertake – without resorting to

12   individualized inquiry (Ex. 20. ¶¶ 33-38).

13         Because the *Motion* does not establish Perlin is entitled to the presumption of reliance,

14   causation, and injury, and that materiality can be determined with common evidence, each class

15   member must establish reliance, causation, and injury.[52]  *See*, *e.g.*, *Vizcarra*, 339 F.R.D. at 550;

16   *Shanks*, 2019 U.S. Dist. LEXIS 160199, at **9-21; *Lack v. Mizuho Bank, Ltd.*, 2019 U.S. Dist.

17   LEXIS 127963, at **9-18 (C.D. Cal. Apr. 30, 2019); *Faulk*, 2013 U.S. Dist. LEXIS 57430, at

18   **28-30.  This individual inquiry renders certification improper.

19                    (3)    *The Motion Does Not Establish A Valid, Common Method Sufficient*

20                           *To Measure Damages*

21         Under *Comcast*, plaintiff must establish damages are capable of measurement on a class-

22   wide basis by "proffer[ing] a common methodology for calculating damages" that "'measure[s]

23   only those damages attributable' to the relevant theory of liability."  *Siino*, 340 F.R.D. at 163-64

24

25   ──────────────────────
     [52] Lamb's assertion that all class members were injured because WSI charged a higher price due

26   to its thread count representations does not establish that injury is not an individual issue.  Dkt.
     292-3 ¶¶ 28-37; *see also* Ex. 21 ¶¶ 22-43.  Lamb's injury opinion – which is based, in part, on his

27   improper and unsupported conclusion that thread count is material – relies on unsubstantiated
     assumptions and does not address how WSI actually prices its products.  Had Lamb considered

28   WSI's actual pricing, he could not have reached his conclusion, as pricing is set by applying a
     target margin (a target that does not change based on product or product attribute including thread
     count) to the cost to WSI to purchase the product.  Ex. 5; Ex. 6; Ex. 21 ¶¶ 22-43.

1   (quoting *Comcast*, 569 U.S. at 35).   The absence of such a methodology defeats certification.   *Id.*

2   at 164 (certification denied were plaintiff did not show that "'damages…[can] feasibly and

3   efficiently calculated once the common liability questions are adjudicated'") (quoting *Leyva v.*

4   *Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

5          Here, the Rule 23(b)(3) class seeks to recover the difference between what they paid and

6   what they would have paid absent the alleged thread count misrepresentations (*i.e.*, the "price

7   premium").   Dkt. 292 at 32:16-18.   To do so, Perlin must introduce evidence of a damages

8   methodology that can determine the price premium attributable to the alleged misrepresentations.

9   *See*, *e.g.*, *Herron v. Best Buy Stores, Ltd. P'ship*, 2018 U.S. Dist. LEXIS 70556, at *10 (E.D. Cal.

10  Apr. 26, 2018); *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118 (C.D. Cal.

11  2015).   If she does not, certification should be denied.   *See Price v. L'Oréal USA, Inc.*, 2021 U.S.

12  Dist. LEXIS 187099, at *12 (S.D.N.Y. Sep. 29, 2021) ("Courts routinely reject price premium

13  methodologies under *Comcast* when [they] do not attempt to isolate the premium due only to the

14  allegedly misleading marketing statement") (quotations omitted).

15         The *Motion* proposes two methods to "measure the price premium that resulted from the

16  deceptive thread count claims":   (1) "a direct benchmark approach"; and (2) "a hedonic pricing

17  model."   Dkt. 292 at 33:5-9.   Other than identifying their names, the *Motion* offers no explanation

18  of the approaches or their application here.   *Id.*   It, instead, merely asserts that the methods are

19  "well accepted" and "rely upon common evidence."   *Id.*   The *Motion*'s rote contentions do not

20  satisfy *Comcast*.   And, when the (often unexplained) details of the proposed methods are

21  considered, it is clear that neither proposed approaches does either.

22                    a)        *The Proposed Direct Benchmark Approach*

23         Under the proposed direct benchmark approach, Perlin's economics expert Lamb would

24  subtract the prices of "benchmark" WSI "bedding products" identified by Perlin's textile expert

25  Rhodes from the Bedding Products' prices to determine the alleged price premium charged by

26  WSI.   Dkt. 292-2 ¶¶ 41-43.   According to Lamb, this "direct comparison of the price" of the

27  Bedding Products and benchmark products is only possible "[i]f the only difference between

28  the…Bedding Products and the benchmark…products is the…Bedding Products' labeling with

1    overstated thread count[.]"  *Id.* ¶ 43.   Courts agree.   A direct product comparison is only

2    acceptable where the product at issue and benchmark product are identical but for the allegedly

3    false advertising.  *Algarin*, 300 F.R.D. at 460.[53]  If the products differ in any other way, a plaintiff

4    cannot establish that any price difference is attributable solely to the alleged misrepresentation.

