UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILLIAM RUSHING, et al.,

        Plaintiffs,

    v.

WILLIAMS-SONOMA, INC., et al.,

        Defendants.

Case No. 16-cv-01421-WHO

**ORDER ON MOTIONS FOR CLASS CERTIFICATION AND TO EXCLUDE**

Re: Dkt. Nos. 292, 294, 308, 309, 316, 328

Plaintiffs move for class certification in this action that contends that defendant Williams-Sonoma, Inc., and its advertising and marketing subsidiaries Williams-Sonoma DTC, Inc., and Williams-Sonoma Advertising, Inc. (collectively "WSI") advertises and markets the thread count in certain of its Bedding Products[1] in a way that is not only contrary to industry-accepted standards, but is also false, deceptive, or misleading to reasonable consumers. Defendant opposes, also moving to exclude expert opinions of two of plaintiffs' experts and moving to strike evidence submitted with plaintiffs' reply in support of class certification. Dkt. Nos. 305, 308, 309, 328. For the reasons that follow, plaintiffs' motion to certify a class of California purchasers of defendant's Bedding Products is GRANTED, although their request to certify a nationwide injunctive relief class is DENIED. Defendant's motions to strike and exclude are DENIED. The administrative motions to seal are GRANTED in part and DENIED in part.

---

[1] Plaintiffs define "Bedding Products" as: (1) Williams-Sonoma Home Signature 600-Thread-Count Sateen Bedding (n/k/a Chambers 600TC Sateen Bedding); (2)Williams-Sonoma Home Greek Key Jacquard 600-Thread-Count Bedding; (3) Williams-Sonoma Home Suzani Jacquard Bedding (500 TC); (4) Pottery Barn Foundations Hotel Sateen Bedding (600 TC); (5) Pottery Barn Morgan 400-Thread-Count Bedding; (6) Pottery Barn PB Organic 400-Thread-Count Bedding; and (7) Pottery Barn PB Classic 400-Thread-Count Bedding.

United States District Court
Northern District of California

## DISCUSSION

## I.      MOTION FOR CLASS CERTIFICATION

Plaintiffs move to certify the following "nationwide **injunctive relief class**" under Rule 23(b)(2):

> All persons in the United States who from January 19, 2007, to the present purchased bedding, including sheets, sheet sets, pillowcases, duvet covers, and/or shams, directly from Williams-Sonoma, Inc. from any of the Bedding Products.

They also seek certification of a "**California Subclass** under Rule 23(b)(3)" of:

> All persons in California who from January 19, 2007 to the present who purchased bedding, including sheets, sheet sets, pillowcases, duvet covers, and/or shams, directly from Williams-Sonoma, Inc. from any of the Bedding Products.

Motion for Class Certification ("CC Mot.") at 1-2 (emphasis in original), collectively, the "Classes."[2]

### A.      Legal Standard

Federal Rule of Civil Procedure 23 governs class actions.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663-64 (9th Cir. 2022). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)).  "[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the

---

[2] Plaintiffs' motion for class certification has the standard 25 pages.  Civ. L. R. 7-2(b). Nevertheless, WSI asked for and I gave it an additional 15 pages for its opposition, allowing 40 pages in total to oppose class certification.  WSI also filed two separate motions to exclude plaintiffs' class certification experts, thereby gaining another 28 pages to oppose class certification.  Still not satisfied with the 68 pages allowed, WSI's opposition brief **contains 73 footnotes in less than the court-mandated 12 point font**.  Civ. L. R. 3-4(c)(2).  The amount of briefing WSI asks me to consider in what is a typical class certification motion in a standard consumer class action case is a questionable use of WSI's money.  Plaintiffs argue that I should ignore the arguments made and cases cited in the excessive and improper footnotes.  Reply in Support of Class Certification ("CC Reply") at 1.  I will not strike the footnotes and I have carefully considered each argument made and all authority cited by defendant, although I do not discuss each of the **hundreds of cases cited without parentheticals in WSI's footnotes**. Defense counsel is admonished that they need to comply with the Court's rules and also explain *why* each case cited supports their arguments.  This is poor advocacy:  String cites of dozens of cases without parentheticals are useless.  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

evidence." *Olean*, 31 F.4th at 665.

A "plaintiff[] must make two showings" to certify its purported class. *Olean*, 31 F.4th at 663. "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." *Id.* (quoting Fed. R. Civ. Proc. 23(a)).[3] "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 349-50 (quoting *Falcon*, 457 U.S. at 157).

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). *Olean*, 31 F.4th at 663. Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3).

For 23(b)(2), a "class action may be maintained if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2).

Under 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and [so] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* 23(b)(3). In deciding this, courts consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in

---

[3] Rule 23(a) provides:
    One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
    (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class;
    (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
    (4) the representative parties will fairly and adequately protect the interests of the class.
Fed. R. Civ. Proc. 23(a).

the particular forum; and

(D) the likely difficulties in managing a class action.

*Id.*

The process of class-certification analysis, "may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (internal quotation marks omitted). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

**B.     Rule 23(a) criteria**

**1.     Numerosity**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of members required for numerosity." *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). However, courts within the Ninth Circuit generally agree that numerosity is satisfied if the class includes forty or more members. *Villalpando v. Exel Direct Inc*., 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig*., 282 F.R.D. 446, 452 (N.D. Cal. 2012). The classes are numerous, as over 50,000 covered Bedding Products were sold in California and over $40 million dollars' worth of bedding products were sold nationwide. Aragon Decl. ¶¶ 42, 48, 50. WSI does not dispute numerosity.

**2.     Commonality**

FRCP 23(a) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. (a)(2). "A common contention need not be one that 'will be answered, on the merits, in favor of the class.' It only 'must be of such nature that it is capable of class-wide resolution.'" *Alcantar v. Hobart Servs*., 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) and *Wal-Mart Stores*, 564 U.S. at 350). Commonality, however, "only requires a single significant question of law or fact." *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012).

4

Plaintiffs identify several questions of law and fact that will be determined on a common basis based on classwide evidence and proof: primarily "WSI made material misrepresentations in their advertising and product labeling that each of the lines of bedding at issue had a specific measurable thread count and concealed the same material fact." CC Mot. at 10. Plaintiffs also identify additional legal and factual questions that can be resolved through common evidence:

> (1) whether ASTM D-3775 is the industry standard for calculating thread count for the bedding; (2) whether WSI violated the industry standards or state or federal law by counting two-ply yarns as two separate threads for the thread count; (3) whether WSI's counting method made WSI's thread count representations false, deceptive, or misleading to a reasonable consumer; (4) whether WSI omitted a material fact by not disclosing that the thread count numbers they advertise on the bedding were not calculated according to industry standards, did not match their own test results, or were unrelated to thread count numbers used by merchants; (5) whether WSI knew or should have known their thread count representations were false; (6) whether WSI had a duty to disclose their knowledge about the thread count; and (7) whether the Class is entitled to injunctive or other relief.

CC Mot. at 11.

WSI disputes whether those questions are really capable of resolution through common evidence, but addresses those arguments as ones of "predominance" under Rule 23(b)(3), addressed below, and not as uncommon under Rule 23(a). I find that plaintiffs have identified numerous questions of law or fact that can be resolved through common evidence, supporting class certification generally.

### 3.    Typicality

Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The "test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). A plaintiff's claims are considered typical if they are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020). A plaintiff may not be typical if she is "subject to unique defenses

which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508.  The concern with unique defenses is the "danger that absent class members will suffer if their representative is preoccupied with defenses is unique to it." *Id*.  But "[d]iffering factual scenarios resulting in a claim of the same nature as other class members does not defeat typicality." *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 985 n. 9 (9th Cir. 2011) (citing *Hanon*, 976 F.2d at 508)).

