UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM RUSHING, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>WILLIAMS-SONOMA, INC., et al.,<br><br>　　　　　Defendants. | Case No. 16-cv-01421-WHO<br><br>**ORDER MAINTAINING PRIOR CLASS CERTIFICATION DEFINITION**<br><br>Re: Dkt. No. 367 |

After gesturing to the specter of arbitration repeatedly throughout the long history of this case – but directly raising it only twice[1] – defendants[2] moved during the parties' dispute over the class notice plan and form of class notice to modify the class definition to exclude segments of the certified class from the class definition based on WSI's Terms & Conditions ("T&Cs") that allegedly require those class members to arbitrate their claims. Dkt. No. 357. In the April 9, 2025 hearing on plaintiffs' Motion to Approve Class Notice and defendant's Motion to Modify the Class Definition, I explained that WSI's motion to modify was too cursory in its evidentiary showing and legal argument to allow me to decide whether the class definition needed to be altered based on WSI's arbitration agreements. In the Minute Order following the hearing, I

---

[1] The first time was the 2020 motion to compel named representative Perlin to arbitration, which I granted. Dkt. Nos. 219, 252. The second was in WSI's April 2023 opposition to the motion for class certification where WSI argued: (1) Perlin was not typical because she was no longer covered by WSI's arbitration agreements (after her challenge) but absent class members were covered; and (2) the impact of arbitration agreements on absent class members raised predominant individual issues and manageability barriers. Dkt. No. 305 at 9-11, 37-38. WSI did not, on class certification, propose ways to narrow the class definition to carve out claims it believed were subject to arbitration.

[2] Defendants are Williams-Sonoma, Inc., William-Sonoma DTC, Inc., and Williams-Sonoma Advertising (collectively "defendant" or "WSI"), which sells the linen Products at issue through their Williams-Sonoma, Pottery Barn, Pottery Barn Teen, Pottery Barn Kids, West Elm, Rejuvenation, Mark and Graham, and GreenRow brands. *See* Declaration of Nicole Zagar (Dkt. No. 357-2) ¶ 2.

denied the Motion to Modify as moot and directed defendant to reraise their request "to refine the class definition in light of defendant's arbitration agreements" based on a "full and properly noticed motion to compel." Dkt. No. 366. WSI then filed a fully noticed motion to compel, but relied on the same evidentiary showing made in connection with the Motion to Modify. Dkt. No. 367. WSI has not met its burden to establish what a consumer would have seen regarding disclosure of WSI's T&Cs when using each of the WSI brands' websites or through one or more apps on a mobile device, nor has it shown that the T&Cs were visually conspicuous. For each reason independently, WSI's motion to modify the class definition is DENIED.

## I. THIS COURT'S AUTHORITY

As an initial matter, the pending motion is not properly considered as a motion to compel arbitration, even though that is what I called it in the April Minute Order and instruction to WSI. Given the posture of this case with a certified class, the motion was originally and is properly considered a motion to modify the class definition to exclude class members subject to valid and enforceable WSI arbitration agreements. *See, e.g., Freitas v. Cricket Wireless, LLC*, No. C 19-7270 WHA, 2022 WL 181218, at *1 (N.D. Cal. Jan. 20, 2022), modified, No. C 19-7270 WHA, 2022 WL 1082014 (N.D. Cal. Apr. 11, 2022) ("This order will not order any absent class members to arbitrate, but it will modify the class definition in light of the issues raised.").

WSI argues that Perlin waived her right to challenge whether she or other class members had reasonable notice of the T&Cs and agreed to arbitration. Mot. at 12 & n.4. Not so. Perlin retained the ability, indeed the duty, to represent absent class members and respond to arguments by WSI that class members are bound by WSI's arbitration agreement. Class Cert. Order, Dkt. No. 342 at 11-12. That Perlin may not have challenged her agreement to WSI's T&Cs in response to WSI's motion to compel her individual claims is irrelevant.