5    *Id.*; Ex. 20 ¶ 52.  As such, any proposed comparator method using products that are not identical

6    but for the alleged false advertising "is inconsistent with the law."  *Algarin*, 300 F.R.D. at 460.[54]

7    This, however, is exactly what the *Motion* proposes.

8            Exhibit 2 to Rhodes' *Expert Report* ("*Rhodes Report*") identifies the benchmark products

9    she understood to be "comparable" to the Bedding Products but with "properly identified thread

10   counts."  Dkt. 292-1 ¶ 60.  The *Rhodes Report* does explain how benchmarks were selected.  *Id.*

11   Nor could Rhodes provide any such details at deposition.  Ex. 3 at 135:15-141:13.[55]  Indeed,

12   Rhodes did not even know that her "benchmarks" would be used for a damages purposes.  *Id.* at

13   146:21-146:22.   Thus, it is not surprising that Rhodes' benchmarks are not identical to the

14   Bedding Products but for the alleged misrepresentation.  Dkt. 292-1, Ex. 2; Ex. 20 ¶¶ 53-55.[56]

---

15/16   [53]  *See also Larsen v. Vizio, Inc.*, 2017 U.S. Dist. LEXIS 223667, at **37-38 (C.D. Cal. Apr. 27, 2017) (comparator model requires products that are identical but for the disputed feature).

17/18   [54]  *See also Jones v. ConAgra Foods, Inc.*, 2014 U.S. Dist. LEXIS 81292, at **75-76 (N.D. Cal. June 13, 2014) (proposal "to take a comparable product and compare the price between it and the allegedly mislabeled…product" insufficient under *Comcast* because the comparator was not identical to the challenged product but for the allegedly false advertising).

19/20   [55]  Rhodes eventually testified that she focused on advertised weave structure and thread count, factors she said are only a starting point and do not determine whether bedding items are the same. Ex. 3 at 142:25-143:143:7, 156:13-23, 162:9-19.  Exhibit 2 to the *Rhodes Report* appears to identify "marketing language" and "fiber content" as additional factors. Dkt. 292-1, Ex. 2.

21-28   [56]  Exhibit 2 to the *Rhodes Report* provides more examples.  For example, it identifies:  (1) Turkish-made sheets as benchmarks for the Italian-made WSH Greek Key Bedding and WSH Suzani Bedding; (2) "Imported" bedding as a benchmark for the Italian-made PB Foundations Bedding; and (3) sheets as a benchmark for the PB Organic Bedding that are from a different brand (*Pottery Barn Teen*), do not have the same certifications as the PB Organic Bedding, and are marketed differently (*e.g.*, the PB Organic Bedding is advertised as fitting mattresses up to 16" deep; the purported benchmark is not).  Dkt. 292-1, Ex 2.  The PB Classic Bedding is made of "95% cotton and 5% organic percale," fits "mattresses up to 18" deep," and has an "Easy-Care finish," while its benchmark is marketed as made of "100% cotton sateen," able to fit mattresses up to 16" deep, with no references to finishes.  *Id.*  The PB Classic Bedding is allegedly 200 thread count when calculated using ASTM D3775, while its benchmark is marketed as 300 thread count.  *Id.*  The unnamed product listed as the PB Morgan Bedding benchmark is marketed as "woven of pure organic cotton" and "100% organic cotton percale," while the PB Morgan Bedding is "[m]ade of 95% cotton/5% organic cotton."  *Id.*  At least two of the benchmarks for the WSH Signature Bedding, which is marketed at "600-thread-count two-ply," are not marketed as two-ply (and the other two were incorrectly marketed as two-ply).  *Id.*; *see also* Ex. 5 ¶¶ 10-11.

---

-30-                                             Case No. 3:16-cv-01421-WHO

1  Most fundamentally, none of the proposed benchmarks are two-ply which means they are not and

2  cannot be identical to the Bedding Products.  Dkt. 292-1, Ex. 2.[57]  That Perlin's benchmark expert

3  failed to identify true benchmarks proves the approach is insufficient.  *See Jones*, 2014 U.S. Dist.

4  LEXIS 81292, at **73-76 (method "deeply flawed" and did not "comport with *Comcast*" because

5  expert did not identify comparator identical to at-issue product but for alleged misrepresentation).