### a.    Statute of Limitations

WSI argues that Perlin is atypical as she is subject to a unique statute of limitations defense that precludes her from fairly representing a class of purchasers from 2007 to the present.  This argument is based upon an issue rejected on summary judgment; that Perlin knew or should have known about WSI's misleading representations concerning thread count when both sets of sheets she purchased in 2011 ripped shortly after she began using them.  I rejected that theory, concluding that there are genuine questions of fact whether the ripping of the sheets Perlin purchased would have put Perlin or any reasonable person on notice that the thread-count had been misrepresented and whether Perlin conducted a reasonable investigation into her claims. Dkt. No. 283 (July 2022 Order).  That Perlin has a strong statute of limitations defense, strong enough to defeat summary judgment, does not mean that she cannot be considered typical under Rule 23(a).  Perlin's statute of limitations' issue will not become a "focus" of the litigation that will cause absent class members' claims to take a back seat or otherwise suffer.  Instead, the common questions identified above are the expected focus of the litigation.

The cases WSI relies on are not to the contrary; most consider claims that are either facially barred by the statute of limitations or statute of limitations issues that have not been tested on summary judgment or otherwise.  *See, e.g., Nguyen v. Nissan N. Am., Inc*., 487 F. Supp. 3d 845, 859 (N.D. Cal. 2020 (whether fraudulent concealment tolled the statute of limitations on plaintiff's claims represented a "significant hurdle" to plaintiff's individual claim); *Lindblom v. Santander Consumer USA, Inc*., No. 15-CV-0990-BAM, 2018 WL 573356, at *5 (E.D. Cal. Jan. 26, 2018 (discussing and following cases within the Ninth Circuit that conclude a class

representative with a "time-barred" claim is not an adequate representative under Rule 23(a).[4]

Here, the lengthy class period means that some significant portion of the class may also face statute of limitations defenses. That supports typicality. *See Corcoran v. CVS Health*, No. 15-cv-03504-YGR, 2019 WL 6250972, at *5 (N.D. Cal. Nov. 22, 2019) (typicality requirement satisfied where, given the long class period, other class members were "very likely to be subjected to the same statute of limitations defense" as proposed class representatives, and the class representatives therefore were not "uniquely subjected to the statute of limitations").

Finally, the statute of limitations issue can be managed through normal pre-trial and trial techniques, such as motions in limine or bifurcation (*e.g.*, allowing the trier of fact to resolve statute of limitations issues prior to reaching merits issues), that would prevent statute of limitation issues from becoming the focus of the trial. S*ee, e.g., Siqueiros v. Gen. Motors LLC*, No. 16-CV-07244-EMC, 2021 WL 2115400, at *23 (N.D. Cal. May 25, 2021), *on reconsideration in part*, No. 16-CV-07244-EMC, 2021 WL 3291837 (N.D. Cal. Aug. 2, 2021) (recognizing that the Ninth Circuit "has repeatedly held that '[t]he existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones,'" and that "[i]f need be, the trier of fact can adjudicate all the other common questions 'in one stroke' and then address [defendant's] statute of limitations defense on an individual basis") (quoting *Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975)).

Perlin's tested statute of limitation issues do not preclude a finding of typicality.

### b.    Arbitration Agreements

WSI also argues that Perlin is not typical because everyone who purchased the Bedding Products online after 2016 was covered by an arbitration agreement.[5]  Perlin purchased her

---

[4] *Vizzi v. Mitsubishi Motors N. Am., Inc*., No. SACV0800650JVSRNBX, 2010 WL 11515266 (C.D. Cal. Feb. 22, 2010) is inapposite. There, the court considered a proposed class settlement that suffered from numerous issues that made it not fair, reasonable or adequate, including an apparent statute of limitations issues both named plaintiffs had. As the Court explained, it "has a duty to determine whether the proposed settlement is fair and adequate for the class as a whole. The Court cannot ignore the significant possibility that, in the calculus of settlement negotiations, the weakness of Vizzi's individual case resulted in a lower settlement for the class." *Id*. at *3. That concern is not at issue here.

[5] Declaration of Devon Jones, WSI Compendium of Evidence, Ex. 4, ¶¶ 2-10 (attaching at least

United States District Court
Northern District of California

Bedding Products in 2011.  Her case went to arbitration, as WSI demanded, and the arbitrator

determined that Perlin's claims regarding the Bedding Products she purchased were not covered

by an arbitration agreement despite Perlin's subsequent purchase of *other* items from WSI in

2020.[6]

Given that background, WSI argues that Perlin cannot be typical of the class members, the

majority of whom it contends are bound by the arbitration agreement.  In support, WSI identifies

numerous decisions from this District that have held that where a plaintiff opts-out of an

arbitration clause or was otherwise not covered by an arbitration cause *but* the vast majority of

class members are covered, the plaintiff is not typical and cannot represent a class of absent class

members covered by an arbitration agreement.  CC Oppo. at 10-11 & n.15.  Given their different

postures, these cases are not persuasive here.

For example, WSI relies on *O'Connor v. Uber Techs., Inc*., 904 F.3d 1087, 1094–95 (9th

Cir. 2018), where the Ninth Circuit reversed the district court's orders denying motions to compel

arbitration, determining that the question of arbitration was for the arbitrator to decide.   The court

also reversed the court's class certification orders, explaining:

> the court's determinations that the requirements of Rule 23 were
> satisfied, was premised upon the district court's conclusion that the
> arbitration agreements were not enforceable.  The class as certified
> includes drivers who entered into agreements to arbitrate their claims
> and to waive their right to participate in a class action with regard to
> those claims. As we held in *Mohamed*, the question whether those
> agreements were enforceable was not properly for the district court to
> answer. The question of arbitrability was designated to the arbitrator.

*Id*. at 1094-95. Here, however, WSI moved only to compel Perlin's claim, which was granted.

The arbitrator determined that the 2020 arbitration agreement did not cover Perlin's 2011 Bedding

Product purchases.

Arguably, a more apposite line of cases stems from an unpublished Ninth Circuit opinion,

*Avilez v. Pinkerton Gov't Servs., Inc*., 596 F. App'x 579 (9th Cir. 2015).  There, the Ninth Circuit

---

eight different versions of arbitration agreements in place between 2016 and 2023).

[6] I compelled this case to arbitration in October 2020.  Dkt. No. 252.  The arbitrator issued an
opinion finding that Perlin's claims were not subject to mandatory arbitration and remanded the
case to this Court, where it was reopened in November 2021.  Dkt. No. 2

United States District Court
Northern District of California

concluded that the "district court abused its discretion to the extent it certified classes and subclasses that include employees who signed class action waivers. Avilez's arbitration agreement does not contain a class action waiver and counsel did not dispute that those who signed such waivers have potential defenses that Avilez would be unable to argue on their behalf. To the extent the classes and subclasses include individuals who signed class action waivers, Avilez is not an adequate representative, Fed.R.Civ.P. 23(a)(4), and her claim lacks typicality, Fed.R.Civ.P. 23(a)(3)."  That unpublished opinion has been followed by a number of Northern District judges in opinions WSI relies on. *See, e.g., Tan v. Grubhub, Inc*., No. 15-CV-05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016), *aff'd sub nom. Lawson v. Grubhub, Inc*., 13 F.4th 908 (9th Cir. 2021) (plaintiff was "one of just two individuals in California to opt out of the class action waiver provisions," and plaintiff could not be typical or adequate because "having opted out of two separate agreements" he "would be unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members, such as that delivery drivers felt compelled to accept the arbitration provisions as a condition of employment or that the opt-out provision was not sufficiently noticeable"); *Andrade v. Am. First Fin., Inc*., No. 18-CV-06743-SK, 2022 WL 3369410, at *4 (N.D. Cal. Aug. 16, 2022) (citing cases from this circuit holding that "plaintiffs who were not subject to an arbitration agreement could not represent a class of persons who were"); *Singh v. Google LLC*, No. 16-CV-03734-BLF, 2022 WL 94985, at *6–7 (N.D. Cal. Jan. 10, 2022) ("The Court agrees with Google that Singh is atypical because he opted out of the arbitration clause to which many or most of the putative class is subject. . . .  Singh cannot represent a class made up of advertisers who will largely be subject to a mandatory arbitration clause and class action waiver.  Signatories to those agreements would have to overcome them to be included in the class, but Singh could not challenge the agreements because he did not sign them" and had no standing to make that challenge and did not dispute the validity or applicability of the arbitration agreement to his claims); *Figueroa v. Delta Galil USA, Inc*., No. 18-CV-07796-RS, 2021 WL 1232695, at *4 (N.D. Cal. Mar. 30, 2021) (because plaintiff was not bound by arbitration agreement, he would not be faced with the defense "to be faced by nearly four hundred putative class members, Figueroa's claims do not satisfy Rule 23(a)'s typicality requirement").