WSI also contends that because the Pre-2023 and 2023-2025 T&Cs incorporated the American Arbitration Association ("AAA") rules, the question of arbitrability must itself be decided by an arbitrator.[3] The question here is the appropriate scope of the definition for the

---

[3] Both sides acknowledge that whether incorporation of AAA rules requires arbitration of arbitrability in disputes between a sophisticated party and an unsophisticated consumer has not

certified class. WSI cites no authority that given the posture of this case, and the way WSI raised the issue of arbitration, I do not have jurisdiction to weigh its arguments in the context of the motion to modify the class definition.

Having had the benefit of more fulsome briefing, but based on the same evidentiary record WSI submitted in March 2025, WSI's motion is DENIED. As explained below, WSI relies on a few screenshots and sparse and ambiguous declarations regarding how WSI's "Shopping Cart" and "Place Order" pages were designed for eCommerce purchases since 2016, as well as disclosures made to consumers registering for Gift Registries and to Key Reward members. That does not satisfy its burden to show or explain what a consumer would have seen regarding disclosure of WSI's T&Cs when using each of the WSI brands' websites (on a desktop or mobile device) or through one or more apps on a mobile device. And even if the few screenshots and ambiguous declarations satisfied WSI's evidentiary burden, the design of the pages did not make a consumer's supposed agreement to WSI's T&Cs sufficiently visually conspicuous to show that consumers were adequately placed on inquiry notice of those T&Cs. The class definition remains as approved in the February 21, 2024 Class Certification Order, Dkt. No. 342.[4]

---

been decided by the Ninth Circuit following *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (holding that incorporation of AAA rules requires arbitration of arbitrability between sophisticated parties). *See* Oppo. at 18-19; Reply at 12-14. I need not reach this issue, but note the posture of this case is similar to *Schlueter-Beckner v. SimpliSafe, Inc*., No. 3:25-CV-01764 (CRB), 2025 WL 2162948 (N.D. Cal. July 30, 2025) where the Hon. Charles R. Breyer rejected delegation of arbitrability by simple incorporation of AAA rules in a consumer case. Judge Breyer explained "that this context—veiled incorporation of arbitration rules within an already veiled lengthy Terms of Service agreement—does not meet the required clear and unmistakable evidentiary standard as to unsophisticated parties. The 'clear and unmistakable' requirement 'pertains to the parties' manifestation of intent'—whether the parties' actions clearly imply a desire to delegate the arbitrability question. [] Where the parties 'are not likely to have thought that they had agreed' to delegate the question, the court must 'avoid[ ] the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate' by deciding the question on its own. [] Because this standard relates to the parties' actual manifestation of intent, recognizing the delegation would require the Court to declare a finding that [plaintiff] unmistakably intended to delegate the 'rather arcane' arbitrability question, [] simply by clicking a button. Such an inference defies common experience."). *Id*. at *8 (internal citations omitted).

[4] That definition is: "All persons in California who from January 19, 2007 to the present who purchased bedding, including sheets, sheet sets, pillowcases, duvet covers, and/or shams, directly from Williams-Sonoma, Inc. from any of the Bedding Products." Class Cert. Order at 30. Bedding Products is defined as "(1) Williams-Sonoma Home Signature 600-Thread-Count Sateen Bedding (n/k/a Chambers 600TC Sateen Bedding); (2)Williams-Sonoma Home Greek Key Jacquard 600-Thread-Count Bedding; (3) Williams-Sonoma Home Suzani Jacquard Bedding (500

## II.    LEGAL STANDARD

For an internet contract to be valid, a website or app must either place the user on actual notice of the agreement or "put[] a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014). Whether a particular website reasonably communicated the existence of the terms is a fact-intensive inquiry that "depends on the design and content of the website and the agreement's webpage." *Id*.

When considering "'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website," courts are "more reluctant to enforce browsewrap agreements because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (citing *Nguyen* 763 F.3d at 1178).

As the *Berman* court explained, "[t]o avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements such as those at issue here have devised rules to determine whether meaningful assent has been given. Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id*. at 856.