6      Indeed, the evidence demonstrates that, in all likelihood, no true benchmark products exist

7  or can be identified.  Rhodes has not identified two-ply benchmarks or proven they exist.[58]

8  Setting aside ply, there are myriad objective factors that make a particular bedding item what it is

9  including weave structure, fiber selection, finish, size, color, design, pattern, fabric type, fabric

10  weight, country of origin, country of manufacture, yarn type, yarn size, yarn strength, yarn

11  evenness, yarn uniformity, staple length, pilling resistance, tearing strength, colorfastness, and

12  care requirements.  *See*, *e.g.*, Dkt. 292-1 ¶¶ 18, 30; Dkt. 292-3 ¶¶ 30-31, Exs. 29-30; Ex. 21 ¶ 50.[59]

13  Rhodes does not claim she tested the Bedding Products or benchmarks for each of these factors

14  (she even said some need not be considered at all (Ex. 3 at 143:8-146:8)), and has not otherwise

15  established they are consistent across products.  And this says nothing of subjective factors that

16  could lead consumers to consider bedding similar including feel, softness, and breathability.  *See*

17  Dkt. 292-2 ¶ 20; Ex. 3. at 163:6-167:15; Ex. 21 ¶¶ 47-51.  Rhodes did (and could) not perform

18

19  [57]  Other than two proposed benchmarks for the WSH Signature Bedding. none of the benchmarks

20  are marketed as two-ply (Dkt. 292-1, Ex. 2) and Rhodes does not claim they are two-ply.  The two
    benchmarks marketed as two-ply (Italian 300TC Sateen Bedding and Italian Border 300 Thread
    Count) were, in fact, not two-ply.  Ex. 5 ¶¶ 10-11

21  [58]  Given the nature of Plaintiffs' claims, that Rhodes has not identified two-ply WSI benchmarks

22  is not surprising.  Plaintiffs allege WSI intentionally uses and miscounts two-ply yarns to pawn off
    inferior bedding products – ignoring, *inter alia*, that WSI's vendors determine thread count and

23  Rhodes' testimony that there are perfectly valid and beneficial reasons for two-ply construction.
    Ex. 3 at 97:22-99:22, 104:22-105:4; Ex. 23 at 270:11-271:8.  Regardless, if it is true that WSI's

24  practice is to improperly count two-ply yarns, then how would Rhodes be able to identify any two-
    ply bedding with yarns counted as Plaintiffs claim they should be (let alone the identical bedding

25  necessary for benchmarking)?  Notwithstanding Rhodes' assertion that, "[a]mong complying
    products, we see fabrics made of a combination and two-ply yarns" (Dkt. 292-1 ¶ 57), she has not

26  identified any specific two-ply WSI product with yarns counted as Plaintiffs assert they should be
    (again, the Italian 300TC Sateen Bedding and Italian Border 300 Thread Count bedding advertised

27  as two-ply and identified as benchmarks are, in fact, one-ply).

    [59]  Another necessary factor is brand.  Ex. 20 ¶ 57.  Different brands carry different premia; thus, a

28  cross-brand comparison (between WSI brands or between WSI brands and third parties) cannot
    isolate the price premium attributable to the alleged misrepresentation.  *Id.*

Case 3:16-cv-01421-WHO   Document 305   Filed 04/25/23   Page 44 of 52

1  consumer testing to determine if consumers perceive the Bedding Products and their purported

2  benchmarks to be comparable.  *See* Ex. 20 ¶¶ 11, 16-17.[60]  In short, because the evidence proves

3  benchmarking "is nearly impossible as no two" bedding "products are completely identical"; thus,

4  the approach should be rejected.  *Algarin*, 300 F.R.D. at 460; *see also* Ex. 20 ¶¶ 52-67.[61]

5  Finally, even if the *Motion* had demonstrated that true benchmarks exist and could be

6  identified (it has not), the approach would still be insufficient.  Lamb has not explained which

7  prices he intends to use for the analysis, which makes it impossible to undertake the rigorous

8  analysis required.  Ex. 20 ¶ 56.  Nonetheless, any choice of price (*e.g.*, list price, price actually

9  paid) presents challenges likely to make the approach unreliable.  *Id.* ¶¶ 58-67.

10               b)     *The Proposed Hedonic Pricing Model*

11  The second proposed method for determining any price premium is a "hedonic pricing

12  model," which "would be used [if] that the benchmark products are not identical to the…Bedding

13  Products but-for the mislabeled thread count."  Dkt. 292-2 ¶ 45.  According to Lamb, a hedonic

14  model can be used to "determine the amount by which a specific feature of a good contributes to

15  the price of that good."  *Id.* ¶ 46.  To do this, the model "take[s] the form of multiple regression

16  analysis," which "explains the movements of one variable, called the 'dependent variable,' by

17  examining the behavior of several other variables, called 'independent variables' or 'regressors'

18  over time."  *Id.* ¶¶ 47, 49.  Here, because "[t]here are a variety of factors that might affect prices

19  for bedding products," the multiple regression analysis proposes measuring the effect of a

20  particular variable on the dependent variable "while simultaneously controlling for the effects of

21  [the] other variables."  *Id.* ¶ 49.  As applied here, the model treats bedding as a "bundle of

22  characteristics" and seeks to determine the effect one of those characteristics on the price of the

---

[60]  Rhodes is not a consumer expert, so any attempts to determine consumers' preferences would be outside the scope of her arguable expertise. Ex. 3 at 17:19-22, 20:22-21:5, 75:13-21.