The crux of these cases is that a plaintiff not covered by the arbitration agreement cannot reasonably challenge the unconscionability of that agreement or lacks standing to raise related defenses to arbitration because the plaintiff opted out or otherwise was not bound.  That is wholly unlike the situation here, where Perlin was covered by an arbitration agreement, challenged it, and prevailed in arbitration.

This case is more like *Garcia v. Cent. Coast Rests., Inc.*, 2022 WL 657972, at *4-5 (N.D. Cal. Mar. 4, 2022).  In *Garcia*, the named plaintiff assented to the arbitration agreement but successfully challenged it and disaffirmed the agreement on the grounds that she was a minor. 2022 WL 657972, at *4. The court, in distinguishing many of the cases on which WSI relies, explained that a named plaintiff who assented to an arbitration agreement and challenged it was different from a named plaintiff who never assented to it. The court noted that because plaintiff challenged the arbitration agreement and was no longer bound by it:

> Whether framed in terms of adequacy or typicality, Plaintiff's success in challenging her arbitration agreement, and that her minority afforded her arguments to disaffirm the arbitration agreement in addition to class-wide arguments against enforceability, does not defeat her ability to lead the proposed class.

*Id.* at * 4.

The court also distinguished *Lawson* and *O'Connor*:

> In both cases, the Ninth Circuit held that a plaintiff who had opted out of an arbitration clause could not lead a class of people who had not opted out.  Defendants are correct that the Ninth Circuit has foreclosed the possibility of a plaintiff who opted out of an arbitration agreement from representing a class of people who are bound by the arbitration agreement, as has been noted by another court in this district. []  The Ninth Circuit, however, has not foreclosed the possibility of a plaintiff who successfully challenged an arbitration agreement from representing a class of people bound by the same or similar arbitration agreements.
>
> There are significant differences between a plaintiff who opted out of an arbitration agreement and a plaintiff who has successfully challenged an arbitration agreement. As another court in this district has noted, a plaintiff who opted out of an arbitration agreement is unable to make certain arguments on behalf of the class; in that case, the plaintiff was "unable to credibly make several procedural unconscionability arguments on behalf of unnamed class members, such as that delivery drivers felt compelled to accept the arbitration provisions as a condition of employment or that the opt-out provision was not sufficiently noticeable." *Tan v. Grubhub, Inc.*, No. 15-CV-

United States District Court
Northern District of California

05128-JSC, 2016 WL 4721439, at *3 (N.D. Cal. July 19, 2016), aff'd sub nom. *Lawson v. Grubhub, Inc.*, 13 F.4th 908 (9th Cir. 2021). In contrast, Plaintiff has already sought to make an unconscionability argument that would be applicable on a class-wide basis. *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment. This Court found that Garcia could disaffirm the contract based on her minority at the time of signing, and did not address her unconscionability argument. Her successful disaffirmation based on her minority does not weaken her other, class-wide arguments that remain unresolved. Thus, the concerns present in cases in which a plaintiff opted out of an agreement are not present here.

*Id.*

The cases WSI relies on are inapposite.  Perlin did not opt out of the WSI online arbitration agreement WSI adopted in 2016.  She reserved her rights to challenge the arbitration agreement. Dkt. No. 233 at 1n.1.  She asserted some of her challenges to the scope of the arbitration agreement before the arbitrator, including whether the 2020 arbitration agreement could be applied to her 2011 purchases.  The arbitrator concluded, as particularly relevant here, that:

> The WSI 2020 arbitration provision was provided to consumers four years after the Rushing class action lawsuit was filed and does not provide a clear and unmistakable consent to the arbitration mandate to the preexisting class action claims. Although, the WSI 2020 Arbitration provision provides the parties will resolve any disputes through binding and final arbitration, including all controversies, claims, counterclaims, or other disputes arising, the clause does not identify that all claims including any *pre-existing claim or lawsuit will be subject to the arbitration clause*. The use of the term "arising between us" is future looking and does not clearly give the customer notice that if they are a putative class member of the Rushing lawsuit and make a purchase using WSI's on-line platform, that they will be compelled to arbitration and *give up the opportunity of being a member of the class action lawsuit*. The WSI arbitration provision is not a simple and clear broad provision that states that any and all pre-existing, present *and future claims* must be arbitrated.

Dkt. No. 316-3 at 6-7 (emphasis added).  As a result, the arbitrator remanded Perlin's claims back to this court.  *Id.* at 8.

Perlin has contested WSI's application of the arbitration agreement to her claims and the lawsuit more generally.  There is nothing to suggest that she cannot represent putative class members arguing (for example) that the arbitrator's conclusions preclude WSI from asserting the arbitration agreement as against the putative class members *if and when* WSI moves to enforce its

arbitration agreement.[7]

I find that Perlin's claims against WSI are typical. She has demonstrated her ability to challenge the arbitration agreement and may continue to do so – if the issue is joined by WSI – on behalf of absent class members. The potential defenses applicable to Perlin were and are typical of a significant portion of the class. Even if they were individual, those defenses will not become the focus of this litigation.

### 4.    Adequacy

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). WSI argues that Perlin cannot be an adequate class representative for the same reasons she is not typical. I have rejected those arguments and find that Perlin and her counsel have fairly and adequately represented the class and will continue to do so.

### C.    23(b)(2) Class

Under Rule 23(b)(2), a "class action may be maintained if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. Proc. 23(b)(2). Perlin seeks to certify a nationwide class under 23(b)(2) because "WSI continues to falsely advertise the thread count of certain bedding sold by WSI." CC Mot. at 20.

### 1.    Standing

WSI first contests Perlin's standing to seek injunctive relief, arguing that because she has disclaimed an interest in purchasing "higher thread count" sheets in the future, there is no likelihood that she will face future injury from WSI's allegedly deceptive practice.[8] Plaintiffs

---

[7] The parties' dispute what exactly the arbitrator determined with respect to Perlin and under what purported version of WSI's arbitration agreements. *Compare* CC Oppo.at 9-10; *with* CC Reply at 4-5. However, the arbitrator's opinion is clear and broad. Dkt. No. 316-3. More significantly, if WSI had strong arguments that there are material differences in versions of the WSI arbitration agreement implemented after 2016 and as a result that Perlin is not able to adequately represent absent class members covered by other identified arbitration agreements that were not considered by the arbitrator on Perlin's challenge, WSI could have made that argument and identified any such agreements. It did not.