"Visual conspicuousness" includes the "factors relevant to [the] visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)." *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025). In addition, courts consider the presence of images and other visual elements

---

TC); (4) Pottery Barn Foundations Hotel Sateen Bedding (600 TC); (5) Pottery Barn Morgan 400-Thread-Count Bedding; (6) Pottery Barn PB Organic 400-Thread-Count Bedding; and (7) Pottery Barn PB Classic 400-Thread-Count Bedding." *Id*. at 1 n.1.

on the website page in question that might "draw the user's attention away from the barely readable critical text." *Berman*, 30 F.4th at 856.

Under "California law, this inquiry is 'fact-intensive' and is informed by the 'totality of the circumstances.'" *Godun*, 135 F.4th at 709 (quoting *Oberstein v. Live Nation Ent., Inc*., 60 F.4th 505, 514 (9th Cir. 2023)). Analysis of exactly how the visual elements work together is critical as "[w]ebsite users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print." *Berman*, 30 F.4th at 857. WSI bears the burden to show actual knowledge or sufficient design of each of its eCommerce sites to satisfy me that consumers were put on inquiry notice by making a purchase, signing up for a registry, or becoming a rewards member.

### III. PROOF AS TO HOW THE TERMS AND CONDITIONS WERE DISCLOSED

Under California law, WSI, the party seeking to compel arbitration, "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017); *see also Ashbey v. Archstone Prop. Mgmt., Inc*., 785 F.3d 1320, 1323 (9th Cir. 2015) (a party seeking to compel arbitration under the FAA has the burden of showing "(1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue." (internal quotation marks omitted)).

#### A.    eCommerce Sites

WSI argues that consumers using its brands' websites and mobile applications ("apps") were put on sufficient notice of the T&Cs, which included an arbitration agreement in all relevant versions, after placing items in their "Shopping Cart" and being required to select either the "CHECKOUT" or "EXPRESS CHECKOUT" buttons to proceed, and again before selecting the "PLACE ORDER" or "CREATE REGISTRY" buttons on their eCommerce websites. In both stages of the process, WSI argues that consumers were informed either above or below those buttons that: "By continuing" or "By continuing with your purchase" "you agree to our terms and conditions and privacy policy"; or "By placing an order you are agreeing to our Privacy Policy and Terms and Conditions"; or "By clicking on 'Create Registry' you agree to our terms and

5

conditions and privacy policy." *See* Declaration of Shiva Harris (Dkt. No. 357-3), Ex. A-G.

To determine whether sufficient disclosures were made in order to bind consumers to browsewrap terms and conditions, a court must engage in a highly "fact-intensive" process and consider how the disclosures were presented to consumers by reviewing "wholistically" the design elements on each of the eCommerce sites at issue. WSI has failed to submit sufficient evidence regarding how the visual elements appeared (1) on each eCommerce page where disclosures were made, (2) for each brand, and (3) through each purchasing channel during the time periods in question in order to meet its preponderance of the evidence burden to show that consumers were put on inquiry notice that by proceeding they were agreeing to WSI's T&Cs.

The first issue with WSI's proof is that the only mention of mobile applications ("apps") in the declarations submitted in connection with the pending and prior motions to modify the class definition is by Harris, whose team is "responsible for the online checkout experience for WSI's eCommerce websites and mobile applications." Harris Decl. ¶ 1. Harris declares *only* that, "[t]he online checkout *process* is the same across WSI's eCommerce websites and mobile applications." Harris Decl. ¶ 3 (emphasis added). No screenshots have been provided to show how that process *appeared* in any of the apps used by multiple WSI brands. Harris Decl. ¶ 2 (noting that Williams Sonoma, Pottery Barn, Pottery Barn Kids Shopping, Pottery Barn Teen Shopping, and West Elm brands used apps). Logically, the visual elements present on an online website page would differ, given the obvious size constraints, when viewed through a traditional desktop or through a mobile app or on a mobile device. WSI presents *no evidence* of how the process for the apps checkout (or for users on mobile devices using browsers) appeared to any consumer during any timeframe. WSI presents no testimony that the visual elements of the "online" website screenshots it provided were materially identical to the visual elements on the app pages or how the pages would display on mobile devices using browsers.