[61]  *See also Bruton*, 2018 U.S. Dist. LEXIS 30814, at **25-26 (proposed comparison model insufficient under *Comcast* because, without controlling for all factors that could lead the prices of the products to differ, the model simply presumes "that the entire price difference between [the at-issue product] and [an alleged comparator product] is attributable to [defendant's] misleading statements"); *In re POM Wonderful, LLC*, 2014 U.S. Dist. LEXIS 40415, at **21-22 (C.D. Cal. Mar. 25, 2014) (benchmark model purported to compare non-identical products to determine price premium did not "answer the critical question why [a] price different existed" and did "not comport with *Comcast*'s requirement that class-wide damages be tied to a legal theory").

-32-                                    Case No. 3:16-cv-01421-WHO
OPPOSITION TO MOTION FOR CLASS CERTIFICATION

1    bedding (the dependent variable) by controlling for all other factors that "may influence" the

2    bedding's price (the independent variables or regressors).  *Id*. ¶¶ 11, 26, 29, 49-51; Ex. 20 ¶ 69.

3    Lamb's model fails to satisfy *Comcast*.

4           As an initial matter, Lamb has proposed the wrong tool for determining what must be

5    under *Comcast* – the price premium associated with the alleged misrepresentations. Ex. 20 ¶¶ 20,

6    70.  The proposed regression is designed to evaluate the premium associated with increased thread

7    count*,* not a representation of increased thread count.  *Id*.; Dkt. 292-2 ¶¶ 50-51.  WSI's pricing

8    practices, which Lamb ignores, demonstrate why the distinction is important.  Ex. 20 ¶¶ 20, 70.

9    WSI prices bedding by applying a target margin (which is consistent across products and does not

10   change based on product attributes) to the cost of the item to WSI.  Ex. 5; Ex. 6; Ex. 20 ¶¶ 20, 70;

11   Ex. 23 at 202:20-209:3.  While a change in actual thread count may affect the cost of the item to

12   WSI, a change in representation would not affect cost to WSI.  Ex. 20 ¶¶ 20, 70.  Because a

13   change in representation does not affect the item's cost to WSI, the Bedding Products' prices

14   would not change even if their thread counts were stated in the manner Plaintiffs allege they must

15   be.  *Id*.  Because Lamb's model does not account for actual pricing, it would not measure any

16   price premium associated with the alleged thread count misrepresentations; at best, it would be a

17   premium associated actual thread count differences (which lead to increases in item costs to WSI).

18   *Id*.  Thus, even if Lamb could execute his hypothetical regression, any price premium he recovers

19   will likely represent the increased manufacturing costs associated with differences in actual

20   product thread count, not an alleged thread count misrepresentation.  *See Schechner v. Whirlpool*

21   *Corp.*, 2019 U.S. Dist. LEXIS 171642, at *22 (E.D. Mich. Aug. 13, 2019) ("Hedonic regression

22   should model firm behavior, including…and pricing"); *Herron*, 2018 U.S. Dist. LEXIS 70556, at

23   **6-16 (hedonic damages model "fundamentally flawed because it conflate[d] 'battery life' and

24   'battery life representations'").

25          And Lamb's proposed analysis is purely ***hypothetical***.  He has not performed or attempted

26   to perform the analysis, or presented anything other than his conclusion that the model will, in

27   fact, be sufficient to calculate any price premium on a class-wide basis.  Dkt. 292-2 ¶¶ 45-52; *see*

28   *also* Ex. 2 at 68:8-15, 76:3-78:8; Ex. 20 ¶ 72.  However, an expert's "bald, unsupported assertion

1  that [the] method will work" does not satisfy *Comcast*. *Randolph v. J.M. Smucker Co.*, 303 F.R.D.

2  679, 698 (S.D. Fla. 2014).[62]  Lamb similarly concludes data exist to undertake the analysis.  Dkt.

3  292-2 ¶¶ 53-54.  But this conclusion is contradicted his admission that he has not seen with any

4  data or know what has been produced, and undermined by his concession that he does not know

5  which products he would include in a regression (*e.g.*, Bedding Lines, Rhodes' purported

6  benchmarks, other WSI items, and/or third party items) or which variables he would need to

7  consider.  Ex. 2 at 76:12-92:6, 106:1-110:15, 142:19-143:20.  If Lamb – who was unaware class

8  discovery closed years ago (*id.*) – does not know what will be included in the regression, he

9  cannot credibly claim the data exist to undertake it.  Even so, there is no evidence that the required

10 information is available for third party items, which is particularly important given the evidence

11 and allegations in this case.[63]  With regard to WSI's items, there is no evidence that the data

12 source cited by Lamb – WSI's Consumer Data Warehouse ("CDW") – contains the information

13 necessary to conduct a regression.  Lamb confirmed he does not know if "the CDW contains all

14 the data that you would need" for the regression .  *Id.* at 143:21-144:14.  He could not; he has not

15 "seen the CDW data" (or any "data at all") and cannot identify what other data is needed.  *Id.* at

16 144:10-153:6.[64]  The failure to prove the necessary data exist is further evidence that the proposed