[8] *See Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533–34 (N.D.Cal.2012) (plaintiffs had

United States District Court
Northern District of California

point to evidence that Perlin has continued to purchase sheets, including "high thread count" sheets in 2021 from WSI (purchases WSI knows about), and her husband continued to purchase high thread count sheets.[9]   More significantly, however, Perlin alleges that she would buy sheets from WSI in the future if "the advertised thread counts were accurately calculated according to Industry Standards and advertised according to the FTC's recommendations, because that proper labeling would allow her to make an informed decision in selecting bedding for different purposes and at different price points."  8AC ¶ 189.

Because Perlin continues to purchase sheets, because the veracity of WSI's representations about thread count cannot be verified other than by testing, and because the thread count is plausibly alleged to be part of an informed decision making process in selecting between different sheets at different price points, there is a likelihood that Perlin will face a risk of future injury sufficient for her to seek injunctive relief on behalf of a class.

### 2.   Nationwide Class

WSI argues that California law cannot apply to the nationwide class under California's choice of law test.[10]  Plaintiffs contend that WSI has proven the first choice of law requirement but

---

standing to pursue injunctive relief alleged intention to purchase products in the future); *Delarosa v. Boiron, Inc.*, No. 10–1569, 2012 WL 8716658, at *3–6 (N.D. Cal. Dec. 28, 2012) (plaintiff lacked standing where no intention to purchase product in the future).

[9] *See* Eighth Amended Complaint ("8AC"), Dkt. No. 217, ¶ 184 (Perlin "also started purchasing lower thread count sheets in hopes they were more durable"); ¶ 189 ("Perlin would likely purchase bedding from Defendants in the future if the advertised thread counts were accurately calculated according to Industry Standards and advertised according to the FTC's recommendations, because that proper labeling would allow her to make an informed decision in selecting bedding for different purposes and at different price points.").  *See also* Aragon CC Decl., Ex. 49, March 22, 2022 Deposition Transcript of Elizabeth Perlin ("Perlin Depo. Tr.") at 39:19—40:2 ("A. The thread count matters, yes, in some cases.  Q. Did it matter to you when you purchased the sheets that are currently on your bed? A. Currently on my bed, no.  Q. Why not? A. Because I kind of gave up on thread count being important and an indicator of durable, luxury sheets."); Declaration of Elizabeth Perlin ISO CC (Dkt. No. 292-5) ¶ 6 ("I no longer buy high-threadcount sheets because in my experience low thread count sheets last longer however, my husband has purchased high thread count sheets without my knowledge").

[10] Under that test, WSI must prove: (1) the law of identified other states "materially differs" from the law of California with respect to the consumer protection claims at issue; (2) a "true conflict exists," meaning that identified other states have an interest in the application of their own laws to this case; and (3) the other identified states' interests would be "more impaired" than California's interest if California law were applied.  *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 562 (9th Cir. 2019).

United States District Court
Northern District of California

1   not the second and third prongs of that test—that specific other states' laws "truly conflict" with

2   respect to the injunctive relief sought here (precluding WSI from misleading consumers regarding

3   thread count) or that those specific other states' interests would be more impaired than California's

4   interests.  Plaintiffs assert that WSI cannot meet either of those prongs because WSI is based here

5   in California and California has a paramount interest in restricting a California-based company

6   (WSI) from misleading consumers.

7       Plaintiffs characterize the appropriate question for the second prong as whether other

8   states' laws would be offended or their policies impaired if a California corporation is enjoined

9   from violating California law.  The injunction plaintiffs seek is "enjoining Defendants from

10  further misstating thread count in advertising and marketing their bedding," conduct created and

11  implemented in California before the transaction takes place."  8AC, Prayer for Relief.  Plaintiffs

12  describe the impact of that injunction as not interfering with any transactions between a consumer

13  in a foreign state and WSI here in California because the restriction on WSI would be in place

14  prior to any transactions.  Therefore, the conflict recognized in *Mazza v. Am. Honda Motor Co*.,

15  666 F.3d 581, 593 (9th Cir. 2012) – that foreign states have interests in applying their law to

16  transactions within their borders and those states would be impaired in their ability to calibrate

17  liability to foster commerce in their states *if* California law were applied to the entire class – is

18  avoided.

19      For the same reasons, plaintiffs contend that even if there is some minimal conflict in

20  enjoining a California-based company under California law from making deceptive

21  representations, the interest of California is paramount in prohibiting future conduct in California

22  by a California company.  Plaintiffs argue that they are not seeking to give citizens of foreign

23  states any type of recovery to which they would not otherwise be entitled, such as different

24  standing requirements, statute of limitations rules, the possibility of damages or other forms of

25  relief that California allows.  But they acknowledge that there is a potential impairment if a

26  foreign state does not allow or otherwise restricts injunctive relief; WSI has identified eight states

27  that do not authorize private plaintiffs or anyone to seek injunctive relief.  CC Oppo. at 15.

28  Plaintiffs contend that any such impairment of those states' interests is small and outweighed by

United States District Court
Northern District of California

14

the paramount interest of California appropriately enjoining conduct that occurs and emanates from California.

Neither side provides helpful case law. WSI does not focus on what is necessary: a conflicts of law analysis where the Rule 23(b)(2) class seeks only injunctive relief and the defendant is based in California. Instead, it argues that I already determined the issue when I concluded that Kentucky's interest over plaintiff's Rushing's claim – where he sought to represent a nationwide class seeking damages – was paramount over California's, despite WSI being based in California. *See* Dkt. no. 170 (agreeing "that Kentucky law applies to Rushing's claims," but because, "WSI did not argue how Rushing's individual or class claims should be resolved on their merits under Kentucky law," denying WSI's motion for summary judgment).

As plaintiffs note in their Motion, "because WSI is headquartered in California, the injunction would have nationwide effect even if the order prohibiting fraudulent marketing is only directed at the California-based corporation. In other words, the outcome of the trial here is no different due to differences in other state's laws." CC Mot. at 18-19. Given that plaintiffs admit that the certification of a nationwide class would serve no separate purpose, and in absence of apposite caselaw regarding nationwide injunctive relief under California consumer law against a California domiciled defendant, I will not certify a nationwide injunctive relief class.[11]

### D.   23(b)(3) Class

Having found that plaintiffs satisfy the Rule 23(a) prerequisites for the California class, I must consider predominance and superiority.

#### 1.   Predominance of Common Questions

The following factors are "pertinent" to the predominance and superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in

---

[11] I could reassess this conclusion if plaintiffs' California class prevails at summary judgment or trial and if plaintiffs can demonstrate an actual need for and entitlement to nationwide injunctive relief.

1    the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P.

2    23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

3    cohesive to warrant adjudication by representation."  *Amchem Prod., Inc. v. Windsor*, 521 U.S.

4    591, 623 (1997).

5         Predominance under Rule 23(b)(3) asks whether a putative class is "sufficiently cohesive

6    to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  Predominant questions

7    make up "a significant aspect of the case" and clearly justify "handling the dispute on a

8    representative rather than on an individual basis." *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1022

9    (9th Cir. 1998).  Predominance is not a counting game, though.  "Rather, more important

10   questions apt to drive the resolution of the litigation" carry greater weight than less significant

11   individualized questions.  *Torres v. Mercer Canyons Inc*., 835 F.3d 1125, 1134 (9th Cir. 2016).

12   So, "even if just one common question predominates, 'the action may be considered proper under

13   Rule 23(b)(3) even though other important matters will have to be tried separately.'"  *In re*

14   *Hyundai & Kia Fuel Econ. Litig*., 926 F.3d 539, 557 (9th Cir. 2019) (*en banc*) (quoting *Tyson*

15   *Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016)).  An "assessment of predominance begins, of

16   course, with the elements of the underlying cause of action."  *Walker v. Life Ins. Co. of the*

17   *Southwest*, 953 F.3d 624, 630 (9th Cir. 2020) (internal quotations omitted).