Each screenshot WSI relies on in support of its motion is, apparently, from a website as represented on a traditional desktop or laptop computer, *not* a mobile device or app, given the breadth of the images as well as the side panels containing additional content. *See* Harris Decl., Exs. A, C, E, F, G. None of the screenshots provided shows how the T&Cs disclosures would

have been presented to a purchaser using an app or a browser on a mobile device. I will take as true that the "online checkout *process* is the same across WSI's eCommerce websites and mobile applications." (Harris Decl., ¶ 3, emphasis added). That proves nothing about how the pages that have disclaimers that "by proceeding," "by purchasing," or "by registering" appeared to users who would be agreeing to the WSI's T&Cs. No information has been provided by screenshot or declaration explaining how or what visual elements would have appeared to consumers using apps or browsers on mobile devices in any of the brands during any time period. The motion to alter the class definition to exclude individuals making purchases through WSI brand apps or mobile devices is DENIED for total failure of proof.[5]

As to the screenshots provided – from various WSI brands broken down into three separate time periods[6] – the proof concerning how all website Shopping Cart and Place Order pages (as well as the Registry page) looked across the WSI stable of brands and across the time periods is insufficient. WSI has not shown through screenshots or a declaration that the CHECKOUT, PLACE ORDER, or CREATE REGISTRY pages of which it has attached exemplars were visually, materially identical across all of the brands. WSI has not shown that the CHECKOUT, PLACE ORDER, or CREATE REGISTRY pages were visually materially identical within the

---

[5] In its pending motion, WSI cites as evidence of the relevant "Terms and Conditions" a declaration submitted in July 2020 regarding how the Shopping Cart and Checkout pages would have looked on a mobile device when Perlin made her 2020 purchases. Dkt. No. 367 at 8 (citing Dkt. No. 219-1 & 219-2). The screenshots from 2020, relied on here as support for a different proposition, demonstrate that WSI has the ability to show the how Shopping Cart and Place Order pages appeared on a website using a computer/desktop versus on a mobile device. Despite that ability, it did not do so here.

[6] Harris provides the following: Two screenshots for the Pottery Barn Teen site; one for the "Shopping Cart" page, where a user can click a button for "CHECKOUT" or "EXPRESS CHECKOUT" and one from the "Place Order" page where the user can "PLACE ORDER," in effect between March 2016 and February 2018, *see* Harris Decl. Exs. A & B; two screenshots William Sonoma and Williams Sonoma Home websites, showing a similar Shopping Cart page with "CHECKOUT" and "EXPRESS CHECKOUT" buttons as well as a Place Order page with "PLACE ORDER" button, in effect between February 2018 to September 2020, *see* Harris Decl. Exs. C & D; one screenshot of the Williams Somona Shopping Cart page with "CHECKOUT" button, followed by three screenshots from the Williams Sonoma Place Order page which has two "Place Order" buttons as well as an "ADD TO CART" button, which were in effect from September 2020 to present, *see* Harris Decl. Exs. E. & F; and four screenshots showing the "final step" to create a Gift Registry from the Williams Sonoma website, in effect since August 1, 2022. *See* Harris Decl., Ex. G.

three periods at issue. All we have is the one sentence from Harris, again, that the "online checkout *process* is the same across WSI's eCommerce websites." Harris Decl. ¶ 3 (emphasis added). That is insufficient.

Harris admits that the visual elements on each page in each time period changed. After discussing each of the exemplar screenshots, Harris acknowledges that unidentified and unspecified "minor visual elements" of the Shopping Cart and Place Order pages "may have changed over time," but asserts the critical disclaimer language "by continuing" "by placing an order" or "by registering" you agree to our terms and conditions and privacy policy" remained either above or below the CHECKOUT and EXPRESS CHECKOUT or PLACE ORDER buttons. Harris Decl. ¶¶ 5, 7 (2015-2018 exemplars); ¶ 9 (2018-2020 exemplars); ¶¶ 12, 16 (2020 to present exemplars). That the disclaimer language remained in the same position – either above or below the larger, brighter "action" boxes – shows nothing of how the disclaimer language appeared alongside the other many visual elements on the pages.