[62]  *See also Singleton v. Fifth Generation, Inc.*, 2017 U.S. Dist. LEXIS 170415, at **67-69 (N.D.N.Y. Sep. 27, 2017) (certification denied where expert's proposed hedonic "model…lack[ed] sufficient detail to permit the [c]ourt to determine whether it satisfies *Comcast* and is suitable to the task at hand"); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 77-80 (D.N.H. 2015) (rejecting unperformed regression models that "set forth little detail [about] the significant conceptual, implementation, or data issues that would be encountered if the[] approach were adopted"); *Brazil v. Dole Packaged Foods, LLC*, 2014 U.S. Dist. LEXIS 157575, *41 (N.D. Cal. Nov. 6, 2014) (*Comcast* not satisfied because "it is not enough to just say that the Regression Model controls for other factors; [plaintiff] must show the [c]ourt that the model can"); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25-26 (D.D.C. 2012) (proposed regression model not "sufficiently developed" to satisfy plaintiffs' certification burden).

[63]  In order to isolate the effect of the alleged misrepresentation on price, Lamb must use two-ply products with yarns counted and advertised using ASTM D3775. Ex. 20 ¶ 70 n.105.  But there is no evidence such WSI products exist; indeed, the *8AC* alleges WSI engages in an intentional practice of miscounting yarns in two-ply products and Perlin has not identified any specific WSI bedding with two-ply with yarns counted and advertised as she prefers.  *Id.*  So, without evidence that these products and data exist (including from third party retailers where necessary), there is no proof Lamb can establish that the regression will measure the premium associated with the thread count misrepresentation, as opposed to the physical differences between the bedding.  *Id.*

[64]  Instead of reviewing data, Lamb relied on the testimony of a WSI witness. Dkt. 292-2 ¶¶ 53-54; Ex. 2 at 144:10-145:14.  This testimony, however, only shows that the CDW contains available transaction details (*e.g.*, sale date) and generic item descriptions, not the detailed

1    hedonic model does not satisfy *Comcast*.[65]

2            The failure to confirm the availability of all necessary data is compounded by the fact that

3    Lamb testified that, without it, he cannot explain how he would conduct the regression.  *Comp.*,

4    Ex. 2 at 106:1-107:1, 129:18-132:21.  The *Lamb Report* – prepared and signed years before Perlin

5    joined this case – bears this out.  Its discussion is mere high-level background description of

6    regression.  Dkt. 292-2 ¶¶ 45-52; Ex. 20 ¶¶ 72-75.  There is no detail about how the analysis

7    would be undertaken.  *Id.*  For example, it is unclear whether Lamb will calculate any price

8    premium for each at-issue product or apply one price premium across all products.  Ex. 20 ¶ 11.

9    Further, although Lamb asserts the model will control the "variety of factors that might affect

10   prices for bedding products" (Dkt. 292-2 ¶¶ 49-51), he has not identified (and could not identify)

11   each factor to be controlled for.  Ex. 2 at 76:12-92:6; Ex. 20 ¶¶ 68-92.[66]  Even more, Lamb has not

12   shown the model can account or control for all factors that might affect prices for bedding

13   products, which means any results would be unreliable.  Ex. 20 ¶¶ 68-92.  These failures – which

14   deprive the Court of the ability to "conduct the required 'rigorous analysis'" by providing

15   "nothing of substance to analyze" (*In re POM*, 2014 U.S. Dist. LEXIS 40415, at **21-22) – doom

16   the proposed regression analysis.[67]

17   _____

18   information regarding bedding attributes necessary to determine if two items are the same.  Ex. 22
     at 46:20-47:3, 188:3-12; *see also* Ex. 20 ¶¶ 72-75, 80-88; Section V.B.2.a.3.i *supra*.  Other than

19   this testimony, Lamb simply speculates that the data could exist in the "public record" or "the
     record in this case" (a record he has not seen).  Ex. 2 at 145:7-149:17.  There is no evidence to

20   support this speculation.  *See* Ex. 20 ¶¶ 72-75, 80-88.
     [65] *See In re Dial Complete*, 312 F.R.D. at 77-80 (rejecting regression model that offered "minimal

21   detail…about what data [it] will rely upon [or] where the data will come from"); *Jones*, 2014 U.S.
     Dist. LEXIS 81292, at **76-78 (regression model insufficient where expert did "not determine[]

22   whether the data related to any or all of his proposed control variables exists"); Ex. 20 ¶¶ 72-88.
     [66] The *Lamb Report* identifies certain "attributes" of bedding products like "thread count, fabric

23   type, weave pattern, size, [and] color[.]"  Dkt. 292-2 ¶ 29.  But its hedonic section does not
     identify any specific factor that must be accounted and controlled for.  *Id.* ¶¶ 45-52.  And Lamb

24   was unwilling to identify any (other than, perhaps, thread count) during deposition.  Ex. 2 at
     93:11-94:15.  Lamb offered no indication of the research he would conduct to determine variables.