### a.    Deception

19         WSI contends that deception is an individual question under the UCL, FAL and CLRA that

20   precludes a finding of predominance.  Not so.  The claims asserted under each of these California

21   consumer protection statutes are "governed by the 'reasonable consumer' test. []  Under this

22   standard, Plaintiff must 'show that 'members of the public are likely to be deceived.'" *Ebner v.*

23   *Fresh, Inc*., 838 F.3d 958, 965 (9th Cir. 2016) (quoting *Williams v. Gerber Prods. Co*., 552 F.3d

24   934, 938 (9th Cir. 2008)).  In other words, plaintiffs must establish a probability "that a significant

25   portion of the general consuming public or of targeted consumers, acting reasonably in the

26   circumstances, could be misled." *Lavie v. Procter & Gamble Co*., 105 Cal.App.4th 496, 508

(2003).[12]

While WSI attacks some of the evidence that plaintiffs identify to satisfy the reasonable consumer test – primarily the expert testimony of Jennifer Frank Rhodes offered regarding WSI's non-adherence to industry standards regarding thread count, testimony that WSI contends is insufficient to establish consumer perception regarding thread count[13] – plaintiffs' showing will be made by additional evidence, including WSI's own documents, regulatory rulings, industry documents regarding consumer perception and the importance of thread count to purchasers, as well as the testimony of consumers like Perlin and consumer survey evidence.  This evidence is disputed but creates predominant questions.[14]

_____

[12] As a California appellate court recently explained, under the UCL "if the challenged advertisement is likely to deceive, it is actionable 'without individualized proof of deception, reliance and injury.'" *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 326 (2022), *cert. denied sub nom. Johnson & Johnson v. California*, 143 S. Ct. 847 (2023) (quoting *Massachusetts Mutual Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 1288 (2002)).  The *Johnson* court affirmed that "'a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. [Citations.] A misrepresentation is judged to be "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" [citations], and as such materiality is generally a question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."  *Id.* at 327 (quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 326–328 (2009)).  A similar analysis applies to claims under the CLRA.  S*ee Gutierrez v. Carmax Auto Superstores California*, 19 Cal. App. 5th 1234, 1258 (2018), as modified on denial of reh'g (Feb. 22, 2018) (under CLRA a fact is "material" if "a reasonable consumer would deem it important in determining how to act in the transaction at issue"); *see also Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (explaining that "because deception and materiality under the FAL, CLRA, and UCL are objective questions" they are ideal for certification because "will not require the court to investigate class members' individual interaction with" the challenged products) (internal quotation omitted).

[13] WSI's objections to Rhodes's testimony are addressed further below.

[14] WSI relies heavily on *Adam v. AQ Textiles LLC*, No. 1:20CV520, 2021 WL 3475677 (M.D.N.C. Aug. 6, 2021).  There, considering warranty claims and Massachusetts's consumer protection statute, the court dismissed plaintiffs' claims despite their reliance on the defendant's alleged failure to comply with the ASTM standard because plaintiffs "provided no evidence that this method is either required by statute or regulation or is even the current dominant standard in the industry. Accordingly, it declines to credit Plaintiffs' conclusory statements that using a different method is a deceptive practice."  *Id.* at *5.  But here plaintiffs are not alleging a per se unlawful claim (under the UCL, for example) based on the ASTM standard and are not relying solely on that standard to support the deception claim.  As noted above, plaintiffs have identified numerous additional sources of common evidence that they intend to rely on, as well evidence not before the *Adamas* court regarding how retailers adopt the ASTM as the industry standard.  WSI is free to rebut the implications of that evidence at the appropriate juncture.

b.       **Advertising exposure & variance**

WSI argues that plaintiffs have not proven that thread counts claims appear prominently on "all" WSI marketing materials for the Bedding Products, and therefore, exposure is an individualized question that defeats predominance.  *See, e.g., Ehret v. Uber Techs., Inc*., 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015) (in "numerous cases involving claims of false-advertising, class-wide exposure has been inferred because the alleged misrepresentation is on the packaging of the item being sold.  In such a case, given the inherently high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it, exposure on a classwide basis may be deemed sufficient.").

Plaintiffs admit that they do not have evidence that the thread count is advertised on the packaging for every challenged Bedding Product covered by their definition.  But they argue that Perlin has presented evidence: (1) that each of the seven lines of Bedding Products contain the statement that the bedding is approximately twice the actual thread count on the website (*see*, *e.g*., Aragon CC Decl. at Exs. 3-5, 7-9 [Dkt. No. 292-3]); (2) of statements associated with the sale of the product that contain those statements (*see*, *e.g*., *id*. at Exs. 6, 10-15); and (3) in *most* cases, so does the packaging itself (*see*, *e.g*., *id*. at Exs. 16-20).  CC Reply at 17 (emphasis added). Plaintiffs argue that this "consistent and uniform" exposure, beyond or in addition to statements on the packages themselves, to the deceptive statements based on common evidence is sufficient.

Plaintiffs have proposed common evidence and it is predominant.  A jury could reject the reasonable consumer showing regarding a *specific* product, *e.g.,* products whose packaging lack thread count disclosures despite other common evidence.  That product line (and consumers who purchased it) would be excluded from any judgment and recovery.  Whether some particular Bedding Product packages may include thread count representations does not defeat predominance given the other common evidence plaintiffs identify regarding the centrality of WSI's reliance on thread count in its overall marketing of the Bedding Products.[15]

---

[15] These allegations differentiate this case from those relied on by WSI, where the nature of changing representations or where defendants submitted evidence that a significant portion of the class would not have been exposed to the representations at the heart of the case defeated predominance.  *See, e.g., Moheb v. Nutramax Lab'ys Inc*., No. CV 12-3633-JFW JCX, 2012 WL 6951904, at *4 (C.D. Cal. Sept. 4, 2012) ("some of the class members may have relied on the

United States District Court
Northern District of California

### c.      Individual Reliance – Butler

WSI contends that the "question is not whether 'a reasonable person shopping for bedding would attach importance to the stated thread count's accuracy in making her purchase decision' (Dkt. 292 at 31:17-20); it is whether consumers find it material that yarns were not counted using ASTM D3775's commercial acceptance method. There is no evidence that any consumer is aware of ASTM D3775 or has any understanding of its method, let alone that its use would be material to a purchase decision." CC Oppo. at 24. WSI also argues that Perlin's failure to identify a "controlling definition" of thread count that plaintiffs contend consumers rely on when making purchasing decisions is fatal to their predominance showing.

WSI relies on its expert report from Sarah Butler. Dkt. No. 307-2, Ex. 21. Butler opines why thread count is only one, and in her opinion not really an important, factor in consumer purchase of bedding products and that different consumers place different weights on thread count as a factor. The Butler Report raises a dispute of material fact, as plaintiffs rely on their expert (Rhodes), a contested consumer survey (discussed *infra*), and industry publications, textbooks, and WSI's own documents to support that thread count is a material consideration when purchasing bedding products. *See* Reply at 18-20. Whether the jury accepts plaintiffs' evidence to find that thread count is material and WSI's representations were deceptive, or accepts WSI's counter evidence, will be determined at trial. These questions are subject to common predominant evidence. *See, e.g., Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) (explaining that "because deception and materiality under the FAL, CLRA, and UCL are objective questions" they are ideal for certification because "will not require the court to investigate class members' individual interaction with" the challenged products) (internal quotation omitted).