For example, Harris identifies that on the 2018-2020 Shopping Cart page, a third action button appears beneath the disclaimer language; a brightly colored, highly contrasted "*VISA*Checkout" button alongside the CHECKOUT and EXPRESS CHECKOUT buttons, and characterizes that button as an example of a "minor visual element" that "may have changed over time." Harris Decl. ¶ 9 & Ex. C. This is *exactly* the type of bright, eye-catching visual element that a court must consider when determining whether the design of a website gives sufficient, clear notice to consumers of agreement to T&Cs. *See Berman*, 30 F.4th at 856. But WSI decided to omit descriptions of or provide screenshots showing the "minor visual elements" that admittedly "may" have changed over time.[7]

WSI was given the opportunity to fully brief these issues and present the proof it needed to meet its burden to show users of WSI's eCommerce sites were put on sufficient notice of WSI's

---

[7] The versions of WSI's T&Cs in place as of March 2016, January 2020, April 2020, January 2023, October 2023, November 1, 2024 and January 24, 2025 are attached to the declaration of Nicole Zagar, Dkt. No. 357-2. Given my resolution of this motion, I do not reach plaintiffs' arguments challenging the scope, applicability, and enforceability of the arbitration agreements. Oppo. at 19-25.

8

T&Cs through visually conspicuous disclaimer language to bind consumers, through implied inquiry notice, to WSI's T&Cs including its arbitration agreement. *See* Dkt. No. 366. WSI failed to do so.

### B. Gift Registry

The Harris testimony regarding the Gift Registry purchases and the "Create Registry" screenshots is concise and concerns a much shorter timeframe; August 2022 to present. Significantly, in that timeframe, Harris does not admit to any "minor" visual changes to the Create Registry page exemplar. Harris Decl. ¶ 17 & Ex. G. However, the screenshots contained within Exhibit G show different design elements, and Harris does not explain the distinctions. For example, it is unclear when a user would see following: the "By clicking on 'Create Registry" you agree to our terms and conditions and privacy policy" disclaimer immediately below the CREATE REGISTRY or BACK action button. *See* Dkt. No. 357-3 at ECF pg. no. 26 of 29. Or when a user would see the materially different page, also in Exhibit G where: the disclaimer language is set off to the right side under "optional settings" and the consumer would see *different* action buttons CREATE **A** REGISTRY (emphasis added), FIND A REGISTRY and MANAGE MY REGISTRY to the left alongside various product images. *See id.* ECF pg. no. 29 of 29. Harris does not explain this significant difference and whether it is function of design changes over time or something else. WSI's proof fails.

### C. Key Rewards

The process and design of the two Key Rewards programs – the Gold Key rewards since May 2023, and the Silver Key rewards since July 2019 – are addressed by Jon Quinn, whose team is responsible for the loyalty and credit card program "across WSI's portfolio of brands." Dkt. No. 357-1, Quinn Decl. ¶ 1. Quinn declares that the Rewards program "currently" has two tiers; the Gold Key rewards, tied to WSI's branded credit card, and Silver Key rewards. *Id.* ¶ 3.

Quinn submits one screenshot for the process by which consumers agree to sign up for a branded VISA card and, thereby, the WSI Gold Key program. Quinn Decl., Ex. A. The issue with the screenshot provided is that both Quinn and the contents of the screenshot show that "By clicking on the **Submit Application** button, I am:" agreeing to nine separate line items, including

9

number 9, "Acknowledging that I have read and agree to the Gold Key Rewards Terms and Conditions." Dkt. No. 357-1, Ex. A (emphasis and blue hyperlinked term in original). Following that list are further disclosures regarding the Visa terms of credit, rates, and fees. Then a "Continue" action button. No screenshot of the "**Submit Application**" button page has been provided. The only button on the screenshot provided is "Continue." No evidence has been provided regarding what was disclosed on or around the **Submit Application** button--again, a total failure of proof.