25   testifying he would determine variables once he sees the results of the regression.  Ex. 20 ¶¶ 78-
     79.  This approach, however, is unscientific and is similar to "p-hacking" – a practice known to

26   produce findings of statistical significance where there are no underlying relationships.  *Id.*
     [67] *See, e.g., Ang v. Bimbo Bakeries USA, Inc.*, 2018 U.S. Dist. LEXIS 149395, at **38-42 (N.D.

27   Cal. Aug. 31, 2018) (*Comcast* not satisfied where expert "provided a partial list of variables that
     will need to be controlled for, and attempt[ed] to postpone his explanation of how he will account

28   for them until after class certification" because the "rigorous…analysis" required did "not permit
     the [c]ourt to wait until after certification to assess whether [the regression model] is capable of

1    The hedonic regression proposal suffers from additional deficiencies.  Lamb has not shown

2    there is sufficient product variation to isolate the effect of thread count advertising, and Rhodes'

3    benchmark products demonstrate that such variation is unlikely.  Ex. 2 at 102:17-22; Ex. 20 ¶ 89.

4    Also, because of the likely correlation between advertised thread count and other features (*e.g.*,

5    fabric quality), it will be hard, if not impossible, to accurately isolate the individual contribution of

6    advertised thread count.  Ex. 20 ¶¶ 90-92.  The *Motion* does not address these issues.

7                    (4)    *The Statutes of Limitations Are A Predominant Individual Question*

8    In the Ninth Circuit, the "existence of a statute of limitations issue does not compel a

9    finding that individual issues predominate over common ones."  *Williams*, 529 F.2d at 1388.  This

10   does not mean limitations issues are irrelevant.  On the contrary, predominance may be defeated

11   where a "limitations defense 'raises substantial individual questions that vary among class

12   members[.]'"  *Lucas v. Breg, Inc.*, 212 F. Supp. 3d 950, 971 (S.D. Cal. 2016) (quoting *O'Connor

13   v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000)).  Here, the limitations defense will

14   predominate.[68]  The *Motion* seeks to certify classes spanning at least sixteen years and that include

15   members who claims are facially time-barred.   The *8AC* alleges the discovery rule and/or

16   fraudulent concealment doctrine apply but, as the Court found, whether either applies is a fact

17   issue for trial.  Dkt. 283  This determination is consumer-specific, as demonstrated by, *inter alia*,

18

19   measuring economic injury attributable to the alleged misbranding on a classwide basis"); *Bruton*,
20   2018 U.S. Dist. LEXIS 30814, at **29-34 (proposed regression did not satisfy *Comcast* because
     plaintiff did "not explain how [it] will account for independent variables that might affect the
21   products' prices or sales" because though "absolute precision is not required at the class
     certification stage," a plaintiff must "provide a meaningful explanation as to how the variables will
22   be addressed"; in other words, "real explanation is necessary"); *Singleton*, 2017 U.S. Dist. LEXIS
     170415, at **67-69 (certification denied where expert made "little attempt to identify a relevant
23   set of product attributes to plug into his hedonic regression model," only "offer[ing] a few
     suggestions…and indicat[ing]…he might use some other attributes as yet undetermined"); *Jones*,
24   2014 U.S. Dist. LEXIS 81292, at **76-78 ("vague and abstract" regression not "sufficiently
     developed" to meet burden because expert did not "provide a clearly defined list of variables," had
25   "not determined whether the data related to any or all of his proposed control variables exists,"
     and had "not determined, or shown how he would determine, which competing and
26   complementary products he would use"); *Brazil*, 2014 U.S. Dist. LEXIS 157575, at *41 (expert's
     conclusion that "the [r]egression…controls for other factors" does not satisfy *Comcast* "burden to
27   show that the model he proposes is capable of…isolating the price premium attributable to [the
     misrepresentation] only"); Ex. 20 ¶¶ 68-92.
28   [68]  Again, Rushing understood these limitations issues would affect certification and, as such, only
     sought to certify a class extending four years before the filing of the action, despite alleging he
     sought to represent consumers whose claims were facially-barred by the statutes of limitations.

1   Perlin's and Rushing's allegations.   Section V.A.2 *supra*.   The *Motion* does not address these

2   issues or prove they can be decided with common proof.[69]   Because whether the limitations period

3   exceptions apply requires "individualized inquiry…before the court may even reach the merits of

4   each…claim," class certification is improper.   *Quezada*, 2009 U.S. Dist. LEXIS 122537, at *29.[70]

5                          (5)      *Arbitration Is A Predominant Individual Issue*

6                The existence of an arbitration agreement that potentially applies to part of the class can

7   defeat predominance.[71]   Here, any WSI consumer that made an online purchase since March 2016

8   agreed to an arbitration provision and class action waiver, and online purchases account for

9   approximately 85% of all *Pottery Barn* and *Williams-Sonoma Home* bedding purchases since

10   2016.   Section V.A.2 *supra*.   And, as Perlin demonstrates, there will be class members potentially

11   subject to the arbitration provision that did not purchase their bedding online after March 2016.