---

recommendations of doctors, veterinarians, reviews, articles, or retailers' sales pitches"); *Davis-Miller v. Auto. Club of S. California*, 201 Cal. App. 4th 106, 125 (2011), as modified (Nov. 22, 2011) (no commonality where "the roadside battery assistance program was minimally advertised during the proposed class period" and sales invoices "inconsistently referred to the member discount and free installation"). For similar reasons, WSI's argument that some Bedding Products disclose only 400 thread count versus 600 thread count and some advertise the "ply" of the thread does not defeat predominance. WSI may present its own common evidence, expert and otherwise, to argue that these distinctions or additional disclosures are material to reasonable consumers. And plaintiffs will argue they are not material. *See, e.g.*, CC Reply at 18. Those are arguments to be made to the jury or post-trial. They do not undermine predominance.

United States District Court
Northern District of California

### d.     Common Method to Prove Damages

WSI challenges and moves to exclude both of the methods offered by plaintiffs' damages expert, Dr. Russell L. Lamb, to establish classwide damages; a "benchmark" and a "regression analysis." WSI argues that Lamb lacks adequate expertise and has no reliable basis for his damages opinions and that he only proposes running his models to show damages but does not actually run them. Those objections are addressed in detail below and rejected. Lamb provides two well-tested methods that can adequately provide evidence of classwide damage.

### e.     Statute of Limitations & Arbitration Agreements

Echoing the substance of its arguments regarding Perlin's lack of typicality given the potential statute of limitations defense and the existence of arbitration agreements, WSI argues that many class members could face significant statute of limitations defenses given the atypically long class period (from 2007 to the present). WSI also contends that because various unidentified segments of the proposed class would have claims subject to arbitration under various arbitration agreements, predominance cannot be satisfied.

If and when WSI raises statute of limitations defenses or moves to compel, there are ample trial management mechanisms that can be utilized to address those issues and not overwhelm the remainder of the litigation. For example, the class could be refined or decertified in part. Presumably, WSI's efforts to compel arbitration would implicate broad segments of the class, and, accordingly, rest on issues common to some significant portion of the class. These potential defenses do not defeat predominance.

### 2.     Superiority

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." See Fed. R. Civ. P. 23(b)(3). The Rule provides that the following factors are "pertinent" to the predominance and superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R.

United States District Court
Northern District of California

1   Civ. P. 23(b)(3).  "A consideration of these factors requires the court to focus on the efficiency and

2   economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that

3   can be adjudicated most profitably on a representative basis."  *Zinser v. Accufix Research Inst*.,

4   Inc., 253 F.3d 1180, 1190 (9th Cir. 2001) (internal quotation marks omitted).

5       As explained above, plaintiffs have identified numerous common questions that

6   predominate, making treating this as a class case superior.  To the extent that significant defenses

7   might limit the size or scope of the class – given the statute of limitations or arbitration issues or

8   otherwise – trial mechanisms can be readily utilized to dispatch those issues and allow this case to

9   continue in an efficient manner.  Superiority has been established and plaintiffs' motion to certify

10  the California class under Rule 23(b)(3) is GRANTED.

11  **II.      MOTION TO STRIKE REPLY EVIDENCE**

12      In response to WSI's opposition argument that neither plaintiffs nor their expert conducted

13  a consumer survey demonstrating that thread count is material to consumer's purchasing decisions

14  and to defendant's expert (Sarah Butler's) opinion that thread count is not material, on reply

15  plaintiffs included the expert report of Brian M. Sowers. Dkt. No. 319-1 (Sowers Report).  The

16  Sowers Report has two parts: first, an explanation of a consumer perception survey Sowers ran

17  and second, a critique of the survey conducted by Butler.  *Id*.

18      WSI objected.  Dkt. No. 320.  In response, I continued the class certification hearing date

19  to allow WSI to depose Sowers and to file a combined motion to exclude or strike.  WSI declined

20  to depose Sowers and does not move to exclude: instead, it moves to strike the affirmative

21  evidence of Sowers's survey but not the portions of the Sowers Report that respond to Butler's

22  survey.  Dkt. No. 328.

23      WSI argues *only* that Sowers's survey was too late and should have been submitted in

24  connection with plaintiff's opening motion in support of class certification.  It asserts that because

25  submission of new evidence on reply is improper, the portion of the Sower's report addressing his

26  own consumer perception survey should be struck.  But as plaintiffs note, consumer perception

27  surveys are not required in support of class certification.  *See, e.g., Hadley v. Kellogg Sales Co*.,

28  324 F. Supp. 3d 1084, 1115 (N.D. Cal. 2018) ("To the extent Kellogg argues that Plaintiff's expert

testimony is weak or that Plaintiff lacks consumer survey evidence, [] that argument is without

merit. California courts have explicitly " 'reject[ed] [the] view that a plaintiff must produce' "

extrinsic evidence "such as expert testimony or consumer surveys" in order " 'to prevail on a

claim that the public is likely to be misled by a representation' " under the FAL, CLRA, or UCL."

(internal case citations omitted)).  When faced with Butler's survey (disclosed for the first time in

WSI's opposition to class certification), however, plaintiffs retained Sowers to both run his

affirmative survey and respond to Butler's.  The Sowers Report and survey are permissible reply

evidence.

There is no prejudice to WSI from considering the Sowers' Report, particularly in light of

my continuance of the hearing to allow it time to depose Sowers, to move to exclude or strike, and

to submit a sur-reply to class certification addressing only the Sowers Report.[16]  The motion to

strike is DENIED.

### III.   MOTIONS TO EXCLUDE

WSI moves to exclude the opinions of two of plaintiffs' experts; Russell Lamb, offered as

a damages expert, and Jennifer Frank Rhodes, offered as a textile expert. *See* Dkt. Nos. 308, 309.

#### A.   Legal Standard

Federal Rule of Evidence ("FRE") 702 allows a qualified expert to testify "in the form of

an opinion or otherwise" when: (a) the expert's scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b)

the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

---

[16] In its Sur-Reply addressing the Sowers Report, WSI makes numerous arguments meant to undercut the persuasiveness of Sowers's conclusions.  *See* Dkt. No. 330.  However, the Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.' . . .  Furthermore, we have made clear that 'technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) & *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir.1988).  That said, I have not relied on the Sowers Report in finding the California class appropriate for certification.  *See supra*.  Survey evidence only adds support to the point that what a reasonable consumer expects and the question of materiality of thread counts can be established through common evidence, even if not Sowers's efforts given the alleged design flaws.  WSI may raise its arguments again pretrial, through motions in limine or otherwise, if plaintiffs intend to rely on Sowers' surveys at trial.

United States District Court
Northern District of California

United States District Court
Northern District of California

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  Expert testimony is admissible under Rule 702 if it is both relevant and reliable.  *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993).  "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline."  *Primiano*, 598 F.3d at 565.  To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance."  *Id*.  These factors are "helpful, not definitive," and a court has discretion to decide how to test reliability "based on the particular circumstances of the particular case."  *Id*. (internal quotation marks and footnotes omitted).  "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied.  *Lust By & Through Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 Advisory Committee Note.  However, the Ninth Circuit has made clear that, at the class certification stage, a district court need only consider "material sufficient to form a reasonable judgment on each [Rule 23(a)] requirement," but the "court's consideration should not be limited to only admissible evidence."  *Sali v. Corona Reg'l Med. Ctr*., 909 F.3d 996, 1004 (9th Cir. 2018).  However, "[w]hen conducting its 'rigorous analysis' into whether the Rule 23(a) requirements are met, the district court need not dispense with the standards of admissibility entirely.  The court may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence.  Indeed, in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*. [] But admissibility must not be

dispositive." *Id*. at 1006.