With respect to the Silver Key online application, Quinn declares and explains how the "process" has remained the same where a consumer enters basic information and hits the button to CREATE ACCOUNT, and then the consumer enters additional information before clicking a SUBMIT or a CANCEL button. Quinn Decl., Exs. B & C. The issue, however, is that while the process may have stayed the same, Quinn does not say that the design of the elements on the SUBMIT or CANCEL page has stayed the same. The differences between the 2019 and "present" pages are obvious. The 2019 page appears to have no additional design elements beyond the steps to enter phone number, address, and birthday. Quinn Decl., Ex. B. The present page has additional, typical content beneath the SUBMIT and CANCEL buttons and disclosures. *Id.*, Ex. C. Without a declaration from a person knowledgeable about the design of the pages between 2019 and present, WSI fails to provide adequate evidence to meet its burden, at least with respect to the time periods between the 2019 exemplar and the present exemplar.

In sum, WSI was given an opportunity to submit a fully briefed and noticed motion to support its argument that the class definition should be modified to exclude consumers who agreed to WSI's terms and conditions requiring arbitration. It was WSI's burden to show by a preponderance of the evidence that its disclosures support a finding of inquiry notice. It failed to do that for app and mobile device purchases, and submitted insufficient and incomplete proof for eCommerce website purchases, Gift Registry creations, and for Key Reward members.[8] The

---

[8] Having found that WSI's evidentiary showing on this motion fails to meet their burden, I do not reach plaintiffs' argument that WSI should be precluded under Rule 37(c) from relying on the declarants and evidence WSI relies on now because WSI failed to identify these declarants and disclose this evidence during class discovery. *See* Oppo. at 6-11. Had WSI identified and

motion to modify the class definition to exclude eCommerce purchases and purchases by Key Rewards members is DENIED.

## IV. VISUAL CONSPICUOUSNESS.

For an internet contract to be valid, the website (or app) must either place the user on actual notice of the agreement or "put[] a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. Whether a particular website reasonably communicated the existence of the terms is a fact-intensive inquiry that "depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177. As a separate and independent ground to deny the motion, I find that the exemplar pages provided by WSI fail the satisfy the visual conspicuousness requirement to support inquiry notice.[9]

Focusing on "visual conspicuousness," the "factors relevant to our visual analysis of webpages and hyperlinks, such as the location of the advisal on the webpage or the font size, color, and contrast (against the page's background)," *Godun*, 135 F.4th at 709, as well as whether the presence of images and other visual elements that might "draw the user's attention away from the barely readable critical text." *Berman*, 30 F.4th at 856. "Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage." *Id.* at 857. I address these in detail below.

### A.     2016-2018 Pottery Barn Teen Exemplars

#### 1.     Shopping Cart page

On this page, the disclaimer language "by continuing you agree to our <u>term and conditions</u>

---

produced this evidence during class discovery, plaintiffs and WSI would have had the opportunity to develop a more complete record to possibly refine the class definition. The failure to do so, again, lies with WSI. Relatedly, I do not reach plaintiffs' argument that WSI is estopped from enforcing the arbitration agreements considered and rejected by the arbitrator with respect to Perlin's 2016 and 2020 purchases.

[9] For purposes of this analysis, I will assume that WSI's proof adequately demonstrates that the design of each website Shopping Cart, Place Order, Continue, and Submit page across its brands and for the time periods at issue were visually, materially identical to the few exemplars WSI provides.