12   *Id*.   Thus, "[i]f the proposed class is certified, the Court will be forced to determine which of the

13   class members may be subject to the arbitration provision…and those who are not" and "may have

---

14   [69]   *See*, *e.g.*, *Martel v. Writers Guild of Am. W.*, 2021 U.S. Dist. LEXIS 252015, at **14-15 (C.D.

15   Cal. Dec. 7, 2021) (no predominance where plaintiff did not show limitations issues could be
      decided using common proof); *Quesada v. Banc of Am. Inv. Servs.*, 2013 U.S. Dist. LEXIS 32588,

16   at *23 n.10 (N.D. Cal. Feb. 19, 2013) (no predominance where plaintiff did not "address[]]
      whether equitable tolling of the statute of limitations under the delayed discovery rule is suitable

17   for determination on a classwide basis").

18   [70]   *See also Lucas*, 212 F. Supp. 3d 971-72 (no predominance where many claims were "time-
      barred unless…the discovery rule or fraudulent concealment doctrine" apply because "resolving

19   these…limitation issues w[ould] involve individualized, fact-intensive inquiries"); *Saulsberry v.
      Meridian Fin. Servs.*, 2016 U.S. Dist. LEXIS 86419, at **50-51 n.5 (C.D. Cal. Apr. 14, 2016)

20   (refusing to certify class extending beyond the limitations period because applicability of
      discovery rule to facially time-barred claims "would depend on a number of individual factual

21   circumstances"); *Henson v. Fid. Nat'l Fin., Inc.*, 300 F.R.D. 413, 421 (C.D. Cal. 2014) (no
      predominance because plaintiff seeking to certify 15-year class would "rely upon various

22   exceptions to the statute of limitations" like the discovery rule or equitable tolling that "are by
      their very nature fact-intensive and highly individualized"); *Fisher v. Ciba Specialty Chems.

23   Corp.*, 238 F.R.D. 273, 309-10 (S.D. Ala. 2006) ("Courts have found that disparate, individualized
      assessment of…limitations issue may cause individual considerations to predominate under Rule

24   23(b)(3)"); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 674-75 (S.D. Ala. 2005) (no predominance
      where "factfinding on a plaintiff-by-plaintiff basis" necessary to determine each's "status vis a vis

25   the…limitations defense"); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 488 (E.D. Tex. 2004) (no
      predominance because "whether individual…claims are timely and whether equitable tolling

26   applies to some or all of these claims are issues that are not amenable to class treatment").

27   [71]   *See O'Connor v. Uber Techs.*, 904 F.3d 1087, 1094-95 (9th Cir. 2018); *Lozano v. AT&T
      Wireless Servs.*, 504 F.3d 718, 728 (9th Cir. 2007); *Robinson v. Onstar*, 2021 U.S. Dist. LEXIS

28   237818, at **15-17 (S.D. Cal. Mar. 31, 2021); *Conde v. Sensa*, 2018 U.S. Dist. LEXIS 154031, at
      **32-35 (S.D. Cal. Sep. 10, 2018); *Hill v. T-Mobile USA, Inc.*, 2011 U.S. Dist. LEXIS 157669, at
      *60 (N.D. Ala. May 16, 2011).

1   to analyze the legality of the arbitration clause and whether it binds all, some, or none of the

2   purchasers." *Conde*, 2018 U.S. Dist. LEXIS 154031, at *35.  The individual issues necessary to

3   determine whether any class member is subject to a binding agreement to arbitration will

4   "overshadow the common issues of whether Defendants' advertisements were false[.]"  *Id*.  The

5   Court, therefore, should find that the *Motion* "has not satisfied the predominance requirement for

6   this reason" and deny certification.  *Id*.

7              **b.       The *Motion* Does Not Establish Superiority**

8              Certification must be denied where the class action is not "superior to other available

9   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Courts

10  consider four superiority factors.   Fed. R. Civ. P. 23(b)(3).[72]   Here, the fourth factor –

11  manageability, which is considered "'the most critical concern in determining whether a class

12  action is a superior means of adjudication'" – establishes that certification is improper.  *Sykes v.*

13  *Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (quoting 2 William B. Rubenstein,

14  NEWBERG ON CLASS ACTIONS § 4.72 (5th ed. West 2014)); *see also Skinner v. Best Buy Co.*, 2008

15  U.S. Dist. LEXIS 130354, at *9 (C.D. Cal. Mar. 18, 2008).

16             A class action is not manageable or superior "when the complexities of class action

17  treatment outweigh the benefits of considering common issues in one trial" and/or "[i]f each class

18  member has to litigate numerous and substantial separate issues to establish his or her right to

19  recover individually, a class action is not 'superior.'"  *Zinser*, 253 F.3d at 1192.  Here, there are