In the end, the inquiry into the admissibility of expert testimony is "a flexible one" in which "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

### B.   Opinions of Jennifer Frank Rhodes

Jennifer Frank Rhodes is the owner of Twin Gingers LLC, a consulting company serving the textile and consumer products industries specializing in the design, development and commercialization of textiles and textile consumer products, particularly bedding products.  She is also employed at Thomas Jefferson University, as the Assistant Program Director, Textile Design B.S. Program and an Adjunct Professor.  Rhodes has studied textile design and textile product development for more than 25 years and has worked in this field for more than 20 years.  Dkt. No. 292-1 ("Rhodes Report), ¶¶ 1-2.  She was retained by plaintiffs to:

> [E]xplain the generally accepted method(s) for calculating thread count for woven bedding products sold to consumers in the United States, and specifically whether that method counts each individual ply of a thread, so that a 2-Ply thread is counted as two threads. Second, I was asked whether ASTM D3775-17 (including other, historic versions of the standard) represented the generally accepted industry standard for calculating thread count for woven cotton bedding products sold to consumers in the United States at all times during the proposed class period. Third, I was asked to test products within the seven lines of bedding using generally accepted testing methods to verify whether their advertised thread counts were within the generally accepted standard deviation for accuracy. Fourth, I was asked to provide my opinion as to whether the various products sold under a single line of bedding, such as sheeting, cases, duvets, and shams, were made of the same fabric. Fifth, I was asked to provide my opinion as to whether the seven lines of products shared characteristics of construction and use. Finally, I was asked to explain the practical process of thread count testing, which can neither be done with the naked eye nor by the average consumer.

Rhodes Report, ¶ 10.  She opines that:

> [T]the generally accepted method for calculating thread count for bedding products sold to consumers in the United States is to count the number of warp yarns (ends) and filling, or weft yarns, (picks) in an inch. Each yarn, or thread, is counted as one thread, even if it is two-ply. Accordingly, bedding that has 300 yarns per square inch has a thread count of 300, even if the thread is two-ply.
>
> Second, ASTM D3775-17 is the generally accepted industry standard for calculating thread count for woven cotton bedding products sold

United States District Court
Northern District of California

1    to consumers in the United States at all times during the proposed
     class period.

2
     Third, my testing of the WSI seven lines of bedding revealed that
3    WSI's advertised thread counts were not accurate. The stated thread
     count of each collection was approximately double the actual thread
4    count. Each of the collections were represented to be two-ply.
     Accordingly, WSI improperly counted each ply in the yarn to falsely
5    inflate the thread count, contrary to the industry standard for
     calculating thread count.

6
     Fourth, I concluded that the various products sold under a single line
7    or collection of bedding, such as sheeting, cases, duvets, and shams,
     are made of the same fabric.

8
     Fifth, I explain the practical process of thread count testing, and
9    conclude that thread count cannot be done with the naked eye or by
     the average consumer.

10   *Id.* ¶¶ 12-16.

11        WSI moves to exclude her opinions of "industry standard" and "generally accepted

12   methods" of thread count because she refers only to "industry" insider expectations that WSI

13   argues are irrelevant and because she testified that there are no mandated "labelling requirements"

14   for thread count and the ASTM standard she relies on is not applicable to how textiles may be

15   marketed.  WSI also argues that because Rhodes is not a consumer perception expert, she cannot

16   testify to what consumers expect regarding thread count as that is outside her area of expertise.

17   Finally, it challenges the reliability of her opinions regarding consumer perception of thread count,

18   contending that she improperly relied on only "a handful of articles and non-binding legal

19   opinions" to support her conclusions.

20        Considering Rhodes qualifications and given her experience in the industry, she is amply

21   qualified to opine on the existence of industry standards and use or non-use of the ASTM

22   standard.  WSI may cross-examine her on the bases for her opinions on these topics.  WSI

23   equation of "industry standard" with irrelevant "insider knowledge" in this consumer case is not a

24   reason to exclude Rhodes' opinions.  While she will need to explain how she connects the

25   existence and use (or non-use) of industry standards to her opinions, including opinions on

26   consumer perception and opinions on how others in the industry calculate thread count, she may

27   opine on these issues given her work and teaching experience, as well as her reliance on industry

28   publications and textbooks.  Rhodes Report ¶¶ 5, 23, 28-30.  Plaintiffs assert that Rhodes's

United States District Court
Northern District of California

testimony will be supplemented by WSI's own documents and testimony from WSI employees. That is sufficient at this stage.  WSI's position that industry standards are irrelevant to consumer perception may be argued to the jury and reraised post-trial if appropriate.  Its challenge to Rhodes' opinions based on a review of too few or "cherry-picked" industry or WSI documents are classic grounds for cross-examination, not exclusion.  And it may raise "legal conclusion" objections in limine or during trial to her opinions regarding whether a product was "mislabeled" or is "misleading."  Those are not grounds to exclude her testimony now.

WSI's motion to exclude the opinions of Rhodes is DENIED.

### C.    Opinions of Dr. Russell L. Lamb

Dr. Lamb, the President and Co-Founder of Monument Economics Group, an economic consulting firm, was retained by plaintiffs to opine on whether the WSI's "challenged conduct resulted in injury to all or nearly all proposed Class members, in that they paid higher prices for the [] Bedding Products they purchased from Defendants than they otherwise would have; [] and whether the magnitude of damages can be calculated on a class wide basis without resorting to individualized inquiry."  Dkt. No. 294-4 ("Lamb Report")  ¶ 6.[17]   He concluded:

> The Challenged Conduct impacted all or nearly all proposed Class members in that they paid more for the Relevant Bedding Products they purchased than they would have in the absence of the Challenged Conduct.
>
> [] There are methods available with which to measure the damages suffered by proposed Class members on a class-wide basis using a formulaic methodology without resorting to individualized inquiry.

*Id.* ¶ 9.

Lamb proposes the following methods of measuring damages on a class-wide basis:

> measuring the amount of the artificial price inflation suffered by proposed Class members is using a benchmark analysis. A benchmark analysis can be used to compare prices paid by customers for the Relevant Bedding Products with prices that customers paid for

---

[17] Lamb defined "Challenged Conduct" as: "Defendants inflated thread counts in their advertising of bedding products by incorrectly calculating the thread count with regard to ply count. This method of multiplying the thread count by the number of plies in the thread is referred to in the industry as 'ply-multiplication.'  I also understand that the Plaintiff alleges that, as a result of this misleading advertising, proposed Class members paid higher prices for lower quality bedding products."  Lamb Report, ¶ 4.

26

> "benchmark" bedding products. Benchmark bedding products are products of comparison that resemble the Relevant Bedding Products but are not a part of the Challenged Conduct, i.e. bedding products with properly labeled thread counts that are materially the same as or very similar to the Relevant Bedding Products. The benchmark analysis can be done in two ways: through a direct benchmark approach or a hedonic pricing model.

*Id*. at 40.  He explains how he would construct and run both models to support his opinions, but did not – for class certification purposes – actually run both models.  *Id*., ¶¶ 41-55.

WSI first moves to strike Lamb's opinions that are based on the materiality of thread count to consumers.  It argues that his opinions assume that thread count is material without adequate expertise and without a reliable basis, given that he relied only on "cherry-picked" industry and WSI documents as well as the challenged testimony of Rhodes, and not on empirical consumer evidence, such as a survey of actual consumers regarding WSI's Bedding Products.  MTE Lamb (Dkt. No. 308) at 6-10.

I have denied the motion to exclude Rhodes, so Lamb cannot be excluded merely because he relied in part on Rhodes's opinions.  More fundamentally, how material thread count is to a reasonable consumer is, of course, subject to dispute by WSI and its experts.  Whether the jury agrees that thread count is material has not yet been determined.  But damages experts are *allowed* to assume the merits of a question in order to conduct their damages work, which is what Lamb did (although he did identify numerous sources supporting the materiality of thread count to consumers).  That is particularly true here, where WSI successfully bifurcated damages discovery from class discovery and plaintiffs have not had the opportunity to fully engage in damages discovery.