11

and privacy policy" language is placed immediately above the CHECKOUT and EXPRESS CHECKOUT buttons. Harris Decl., Ex. A. The disclaimer is in small font (much smaller than Shopping Cart above and the highly contrasted CHECKOUT and EXPRESS CHECKOUT action buttons below), is the same color as surrounding text, the terms and conditions are not capitalized, and while underlined, the hyperlink represented by the underlining is not in blue or otherwise color contrasted. Taken together, the design of the disclosure is insufficient to show visual conspicuousness. *See Berman*, 30 F.4th at 857; *see also Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024) (finding visual conspicuousness where "the notice is on an uncluttered page and is not hidden or obscured. The notice is clear and legible, and the hyperlinked phrase "terms of use" is colored bright green—contrasted against the surrounding white background and adjacent black text.").[10]

If that is not enough, the highly clustered nature of the exemplar Shopping Cart page – with side panels showing other items on the side and text beneath showing shipping options – further minimizes the conspicuousness of the "terms and conditions." WSI did not design this page to make the disclaimer – by continuing to CHECKOUT or EXPRESS CHECKOUT that users would be agreeing to WSI's "terms and conditions" – sufficiently visually conspicuous to satisfy inquiry notice.

### 2. Place Order Page

The separate Place Order exemplar provided is better in some ways – it is not as cluttered

---

[10] The district court decisions that WSI relies on in its Reply, finding that black hyperlinked text partly satisfied the visual conspicuousness test, are distinguishable and do not follow the significant holdings of the Ninth Circuit cases on which they rely. *See, e.g., Nail v. Lens.com, Inc.*, 2024 WL 3723912, at *3 (C.D. Cal. June 20, 2024) (relying on *Patrick v. Running Warehouse, LLC*, 93 F.4th 468 (9th Cir. 2024) but also reviewing a relatively uncluttered page and where Terms and Conditions was capitalized); *Slaten v. Dick's Sporting Goods, Inc.*, 2024 WL 1136399, at *4 (C.D. Cal. Feb. 2, 2024) ("Terms Of Use" capitalized and placed by itself directly under Place Order button); *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838, at *1 (N.D. Cal. Aug. 15, 2022) (language immediately under action button that "By clicking See My Rates you agree to the following: to AmOne's Privacy Policy, Terms of Use, and Consent to Receive Electronic Communications."). To be clear, that the hyperlinked "terms and conditions" is not highlighted in a different color – the "customary" blue or otherwise – on each of WSI's exemplars is a significant but not sole reason for failing the visual conspicuousness test. The failure to capitalize "terms and conditions," the size of the font, the placement, and the cluttered design of many of the pages are equally important.

and the disclaimer language is standing alone directly beneath the PLACE ORDER button. Harris Decl., Ex. B. However, the disclosure language is *not* underlined and not capitalized. The fact that the "terms and conditions" is a hyperlink is not visually apparent whatsoever.

The motion to modify the class definition to exclude class member who made eCommerce purchases from 2016 through 2018 is DENIED.

### B.   2018-2020 Exemplars

#### 1.   Shopping Cart

The Shopping Cart exemplar page from this time period suffers from similar issues as the prior exemplar. Harris Decl., Ex. C. The "terms and conditions" disclosure is found beneath the Subtotal information and a disclaimer about gift wrap, above the action buttons, and again in small black font without any color demonstrating the lower cased "terms and conditions" was in fact a hyperlink. The page suffers from an additional significant issue; in addition to the CHECKOUT and EXPRESS CHECKOUT action buttons, there is the VISACheckout button that is highly contrasted and likely to further minimize the conspicuousness of the much smaller font "terms and conditions." The disclaimer on this page is not sufficiently visually conspicuous.

#### 2.   Place Order

The Place Order page is, again, less cluttered than the Shopping Cart page, but the "terms and conditions" remain uncapitalized and in black. Harris Decl., Ex. D. The font size of the disclosure is also smaller than the majority of the text on the page and not bolded. The disclosure is not visually conspicuous.

The motion to modify the class definition to exclude class member who made eCommerce purchases from 2018 through 2020 is DENIED.