20

21  [72]  The factors are:  (1) the class members' interests in individually controlling the prosecution or
    defense of separate actions; (2) the extent and nature of any litigation concerning the controversy
22  already begun by or against class members; (3) the desirability or undesirability of concentrating
    the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a
23  class action. Fed. R. Civ. P. 23(b)(3).  "A consideration of these factors requires the court to focus
    on the efficiency and economy elements of the class action so that cases allowed under Rule
24  23(b)(3) are those that can be adjudicated most profitably on a representative basis (*Zinser v.*
    *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001)) and to undertake the review
25  from the "point of view" of the judicial system, potential class members, plaintiff, the attorneys,
    the public at large, and the defendant (*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th
26  Cir. 2010)).  Here, Defendants do not dispute that the potential recovery is "modest" (Dkt. 292 at
    33:21-22) or that the first factor favors certification. *Zinser*, 253 F.3d at 1190.  Defendants are not
27  aware of any pending litigation filed by class members, which makes the second factor "neutral."
    *In re MyFord Touch Consumer Litig.*, 2016 U.S. Dist. LEXIS 179487, at *81 (N.D. Cal. Sep. 14,
28  2016).   And the California-based Defendants do not deny that there is some desirability to
    litigation in the Northern District of California.

1    individual liability questions of deception including whether a reasonable consumer would be

2    deceived, whether a consumer saw a representation, and which representation (if any) the

3    consumer saw.   Because the *Motion* does not prove materiality can be shown with common

4    evidence, each class member must demonstrate reliance, causation, and injury.   There is no

5    showing that damages can be determined on a class-wide basis.   The limitations defense presents

6    an individual issue for any consumer that purchased his or her sheets between January 2007 and

7    June 2016 (four years before Perlin filed the *8AC*).   Similarly, the arbitration/class action waiver

8    defense presents an individual issue for all class members and will require, *inter alia*, review of

9    each customer's transaction history to determine whether the purchaser agreed to the Terms before

10   they made their bedding purchase, when they made their bedding purchase, and/or or after they

11   made their bedding purchase.[73]   Even if these factors taken alone are insufficient to establish that

12   Rule 23(a)'s requirements and Rule 23(b)(3)'s predominance requirement are not met, when

13   viewed together, they prove that a class action is not superior.   *See, e.g., Gallardo v. UPS*, 2011

14   U.S. Dist. LEXIS 165174, at *18 (C.D. Cal. Aug. 22, 2011); *Hadjavi v. CVS Pharmacy, Inc.*, 2011

15   U.S. Dist. LEXIS 86341, at **24-25 (C.D. Cal. July 25, 2011); *Haley v. Medtronic, Inc.*, 169

16   F.R.D. 643, 654 (C.D. Cal. 1996).

17                              **VI.    CONCLUSION**

18          This case has been pending for more than seven years.   In that time, there have been

19   numerous complaints, summary judgment motions, Ninth Circuit appeals, multiple plaintiffs, and

20   a reference to arbitration.   Certainly, this was more than enough time for Perlin and her counsel to

21

22   _____

     [73]   *See, e.g., Nat'l Convention Servs., LLC v. Applied Underwriters Captive Risk Assurance Co.*,
23   2019 U.S. Dist. LEXIS 125810, at **11-12 (S.D.N.Y. July 27, 2019) ("Courts have found that
     [class action waiver] provisions prevented plaintiffs from establishing the class action procedure
24   as the superior method of adjudication"); *Tan*, 2016 U.S. Dist. LEXIS 186342, at *13 (arbitration
     and class action waiver clause prevented plaintiff from proving "the class action procedure is a
25   superior method of adjudication"); *Heejim Lim v. Helio, LLC*, 2012 U.S. Dist. LEXIS 197229, at
     *6 (C.D. Cal. Apr. 18, 2012) (manageability not established where evidence suggested that the
26   majority of class members signed arbitration agreements with class action waivers); *Pablo v.
     Servicemaster Glob. Holdings, Inc.*, 2011 U.S. Dist. LEXIS 87918, at **4-7 (N.D. Cal. Aug. 9,
27   2011) (no superiority where the evidence "support[ed] an inference that a significant number" of
     putative class members signed arbitration agreements, and "that a significant portion of th[e]
28   litigation would be devoted to discovering which class members signed such agreements and
     enforcing those agreements, rather than to the resolution of plaintiffs' legal claims").

collect and present the evidence necessary to prove that certification is proper.  They have not, and certification cannot be granted based on their say-so.  The *Motion* should be denied with prejudice.

SHEPPARD MULLIN RICHTER & HAMPTON LLP

Dated:  April 25, 2023          By     _____
                                                   */s/ P. Craig Cardon*
                                            P. CRAIG CARDON
                                            ROBERT J. GUITE
                                            BENJAMIN O. AIGBOBOH
                                            ALYSSA SONES

                                            *Attorneys for Defendants*

SMRH:4884-0784-1831.16

OPPOSITION TO MOTION FOR CLASS CERTIFICATION