WSI next moves to exclude Lamb's opinion that a "direct benchmark approach" can be used to determine class-wide damages, because in order to complete that benchmark analysis Lamb will rely on Rhodes's selection of "benchmark products," meaning products comparable to the Bedding Products at issue in this case but with "properly identified thread counts."  Rhodes Report, ¶ 60.  WSI argues that the benchmark products identified by Rhodes are not comparable to WSI's Bedding Products in numerous ways.  Those are matters for cross-examination and go to the weight of the *final* benchmark analysis.  At the class certification stage, damages experts are

United States District Court
Northern District of California

1  not required to have run their damage analyses, but instead are required to explain how they would

2  do so and why the resulting analysis would provide an accurate and common method to prove

3  classwide damages.  Lamb has satisfied that burden here with respect to the benchmark analysis.

4          WSI also moves to exclude Lamb's second proposed method of showing classwide

5  damages, his proposed hedonistic-regression model.  WSI argues, first, that a hedonistic-

6  regression model does not fit the contours of this case (as required under *Comcast Corp. v.*

7  *Behrend*, 569 U.S. 27, 36 (2013)), offering testimony from two WSI declarants regarding "actual"

8  WSI's pricing practices.  It argues that those declarants' testimony demonstrate that even a

9  reduction in demand (an assumption in the hedonic model) would not result in a lower price or

10  vice versa in the real world because WSI sets prices at a fixed rate above the supplier's price and

11  does not price sheets according to demand.  MTE Lamb (Dkt. No. 308) at 12-13.  It asserts that

12  Lamb's hedonic regression model, as Lamb admits, would be "artificially constructed" and should

13  be excluded.  But WSI ignores that hedonistic-regression models are based on real world

14  transactions and real word data regarding price and other variables.  WSI may offer to the jury

15  evidence of its pricing strategies to rebut or challenge the damages produced by Lamb's model.[18]

16          Finally, WSI argues that because Lamb did not conduct his proposed hedonic-regression

17  analysis (only describing it in a few paragraphs of high level detail) or confirm that the data

18  needed to run that analysis exists (as part of WSI's "Consumer Data Warehouse"), his opinions

19  regarding the hedonistic-regression model must be excluded as impermissibly vague and

20  unreliable.  For class certification purposes, it suffices.  What the final hedonistic-regression

21  model looks like, after damages discovery has been completed and Lamb has finalized the

22  variables selected and run the analysis, can be tested pre-trial.[19]

23

24  [18] Separately, plaintiffs challenge WSI's reliance on the "untested" testimony of its declarants that

25  plaintiffs characterize as "self-serving," noting that plaintiffs have not had the opportunity to
   complete damages discovery.  Presumably in the next phase of discovery, those assertions will be
   tested.

26  [19] WSI's argument that the model should be excluded because Lamb does not know "what data

27  points" WSI has that would be included is not persuasive, especially considering that damages
   discovery has not been completed.  It does not argue or attempt to affirmatively show that the data
   points necessary for a hedonic-regression model run by Lamb do not exist.  Similarly, if Lamb's

28  eventual final selection of variables is "unscientific" as WSI's damages expert Dominique M.

1    The motion to exclude Lamb is DENIED.

2    **IV.   ADMINISTRATIVE MOTIONS TO SEAL**

3    Plaintiffs filed two administrative motions to file under seal in connection with their

4    motion for class certification (Dkt. No. 294) and their Reply in support of class certification.  Dkt.

5    No. 316.  WSI filed declarations requesting narrower sealing of specific documents.  Dkt. Nos.

6    295, 321.

7    Those motions are GRANTED in part and DENIED in part, under the compelling

8    justifications standard.  *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-99

9    (9th Cir. 2016) (a party must demonstrate "compelling reasons" to seal motion-related filings

10   where "the motion at issue is more than tangentially related to the underlying cause of action.");

11   *see also Adtrader, Inc. v. Google LLC*, No. 17-CV-07082-BLF, 2020 WL 6391210, at *2 (N.D.

12   Cal. March 24, 2020) (collecting cases in the Ninth Circuit applying the compelling justifications

13   standards to motions to seal documents relating to class certification).

14   **Pleadings**.  WSI's requests to seal portions of the Motion discussing aggregate sales

15   information over a 12 year period (CC Mot. pg. 8), information regarding consumer data tracked

16   by WSI (*id*., pgs. 8-9, 25), and that marketing content was developed in California (*id*.., pg. 17)

17   are DENIED for failure to show compelling justifications to seal this information (including that

18   the information is not otherwise known in its aggregated/general form).  WSI's requests to seal

19   portions of the Reply in support of class certification discussing the arbitrator's award (CC Reply

20   pg. 5) and WSI's use or non- use of ASTM (*id*., pgs. 15, 16, 18) are DENIED for lack of

21   compelling justifications shown, especially considering the central nature of these issues to the

22   Court's decision, *supra*.

23   WSI's request to seal one line from the Opposition to the motion to exclude Lamb (with a

24   vague reference to data WSI collects) is DENIED for lack of compelling justification shown.

25   WSI's request to seal one sentence from the Opposition to motion to exclude Rhodes (regarding

26   WSI's use or non-use of the ASTM standard) is DENIED for lack of compelling justification

27

28   _____

Hanssens suggest is "likely," that too may be tested pretrial.

1  show.

2      **The Clerk SHALL UNSEAL Dkt. Nos. 294-3, 316-2, 316-4 and 316-5**.

3      **Lamb Expert Report**.

4      WSI's requests to seal portions of the Lamb expert report discussing aggregate sales data

5  (pg. 5), excerpts from vendor compliance manuals and WSI testimony regarding thread count and

6  ASTM standards (pgs. 7-8), and his generalized testimony regarding the type of consumer data

7  tracked are DENIED for failure to meet the compelling justifications standard.

8      **The Clerk shall UNSEAL Dkt. No. 294-4**.

9      **Exhibits**.

10      The motion to seal the *full* text of the arbitrator's award (Aragon Reply Decl., Ex. 1) is

11  GRANTED.  Other than the portions of the arbitrator's decision cited in this Order as necessary to

12  my determination, the full text of that order may otherwise remain under seal given the

13  confidentiality of those proceedings.

14      Generally, the exhibits disclosing testing data, weekly and other granular sales, and vendor

15  compliance materials may stay under seal at this juncture.  The motion to seal those exhibits is

16  GRANTED.  *See* Dkt. No. 295 (Aragon Decl. Exs. 24, 28-30, 32-35, 41-42, 48).

17      The motion to seal the names of certain high-level WSI employees and their work

18  locations, employees involved in specific departments, and generalized details about limited

19  Bedding Products is DENIED.  (Aragon Decl., Ex. 45, 46).

20      Within 10 days of the date of this Order, plaintiffs shall file on the public docket Exs. 31 &

21  45 to the Aragon Declaration (that WSI agrees may be unsealed), and Exs. 45-46.

22                              **CONCLUSION**

23      Plaintiffs' motion to certify a class of California purchases is GRANTED.  The following

24  class is certified under Rule 23(b)(3):

25          All persons in California who from January 19, 2007 to the present
            who purchased bedding, including sheets, sheet sets, pillowcases,
26          duvet covers, and/or shams, directly from Williams-Sonoma, Inc.
            from any of the Bedding Products.
27
    Plaintiffs' motion to certify a nationwide injunctive relief class is DENIED.  Defendant's
28

United States District Court
Northern District of California

motion to strike and exclude are DENIED.

Plaintiffs and defendant shall meet and confer regarding the form of Notice and Notice Plan for the certified class.  That meet and confer process shall conclude by March 26, 2024.  Any disputes over the Notice or Notice Plan will be discussed at the next Case Management Conference, set for April 9, 2024 at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: February 21, 2024



William H. Orrick
United States District Judge