### C.   2020 – Present Exemplars

#### 1.   Shopping Cart

The Shopping Cart page exemplar suffers from the same issues identified above ("terms and conditions" not capitalized, the hyperlink in same black font) but also additional ones. Harris Decl., Ex. E. The exemplar page is cluttered with pictures (items selected or related) and the disclosure language is found in a side panel that has a visually prominent "*PayPal* Checkout"

option underneath the CHECKOUT button. In addition, in between those action buttons and the disclaimer language is additional, more eye-catching language offering an "affirm" payment option. Finally, there is additional disclaimer language, regarding the prices of items in the Shopping Cart, beneath the "terms and conditions and privacy policy" language that further obscures the conspicuousness of the T&Cs disclaimer. The disclaimer on this page is not sufficiently visually conspicuous

### 2. Place Order

The Place Order page in use from 2020 to date is improved. Immediately above the "Place Order" sole action button, is the language that "By placing an order, you are agreeing to our Privacy Policy and Terms of Use." The T&Cs disclaimer is now capitalized and the whole sentence directly above the action button. However, it remains in the same smaller font (smaller than any other font in the Order Summary box except the product font) and again in the same black font. The other issues remain with the whole page, with the payment shipping, delivery and payment information, including pictures of the items being purchased, in larger more prominent boxes to the left of the Order Summary box, and a second Place Order action button (with the disclosure language immediately above) but beneath a larger and more prominent opportunity to sign up for "Key Rewards." The disclaimer language on this page does not satisfy the visual conspicuousness test either.

The motion to modify the class definition to exclude class member who made eCommerce purchases from 20202 through present is DENIED.

### D.   Gift Registry Exemplars

The exemplars of the "last steps" required to set up Gift Registries on the related WSI brand sites are in Exhibit G to the Harris Declaration. These suffer from similar issues identified above; the "By clicking on 'Create Registry' you agree to our terms and conditions and privacy policy" are in the same color font, without a color denoting the hyperlinks, and without capitalization. More problematic is that the "CREATE REGISTRY" action button is separate from the disclosure language and located in a separate section of the page with highly contrasted "FIND A REGISTRY" and "MANAGE MY REGISTRY" action buttons. The disclosure

14

1  language is set off to the right, under a section offering information about privacy setting and
2  "Optional Questions." The placement of the disclaimer language is not proximate to the action
3  button to create the registry. The disclaimer language on this page does not satisfy the required
4  visual conspicuousness to find inquiry notice.

5  The motion to modify the class definition to exclude class member who signed up for Gift
6  Registries from 2022 to the present is DENIED.

### E.  Key Rewards

As noted above, a screenshot of the actual **Submit Application** button to sign up for the Visa branded card and Gold Rewards program has not been provided. I cannot, therefore, perform the fact-intensive wholistic review of the design of the process in order to determine visual conspicuousness. Assuming that the "Continue" button that does appear on the screenshot *is* the action that binds consumers to the Gold Rewards T&Cs – of which there is no evidence – the disclosure about acknowledging and agreeing to the Gold Key Rewards Terms and Conditions is in a prior section of the application, above "Important Disclosures" regarding "eligibility, rates, fees, and other costs as applicable" and a more prominent box containing Capital One's annual percentage rate disclosures. Therefore, while the hyperlink denoting the separate Gold Key Rewards Terms & Conditions link has been made more conspicuous by using the customary blue font, the organization of the page – that has a clear focus on the disclosures of the terms of *credit* related to the Visa card as opposed to the terms of the Key Rewards program – does not satisfy the visual conspicuousness standard and does not support a finding that a consumer applying for a VISA, and thereby gaining access to the Gold Rewards level, "unambiguously manifests his or her assent to" the Rewards Terms. *See Berman*, 30 F.4th at 856.

The motion to modify the class definition to exclude class member who signed up for Gold Key rewards through the VISA branded card is DENIED.[11]

---

[11] I do not evaluate Quinn's evidence regarding the Silver Key rewards signup screenshot from 2019 and screenshot from the present, given the failure of proof identified above. *See* Quinn Decl., Exs. B&C.

**CONCLUSION**

For the foregoing reasons, WSI's motion to modify the class definition on the basis of arbitration agreements is DENIED.

**IT IS SO ORDERED.**

Dated: August 18, 2025



William H. Orrick
United States District Judge